**In the Matter of the VALUATION PROCEEDINGS UNDER §§ 303(c) AND 306 OF THE REGIONAL RAIL REORGANIZATION ACT OF 1973.**

**Misc. No. 76–1.**

Special Court,
Regional Rail Reorganization Act.

July 12, 1983.

On Petition for Reconsideration
Sept. 20, 1983.

Frazer C. Hilder, Cary W. Dickieson, Stephen C. Rogers, Howard M. Wilchins, Judith L. Walter, and Christopher J. O'Donnell, U.S. Ry. Ass'n, Washington, D.C., James V. Dolan, Steptoe & Johnson Chartered, Washington, D.C., Wilmer, Cutler & Pickering, Washington, D.C., Peter J. Carre, Washington, D.C., for U.S. Ry. Ass'n.

J. Paul McGrath, Asst. Atty. Gen., and Jane A. Restani, Director Commercial Litigation Branch, U.S. Dept. of Justice, Washington, D.C., G. Joseph King, U.S. Dept. of Transp., Washington, D.C., for U.S.

Stanley Weiss, John C. Heavey, Alexander Cohen, Dean R. May, and Edward Pikus, Carpenter, Bennett & Morrissey, Newark, N.J., for Cent. Jersey Industries, Inc.

Jack M. Zackin, Ravin, Katchen & Greenberg, Roseland, N.J., for John E. Farrell, receiver for The Lehigh & New England Ry. Co.

Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.

*Opinion on Valuation of the Central Railroad of New Jersey and the Lehigh & New England Railway for Nonrail Use*

Table of Contents

| | | |
|---|---|---|
| I. | Introduction | 1278 |
| II. | CNJ's Perception Therory | 1280 |
| III. | Real Estate | 1284 |
| | A. Base Value | 1284 |
| | B. Adjustments to Base Value | 1290 |
| | 1. Title Defects | 1290 |
| | 2. Selling Costs | 1292 |
| | 3. Discount to Present Value | 1294 |
| IV. | Facilities and Other Assets | 1302 |
| | A. Ballast and Fill | 1302 |
| | B. Ties in Track | 1303 |
| | C. Rail and Other Track Material | 1305 |
| | D. Ties in Inventory | 1313 |
| | E. Rail in Inventory | 1313 |
| | F. Other Materials and Supplies | 1314 |
| | G. Miscellaneous Assets | 1315 |
| V. | Equipment | 1316 |
| | A. Locomotives | 1316 |
| | B. Freight Cars and Cabooses | 1319 |
| | C. Outstanding Equipment Obligations | 1321 |
| | D. Other Machinery and Equipment | 1321 |
| VI. | Deductions from Value of Facilities and Equipment | 1324 |
| | A. Winddown Costs | 1324 |
| | B. Liquidation Organization and Disposition Costs | 1326 |
| VII. | Lehigh & New England Railway Co. | 1331 |
| VIII. | Conclusion | 1335 |

PER CURIAM:

## I. INTRODUCTION

This opinion, which can be referred to as the CNJ Opinion, begins where our opinion reported at 531 F.Supp. 1191 (1981) ends. Familiarity with that opinion and our other major opinions, notably the *Constitutional Minimum Value (CMV) Opinion,* 445 F.Supp. 994 (1977), is assumed. While our 1981 opinion is generally characterized by the parties as the *Rail Use Opinion* and this proceeding as relating to nonrail use, and we shall follow this method of description, it is not entirely accurate. The earlier opinion did deal in the main with the valuation of railroads or segments of railroads which had established earning power and would be continued in rail use on that account.

Also, for reasons detailed primarily in Part III of the opinion, 531 F.Supp. at 1210–14, it announced certain conclusions with respect to railroads that would be continued in rail use despite lack of earning power or with earning power but without the prospect of competitive bidding. We deferred the valuation of such railroads to the second phase of the proceeding and referred to "the values that we will determine in the second phase of the proceeding simply as X." 531 F.Supp. at 1213. We also made a number of observations both in the *CMV Opinion* and in the *Rail Use Opinion* which bear upon the determination of X. Broadly speaking, we concluded that for all categories of rail lines, X was the value that could be obtained by sale for the next most valuable use, namely, a break-up of the railroad and a sale of its component parts. We shall call this scrap value, although recognizing that for certain categories of property, e.g., rail, the sale might be for continued use by another carrier in supplying rail service.

When we initiated this phase of the proceeding by our Sixth Pretrial Order of June 12, 1981, it appeared that, despite the earlier settlement by the Penn Central, a number of carriers would be involved. However, as described in the *Rail Use Opinion,* 531 F.Supp. at 1204, we received, on August 5, 1981, an application from the GPs and the Reading Company for approval of a settlement of the claims of the Reading and five other companies for which it was (or expected soon to be) in a position to speak. Settlements were later approved with respect to all of the railroads that had been involved in these proceedings with the exception of the Central Railroad of New Jersey (now, as a result of reorganization, Central Jersey Industries, Inc.) (CNJ), including its interest in the assets of the Raritan River Railroad [1] and the Lehigh & New England Railway (L&NE).[2] We found

that despite CNJ's lack of earning power, "in the absence of the Rail Act, New Jersey would have bought all of CNJ's conveyed properties", 531 F.Supp. at 1379. L&NE conceded that the Tamaqua branch would not have been sold for continued rail use, 531 F.Supp. at 1374. With respect to L&NE's Bethlehem branch, we found that while the Chessie, as an acquirer of the Reading's class (a) lines and of the Lehigh Valley, might have bid for this, there would have been no competitive bidding and that "the sales price would not have been significantly more than the applicable version of X", *Id.*[3]

Even with the scope of the proceeding thus reduced, a formidable record has been compiled. The statements of witnesses and appendices for the CNJ and L&NE comprise 5154 pages; those for the GPs 3368; and 17,435 pages of depositions were taken. The GPs' opening and reply briefs contain 786 pages; the CNJ's and L&NE's 741. Oral argument was heard on March 16 and 17, 1983.

The CNJ presented two theories of its case. Its preferred version was what it terms the "perception theory"—perhaps better described as the "constructive offer" theory. Under this theory CNJ endeavors to reconstruct what would have happened in the real world if the Rail Act had not been passed and its validity sustained, first by us in the *180 Day Appeals,* 384 F.Supp. 895 (1974) and later by the Supreme Court, *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), the former disagreeing with and the latter reversing *Connecticut Gen. Ins. Corp. v. United States Ry. Ass'n,* 383 F.Supp. 510 (E.D.Pa.1974). Alternatively it submitted its own scrap value model, avowedly following the same principles as that of the GPs but unsurprisingly producing quite differ-

---

**1.** CNJ owns 49.9% of the preferred stock and 100% of the common stock of the Raritan River R.R. Under the Amended Certificate of Incorporation, CNJ is entitled to 49.9% of the first $1,981,600 of the value of the Raritan River, and any amounts in excess of that figure.

**2.** L&NE was operated for a number of years as part of the CNJ system. It has relied virtually exclusively on CNJ's arguments in the instant litigation.

**3.** The location of these lines is described at 531 F.Supp. at 1209 and 1373–74.

ent results. The results of the models (in thousands) were:

| | |
|---|---|
| CNJ perception theory | $72,886 |
| CNJ perception theory as adjusted by GPs | $33,169 |
| CNJ scrap value model | $82,441 |
| GPs scrap value model | $22,932 |

We shall first analyze, and ultimately reject, CNJ's perception theory and then take up, category by category, the two scrap value models. While we shall not be able to arrive at an exact figure, we aim to express the governing considerations in sufficient detail that the parties should readily be able to agree on one, or, failing agreement, to submit figures carrying out our decision, with supporting memoranda.

## II. CNJ'S PERCEPTION THEORY

The takeoff point for CNJ's perception theory is the negotiations between Alan Sagner, Commissioner of Transportation for New Jersey's newly elected Governor, Brendan Byrne, and CNJ's Trustee and representatives of its security holders, in the spring and early summer of 1974, which are reviewed in the *Rail Use Opinion,* 531 F.Supp. at 1375–77. CNJ claimed that at a meeting with CNJ bondholder representatives on July 18, 1974, Sagner committed New Jersey to purchasing virtually all of CNJ's properties at a price equivalent to about $100 million for the conveyed properties, and that just compensation required CNJ to be paid that amount.[4] CNJ's legal theory was apparently premised on the argument that "the Transferors' entitlement was to be measured by the indemnity required to compensate for the value of their lost opportunities",. CNJ Opening Brief With Respect to Sales for Rail Use at 4, and that the frustration of the sale to which New Jersey had allegedly agreed was such a lost opportunity. We had no occasion to explore the legal validity of CNJ's theory since we concluded that the evidence did not support its contention "that an agree-

ment had nearly been reached", 531 F.Supp. at 1378. One of the reasons sustaining our factual conclusion that no definite offer was in the immediate offing was Sagner's statement to a representative of the bondholders on July 30 that he had commissioned a further study by L.E. Peabody & Associates and that any proposals he would make would be based on that study, 531 F.Supp. at 1376.

With its argument based on a July 1974 "near agreement" thus having been rejected on the facts, CNJ here makes a similar argument on the basis that the evidence shows an agreement would have been reached in the fall of 1974. It contends that four studies in the State's possession, two of which—the Peabody study and the Hyde study—were commissioned by the State as a result of the discussions in July 1974, established a frame of reference that would have resulted, after further negotiations, in a purchase price in the neighborhood of $72,886,000 for the conveyed properties. This is put forward as a form of the "foreclosed option" principle, *see* 445 F.Supp. at 1012–13, which the GPs have recognized in other contexts. The argument is that but for the Rail Act and the court decisions sustaining it and holding it applicable to CNJ, Commissioner Sagner would have returned to the negotiating table and would have made an offer derived from the four studies, especially the two recent ones he had commissioned. Deprivation of the opportunity to accept such an offer would constitute on this view a taking of property compensable under the Fifth Amendment.

To analyze the argument a bit further, its premise is that if the State of New Jersey had made a firm offer to purchase the conveyed properties and this was rendered ineffectual by enactment of the Rail Act and the decisions upholding its validity and applicability to CNJ, foreclosure of CNJ's right to accept this offer would be a taking

---

**4.** According to CNJ, the tentative offer was for all of CNJ's properties except three parcels of off-line realty and certain court-controlled accounts. Under the terms of the offer, the State was allegedly to assume $94 million in obligations and pay $25 million in cash. 531 F.Supp. at 1376. CNJ translated this into a promise to pay about $100 million for the conveyed properties.

requiring payment of just compensation. The argument then proceeds from this premise to a conclusion that the same consequences should follow if the evidence shows with sufficient certainty that a firm offer of a fixed amount (or falling within an acceptably small range) would have been made but for the intervention of the Rail Act.

As indicated above, we previously found it unnecessary, see 531 F.Supp. at 1378, to consider the legal validity of the premise, namely, that frustration of a firm offer would be compensable, since we concluded that the necessary facts had not been established. The weight of authority is that offers to purchase property under condemnation are not even admissible,[5] much less determinative. However, the reasons expressed for this are singularly inapplicable to the kind of offer posited by CNJ. One is the danger of fabrication; however sound this may be with respect to oral offers, it would have scant applicability to a formal offer bearing the signature of the Governor or other authorized officer of New Jersey. Another argument, that the offer may have been made irresponsibly, without any real intention of consummation, is equally inapplicable to an offer of the sort described. A further objection, lack of knowledge by the offeror, is similarly inapplicable where a state which has been formally studying the question for months makes a firm offer. A final objection, made with respect to persons having the power to condemn, is that the offer may include a premium to avoid the expense of condemnation and the risk of an excessive award. This objection is removed when the court can determine, from the appraisals on which the offeror relied or from other circumstances, that no such element existed. Although it is unnecessary to decide the point, we thus do not

readily dismiss the premise of CNJ's perception theory.

Movement from the case of an actual offer to one where none has been made is a quite different matter. The first issue is one of law. Has a condemnee been deprived of anything for which he is entitled to compensation because of having lost the opportunity to accept an offer which was not but rationally could have been made on the facts available at the time? We find it unnecessary to decide this beyond noting that an affirmative answer would open up possibilities for condemnees that are not to be contemplated lightly. Such considerations suggest that, even if we were to assume arguendo that the question should be answered in the affirmative, the proof that the offer would probably have been made and what it would have been must be clear and convincing. CNJ's perception theory shatters on this rock.

CNJ's evidence with respect to the probability and amount of the State's offer begins with Sagner's requests on July 26, 1974, for two independent valuations of CNJ which are referred to in the Rail Use Opinion, 531 F.Supp. at 1376, and which we shall now discuss in more detail. The first was by the firm of L.E. Peabody & Associates, which had long advised New Jersey on real estate matters. On July 26, 1974, Lee Peabody and William Whitehurst of that firm met with Commissioner Sagner. Lee Peabody later prepared a memorandum of the meeting. This recited that the Peabody firm was to determine the value of the CNJ on the bases of "book value, reproduction value, net liquidation value, and going concern value" and that in doing so it was to "use the Wyer Dick and DeLeuw Cather reports" described below. The Peabody report was submitted on September 23, 1974. While it reported values on the three other bases specified,[6] it concluded that the value

**5.** Sharp v. United States, 191 U.S. 341, 348–49, 24 S.Ct. 114, 115, 48 L.Ed. 211 (1903); United States v. Smith, 355 F.2d 807, 811 (5th Cir. 1966); Liflans Corp. v. United States, 390 F.2d 965, 969–70 (Ct.Cl.1968); Missouri Baptist Hosp. v. United States, 555 F.2d 290, 302–03 (Ct.Cl.1977); United States ex rel. TVA v. 72.0 Acres of Land, 425 F.Supp. 929, 938 n. 3 (E.D.

Tenn.1976); but see Wolff v. Commonwealth of Puerto Rico, 341 F.2d 945, 947 (1st Cir.1965).

**6.** The Peabody study assessed CNJ's book value at $109,439,000, CNJ's reproduction value (reproduction cost less depreciation) at $676,359,000 and CNJ's going concern value at $141,683,000.

most useful for negotiations with CNJ was net liquidation value. This it found to be $113 million as of December 31, 1973, which "should be discounted 20 percent to reflect the elimination of future uncertainties and risks resulting in a value of $90 million." In arriving at this figure the Peabody firm relied heavily on a study of the net liquidation value (NLV) of all of CNJ's assets as of June 30, 1968, made pursuant to Orders 101 and 137 of the CNJ reorganization court by Wyer, Dick & Co. and completed June 12, 1970. This had relied for real estate values on a report made by the firm of Van Horn & Dolan, which had assisted CNJ in regard to real estate matters for many years.

The second study was by James V. Hyde, Jr., Director of the Right-of-Way Division of the New Jersey Department of Transportation. As reflected in a memorandum dated July 24, 1974, the Division was asked to submit within 60 days reports on the value of the CNJ (excluding rolling stock) as an operating railroad in use and at liquidation or net salvage value. The report, consisting of three volumes, estimated the liquidation value of the CNJ's land and trackage at $121,005,000, as of October 1974.

The Wyer Dick study had shown a NLV of $79,654,000 as of June 30, 1968. Shortly after its preparation, New Jersey retained DeLeuw, Cather & Co., which was later to make many studies for the GPs in connection with these proceedings, to review the Wyer Dick study and "to express opinions on the methods and procedures used ... and on the accuracy of the values presented therein." DeLeuw Cather Study, 1 CNJ App. at 80. DeLeuw Cather, with the approval of the State, retained the New Jersey real estate firm of Stack & Stack to review the estimated values of land contained in the Wyer Dick study. Agreeing with some of Wyer Dick's conclusions, and believing others to be too favorable but more to be too unfavorable to CNJ, it concluded that the net liquidation value of the

CNJ as of June 30, 1968, was approximately 15% greater than Wyer Dick's estimates, or, in other words, $91 million. Particularly DeLeuw Cather regarded Wyer Dick's real estate values as too low.

At the trial CNJ undertook to distill from the four studies what New Jersey would have thought the NLV of the conveyed properties would be. It did this through two witnesses, John Van Horn, a real estate expert of long experience who, as stated, had been involved in the Wyer Dick study, with respect to real estate, and Jack Storm, who was Director of Engineering for Snavely, King & Associates, Transportation and Economic Consultants, with respect to other assets. The problems faced by these witnesses were formidable. All the appraisals had dealt with the totality of CNJ's assets. Some of these assets had been disposed of before enactment of the Rail Act and not all of the remainder were designated for conveyance. Other categories had increased in quantity between December 31, 1973 and the conveyance date, April 1, 1976. The methodologies of the studies differed with respect to many important matters. Some discounted the assumed proceeds of sale to present value; others did not. The Peabody study simply trended Wyer Dick's real estate values upward; Hyde made an independent appraisal. The Hyde study made a deduction for title defects; the Peabody study did not. Despite all these problems, Storm felt able to conclude that New Jersey would have perceived the NLV of the conveyed properties in 1974 to be $69,472,000 on the basis of the Peabody study and $72,886,000 on the basis of the Hyde study. As indicated, CNJ urges the $72,886,000 figure, primarily on the basis that Hyde made an independent appraisal of the real estate, whereas Peabody had simply trended Wyer Dick's real estate values which DeLeuw Cather had considered too low.[7] The GPs, while challenging the whole

<hr/>

7. After reaching a determination of the State's 1974 perception of the scrap value of the assets which CNJ conveyed on April 1, 1976, CNJ sought to add still other items. CNJ contends that under its perception approach, it is entitled

to receive payment for the additional costs incurred and for the value of lost benefits foregone between late 1974 and April 1, 1976. CNJ puts these costs and lost benefits at $22,500,000—$14 million for the removal of the New-

concept of the perception case on both legal and factual grounds, retort that if proper adjustments were made, New Jersey's 1974 perception would have been only $33,169,-000.

The GPs mount their factual attack on a broad front. They emphasize that neither Storm nor Van Horn purported to testify what New Jersey in fact perceived; their testimony was limited rather to how Peabody and Hyde would have perceived the value of the assets conveyed on April 1, 1976, and, inferentially, how the State should have perceived this on the basis of their appraisals. They emphasize CNJ's failure to call any New Jersey officials as witnesses. The GPs called Whitehurst to testify that the Peabody study was designed simply to meet Commissioner Sagner's request for a "rough cut" and to supply a "rank order" of alternatives. CNJ answers that nothing in the letter transmitting the Peabody report suggests that it was a "rough cut" and that the authors of the study knew that negotiations would proceed on the basis of NLV and the other figures were included for cosmetic purposes, such as showing that a purchase at net liquidation value would be a good deal for the State. Whitehurst also pointed out a number of serious defects in his firm's study, such as the lack of an independent real estate appraisal, failure to consider the timing of the liquidation process, failure to discount proceeds to be received over a term of years to present value, and failure to take account of potential glut. CNJ responds that this poor mouthing of the report ill comports with what the Peabody

firm said at the time and also that if there are defects, these can be rectified by resort to the other studies, particularly the Hyde Study. Whitehurst concluded that he "would not have advised the State of New Jersey to proceed to set a purchase price on the basis of [the] figure" set forth in his firm's report. Whitehurst Testimony, June 2, 1982, at 7. CNJ answers that this is exactly what the report purported to do, indeed, that what Commissioner Sagner wanted was a floor since he expected CNJ's zealous Trustee, R.D. Timpany, to press for more.[8] CNJ calls attention to a memorandum prepared by New Jersey state officials of a meeting with federal officials in Washington on August 23, 1974, in which Sagner stated that he expected the Peabody report to place a net liquidation value of $70 to $80 million on CNJ's rail properties. The GPs did not call Hyde but relied on an affidavit in which he said that his study was "a preliminary planning study related solely to the transportation activities of the Department of Transportation", which it manifestly was not, and that it "had nothing to do with the acquisition of land through condemnation." CNJ objects to this affidavit as inadmissible hearsay, as it well may be. In any event, while the statement that the report "had nothing to do with the acquisition of land *through condemnation*" (emphasis supplied) is literally correct,. the letter transmitting the report clearly stated that it was an estimate of the liquidation value and also that "the equitable true market value of the present system lies between the Liquidation Value and the Value-in-Use." More impressive are the GPs' at-

ark Bay Bridge; $7.5 million in interest accruals; and $1 million for loss of investment income. CNJ also argues that it is reasonable to expect that the 1974 agreement between the State and CNJ would have provided for a 6% annual escalation in the purchase price of $72,-886,000 reached in the hypothetical 1974 agreement. Such an escalation would add $6,560,-000, and raise CNJ's conclusion as to the total value of its alternative scenario rights foreclosed by the Act to $101,946,000. Insofar as these items do not fall with the collapse of CNJ's perception case, they lie beyond the scope of this proceeding—determination of the value of the conveyed assets as of April 1, 1976. *See*

*CMV Opinion,* 445 F.Supp. at 1041; Sixth Pretrial Order ¶ 1.

8. Whitehurst testified that at the meeting of July 26, 1974, when Sagner requested the Peabody study he stated that:

Mr. Timpany is going to come in with the highest number he can think of and the basis that gives him the highest number. And there is going to be a variety of bases, and we want to know what the possibilities might be as to different bases as part of the overall context of what are we going to do? You know, do we want to get into it or don't we want to get into it?

tacks on the Hyde study, pointing out the use of all sales in the area rather than sales of comparable properties to value real estate, the admitted failure to allow for title defects, and the wide disparity between Hyde's estimate of the values of two parcels retained by CNJ under the Final System Plan and what was actually paid for them by the State.

■ We are left with two conflicting impressions. One is that, on the basis of the appraisals, Sagner would have returned to the bargaining table with an offer which exceeded not only the GPs' presently asserted scrap value figure but the higher scrap value figure we have found. For one reason or another the minds of all concerned in 1974 were attuned to a higher scale. There is, for example, no evidence that in 1974 New Jersey entertained such ideas as that all of CNJ's ties and much of its rail was valueless, largely because of glut, although perhaps it ought to have done so. The other impression is that we have no sufficient basis for finding what New Jersey's offer would have been. For one reason, neither the Peabody report nor the Hyde report gave any satisfactory notion of the liquidation value of CNJ's real estate,[9] as CNJ's expert Van Horn conceded. We cannot assume that the State would have entered into serious negotiations when one of its figures with respect to such a major item was more than 150% of the other. Perhaps there might have been a split-the-difference approach, perhaps New Jersey would have commissioned a new appraisal of the real estate, perhaps something else would have occurred—we simply do not know. While it "has been obvious . . . from the beginning . . . that no amount of effort by counsel and the court will produce a mathematically precise figure of what the estates are constitutionally entitled to re-

ceive and the Government is required to pay" and that "the best for which anyone can hope is a fair approximation", *Compensable Unconstitutional Erosion (CUE) Opinion,* 439 F.Supp. 1351, 1390 (1977), we cannot properly award judgment on the basis of mere speculation. CNJ has simply not met its burden of showing by clear and convincing evidence that, after the Peabody and Hyde appraisals were available, New Jersey would have made an offer at any ascertainable figure, and we therefore need not discuss what the result should be if CNJ had carried its burden on the facts.

## III. REAL ESTATE

### A. *Base Value* [10]

The parties stipulated to real estate base values in all counties except three. With regard to the real estate in Essex, Hudson, and Union Counties, the parties arrived at widely divergent base values. CNJ conveyed approximately 940 acres in those three counties to Conrail. CNJ assigns a base value of $33.4 million to the conveyed real estate in the three counties, while the GPs have adopted a $17.6 million figure.

CNJ and the GPs have used a market data approach to arrive at their estimates. Under this approach, an appraiser attempts to determine the value of the property at issue by inspecting or otherwise determining the characteristics of the parcel of property. The appraiser then examines sales of similar property to come up with the "going rate" for property in the area. CNJ refers to the resulting figure as the "typical property value"; the GPs refer to the result as the "across the fence value". Although some underlying assumptions differ, the two terms describe the same basic appraisal methodology.[11] *See* Hannoch/Heaney Dep-

9. The Peabody Study treated CNJ's real estate as having a December 31, 1973, net value of $62,687,000. The Hyde Study estimated the net value of CNJ's property to be $96,449,000 as of October 1974.

10. By the term "base value" we mean the market value of the conveyed parcels as of the valuation date, April 1, 1976, before adjustment

for title defects, discounting to present value, holding costs, and selling expenses.

11. Although CNJ developed typical property values for most of the conveyed property, it employed an income based valuation in its appraisal of a few of the parcels. In particular, the CNJ appraisers used an income based valuation method to value a tract on the Liberty

osition, January 11, 1982, at 30–31, 2 CNJ App. at 136–37. By adjusting the comparable sales figures to take into account the peculiar characteristics of the subject property and any change in price levels or other circumstances warranting adjustment between the date of the comparable sale and the valuation date, the appraiser hopes to arrive at an accurate estimate of the property's value.

As the use of the term "comparable sales" indicates, the market data approach necessarily involves many subjective judgments on the part of the appraisers. The parties spend many pages in their briefs singing the praises of their own appraisers and attacking the credentials and objectivity of the appraisers who worked for the other side. Because we find fundamental flaws in the assumptions underlying the estimates of both CNJ and the GPs, we do not fully accept either party's estimate of real estate base value.

### 1. CNJ Appraisal

In conducting their studies, the CNJ appraisers, Franklin Hannoch, Jr., and Michael J. Heaney, employed two assumptions that detract significantly from the reliability of their estimates. The first invalid assumption involves the availability of continued rail service to CNJ's conveyed parcels. The parties do not dispute that if a piece of industrial real estate has access to a rail line it is worth more to a potential buyer than one not having such access. The parties did not agree, however, on whether particular parcels would continue to be served by a rail line after the conveyance of the property to Conrail. CNJ's appraisers assumed that all CNJ real estate would continue to be served by a rail line if the purchaser so desired. CNJ contends that

this assumption is necessary to vitiate the unfairness that would result if the government forced CNJ to convey property for the formation of a railroad and then valued the property as if the railroad did not exist. Hannoch/Heaney Deposition, March 24, 1982, at 782, 33 GPs Supp.App. at 228.

CNJ's argument overlooks the fact that, in the conceded absence of proof that the property in question had earning power that would make it valuable for rail use, it is entitled to compensation based on the property's nonrail use value. See Sixth Pretrial Order, Sp.Ct.Rptr. N–35965, at ¶ 1. By assuming continued rail service to all conveyed parcels, CNJ would have us value its property as if the CNJ would continue as a functioning unit, whereas the assumption underlying the nonrail use approach is precisely the contrary.

Our holding does not suggest, however, that none of the CNJ property would ever be served by a rail line. Many parcels are close enough to other northeastern rail lines for the construction of a spur to service the property that would be both economically feasible and desirable. See Peabody Study, Analysis of CNJ Freight Traffic by Line Segment, September 19, 1974, at 77–107, 1 CNJ App. at 307–37;[12] cf. New Haven Inclusion Cases, 399 U.S. 392, 453–57, 90 S.Ct. 2054, 2090–92, 26 L.Ed.2d 691 (1970).

Unfortunately, we are unable to adjust the CNJ figures to reflect continued rail service to some, but not all, parcels. The CNJ appraisers did not consider the rail service potential of individual parcels. They uniformly assumed that each parcel would have continued rail service. Hannoch/Heaney Deposition, March 24, 1982, at 782, 33 GPs Supp.App. at 228. Furthermore, Hannoch and Heaney admitted that the continued rail service assumption had

Harbor waterfront that had been zoned for high density residential use. A few parcels that CNJ appraised for use as parking lots were valued on an income producing basis if no comparable sales could be found.

12. L.E. Peabody & Associates, Inc. conducted an appraisal of CNJ's assets for the New Jersey Department of Transportation between July and September of 1974. As part of its study,

Peabody analyzed CNJ freight traffic by line segment to determine the minimum trackage required to provide freight service to customers serviced by CNJ. The study examined 23 segments of CNJ track totaling 366.4 route miles. In its report, Peabody discussed the ability of other rail lines to service the areas then serviced by CNJ.

played an important part in their valuations, but they were unable to estimate how much their real estate estimates would decrease in the absence of the continued rail service assumption. *See* Hannoch/Heaney Deposition, March 24, 1982, at 741–48, 2 CNJ App. at 311–16.

The other faulty assumption on which Hannoch and Heaney relied relates to topography. A substantial portion of the property in question is old CNJ rights of way. Much of this property contains embankments or depressions constructed to maintain even track levels. The embankments mainly consist of ballast and fill materials. The parties assumed for appraisal purposes that the rights of way would have been stripped of rail, ties, and ballast before sale. The CNJ appraisers went one step further and assumed that, with respect to embankments, the land would be returned to its original contours prior to sale.[13] This assumption was based on the premise that fill materials could be sold on site for a price greater than the cost of removal.[14]

Even if we were willing to assume that fill could be sold, we are unwilling to conclude that the presence of embankments should be ignored in estimating the value of the parcels on which the embankments stand. If a market existed for fill, CNJ still should have considered the side effects of removal. For instance, the CNJ appraisers should have taken into account the difficulty of removing fill from remote, narrow rights of way and the ecological impact of heavy earth-moving machinery on adjacent land.

Removal of all embankments also would be an extremely time-consuming endeavor. Fill could be sold only as a need for it arose in the marketplace. Because removal of all embankments would involve disposal of more than 6.4 million cubic yards of fill, we assume that the market would not absorb the supply of fill within a short period of time.[15] As a result, sale of those parcels containing embankments would be delayed pending the sale of the fill. This delay would translate into lower present values for the proceeds from the sale of those parcels.

Furthermore, removal of fill might hinder the sale of parcels not containing embankments. A buyer might be hesitant to purchase a segment of right of way if he anticipated use of his property by CNJ as a means of access to a parcel from which fill was to be removed. Taken as a whole, these factors indicate that the CNJ's appraisers incorrectly ignored the effect that embankments would have on base values of real estate.[16]

 CNJ's misconceptions with regard to topography and continued rail service signify that its methodology in arriving at real estate values is fundamentally flawed. Hannoch and Heaney admitted that their assumption of continued rail service was an integral factor in their valuation. Hannoch/Heaney Deposition, March 24, 1982, at 772–73, 38 GPs Supp.App. at 200–01. We have stated that we are unable to adjust their figures to take into account any rail service that would have been available. CNJ's erroneous assumption that all real estate with embankments would be restored

13. CNJ's appraisers assumed that depressions would not be filled prior to sale.

14. In fact, CNJ argued that the sale of the ballast and fill would produce $2.3 million in net proceeds. *See* Section IV.A., *infra.*

15. As the GPs point out, and we discuss in Section IV.A., *infra,* CNJ has not presented evidence on the expected demand for fill in the markets that CNJ could have supplied. As evidence that a market existed, CNJ relies on its discovery that Conrail has removed fill from conveyed property. CNJ did not present evi-

dence regarding the use to which Conrail has put the removed fill nor any prices at which Conrail has sold fill. In the absence of more detailed evidence, we must assume that the market would have been slow to absorb 6.4 million cubic yards of fill.

16. Our conclusion that the presence of embankments may have had a negative effect on the value of the underlying real estate is consistent with our finding in Section IV.A., *infra,* that CNJ has failed to produce sufficient evidence to establish a positive NLV for its fill and ballast.

to its original contours has an equally unquantifiable effect on the CNJ estimates.[17] In short, Hannoch and Heaney have cast substantial doubt on the accuracy of their appraisals by basing their work, in part, on two incorrect assumptions.

### 2. GPs Appraisal

Unfortunately, the GPs' valuations suffer from some severe inadequacies as well. One such inadequacy involves continued rail service. As we pointed out in our discussion of CNJ's continued rail service assumption, some parcels might have had continued rail service from other nearby rail lines. *See* Peabody Study, Analysis of CNJ Freight Traffic by Line Segment, September 19, 1974, at 77–107, 1 CNJ App. at 307–37.[18] Nevertheless, the GPs instructed their appraisers to assume that none of the parcels would be serviced by rail. GPs Opening Brief at D–9. Just as the CNJ appraisers were too liberal in assuming rail service to all parcels, the GPs were too conservative in assuming no rail service. The proper approach would have been to determine the accessibility of each parcel from rail lines that would have been proffered for continued service after April 1, 1976, and would have met the tests laid down in our *Rail Use Opinion*.

Another shortcoming of the GPs' studies involves the GPs' choice of comparable sales figures. The GPs instructed their appraisers to consider only sales occurring before April 1, 1976 in arriving at their "across the fence" values. In many cases, sales of property similar to that which was being appraised occurred after April 1. In some cases, Conrail sold the very parcels under examination.[19] The CNJ appraisers testified that they considered all comparable sales in arriving at their figures. *See* Hannoch/Heaney Deposition, January 11, 1982, at 31–32, 2 CNJ App. at 137–38.

The GPs argue that post-April 1 sales should not be considered because they may distort the value assigned to a parcel of real estate. The GPs contend that a purchaser who buys property after the valuation date has at his disposal information not available on or before the valuation date. The price paid for similar property after the valuation date, therefore, does not accurately reflect the economic environment on that date.[20]

---

17. CNJ argues that its "original contours" assumption was an inconsequential factor in its appraisals because most of the land in question was level. As support for its argument, CNJ cites evidence that 92% of its right-of-way acreage in Essex County is level with adjacent property. *See* Simon Testimony, October 26, 1981, Exhibit 2, at 15–16. Using the same sources, however, we find that only 60% of the conveyed right-of-way acreage in Hudson and Union Counties is level with surrounding terrain. *See* Simon Testimony, *supra,* Exhibit 2, at 20–21; Barkan Testimony, October 26, 1981, Exhibit 3, at 15–16. CNJ does not indicate how much of the total appraised value of real estate is applicable to elevated property. It is entirely possible that the rights of way that have the most topographical variances are located in the most expensive areas. In the absence of additional information, we must assume that the use of the "original contours" assumption had a significant effect on CNJ's real estate estimates.

18. *See* note 12.

19. It is difficult to determine what sales the GPs actually relied on, except in individual instances covered in deposition testimony, because they did not file a list of the comparable sales used in their valuations.

20. Another widely recognized objection to the admission of subsequent sales data is that the price paid in any purchase of nearby property after the date of condemnation will have been artificially inflated by the enhancement of land values often brought about by the condemnation. *See United States v. 320.0 Acres of Land,* 605 F.2d 762, 800 (5th Cir.1979). Decisions can be found authorizing exclusion of evidence of such sales. *See United States v. Meadow Brook Club,* 259 F.2d 41, 46 (2d Cir.), *cert. denied,* 358 U.S. 921, 79 S.Ct. 290, 3 L.Ed.2d 239 (1958); *International Paper Co. v. United States,* 227 F.2d 201, 209 (5th Cir.1955); *District of Columbia v. Lot 813 in Square 568,* 232 F.Supp. 714, 719 (D.D.C.1964), *aff'd sub nom. Rubinstein v. District of Columbia,* 346 F.2d 833 (D.C.Cir.1965). The weight of authority, however, has been to the contrary. The possibility that the prices obtained in comparable sales subsequent to the date of the taking have been influenced by the fact of the taking has been held to go to the weight, not the admissibility, of evidence of such sales. *See United States v. 320.0 Acres of Land, supra,* 605 F.2d at 802–03; *United States v. 1,129.75 Acres of*

We find the GPs' reasoning unpersuasive. Although a post-April 1 buyer might have more information at his disposal than a hypothetical buyer as of the valuation date, a buyer of comparable property before April 1 would have less information than the hypothetical buyer. Therefore, we see no reason to assume that pre-valuation date sales have any more merit for establishing the market value of the subject property than post-valuation date sales, unless the latter have been influenced by the condemnation of the subject property. We find that the GPs' appraisers should have considered post-April 1 comparable sales in determining the NLV of CNJ's conveyed real estate.

Just as we find it impossible to rectify the effect of CNJ's erroneous assumptions on its estimate of base value, we cannot quantify the effect that the GPs' misguided instructions had on their real estate valuations. Referring to the issue of continued rail service, counsel for the GPs stated at oral argument, "unquestionably, it has a very significant impact". Transcript at 153. The GPs' opening brief states that the assumption of continued rail service is "a major reason why the base values presented by Messrs. Hannoch and Heaney are so much higher than those of the Government Parties". GPs Opening Brief at D–51.

■ In a similar vein, the GPs did not indicate how much real estate values would have changed had they considered post-April 1, 1976 sales data. The evidence indicates, however, that the CNJ appraisers relied heavily on post-April 1 sales and that the GPs appraisers had available to them many post-April 1 comparable sales with which they could have worked.[21] The net effect of these two errors in the GPs' appraisal methodology is to undermine the credibility of the GPs' real estate values. We therefore cannot adopt the GPs' estimate of $17.6 million as the base value of conveyed real estate in the disputed counties.

### 3. Van Horn Appraisal

Although we find fundamental flaws in the real estate estimates propounded by both sides, we believe that there is an equitable means of arriving at more accurate real estate base values. The evidence indicates that Hannoch and Heaney relied to a great extent on information provided by the appraisal firm of Van Horn & Dolan. From the 1950's until 1978 the Van Horn firm, principally under the supervision of John Van Horn, performed a number of appraisals for CNJ. In 1969–70, Van Horn appraised several individual parcels of CNJ real estate and served as project manager for a complete appraisal of all CNJ's real estate valued as of June 30, 1968. In 1974 and 1975, he supervised another complete appraisal of all CNJ real estate.

Van Horn's association with CNJ did not end with the conveyance of most of CNJ's property to Conrail. Since April 1, 1976, Van Horn (and his firm) has acted as consultant and manager of CNJ's retained real estate, and has performed some services with regard to conveyed real estate. These services have included the preparation of a

---

Land, 473 F.2d 996, 998–99 (8th Cir.1973); United States v. 691.81 Acres of Land, 443 F.2d 461, 462–63 (6th Cir.1971); United States v. 79.39 Acres of Land, 440 F.2d 1190, 1191 (6th Cir.1971); United States v. An Easement and Right of Way, 405 F.2d 305, 308 (6th Cir.1969); United States v. 63.04 Acres of Land, 245 F.2d 140, 144 (2d Cir.1957); see also United States v. Meadow Brook Club, supra, 259 F.2d at 49 (Lumbard, J., dissenting). The condemnation here was unlike those in which property has been taken for a new value enhancing use, e.g., farmland taken for conversion into a highway. The use remained the same; the only value enhancing factor would have been the removal of doubt with respect to continuation of rail

services. Of course, sales taking place many years after the date of the taking would be far less relevant to the determination of a market price on that date than would sales immediately before or afterward.

**21.** Heaney testified that he and Hannoch relied on 34 sales before April 1, 1976 and 27 sales after that date in appraising the real estate in Essex, Hudson, and Union Counties. Hannoch/Heaney Deposition, December 10, 1981, at 115, 33 CNJ App. at 44A. The GPs maintain that more than half of the sales that Hannoch and Heaney used to value Elizabethport Yard and Brills Yard were post-April 1, 1976 sales.

land inventory and maps of CNJ's conveyed property in late 1977 and early 1978.

Between August 1978 and the end of the year, in response to a request from CNJ's counsel, Van Horn updated his previous work to arrive at a nonrail use value for CNJ's conveyed property as of April 1, 1976. CNJ did not use Van Horn's appraisal as evidence of real estate base values. Instead, it commissioned Hannoch and Heaney in July 1981 to perform new appraisals. Van Horn furnished Hannoch and Heaney with work papers containing sales and other component data and maps accumulated by his firm.[22] CNJ has not given any explanation for its decision to change appraisers.

Three aspects of the 1978 Van Horn appraisal recommend it to us, other than Van Horn's long-standing familiarity with CNJ property. First, Van Horn made no artificial assumptions, such as the blanket presence or absence of continued rail service, regarding access to the conveyed property.[23] Van Horn did not assume that the real estate would be returned to its original contours.[24] Finally, Van Horn considered some post-April 1, 1976 sales in arriving at his estimates.[25]

CNJ has long maintained that the Van Horn estimates are unreliable indications of the base value of its conveyed real estate.[26] In its attempt to deny the GPs access to most of Van Horn's study, CNJ referred to Van Horn's study as a "false start" appraisal. CNJ argued that the Van Horn appraisal was hastily performed as a means of arriving at preliminary estimates of real estate values rather than final figures. CNJ contended that Van Horn designed his 1978 update of previous appraisals only to give CNJ's counsel a general indication of the value of conveyed real estate. *See* Objections of Central Jersey Industries, Inc., and Brief in Support Thereof, to Government Parties [sic] Motion of January 19, 1982, to Compel Production of Certain Documents, January 25, 1982, at 5. Although CNJ's brief does not set forth its objections to the use of Van Horn's figures, we assume that CNJ still harbors the concerns stated in its January 25, 1982, memorandum.

CNJ's argument not only ignores the fact that Van Horn's past experience with CNJ's

---

**22.** The GPs contend that Van Horn furnished Hannoch and Heaney with:

(A) the work papers from his 1978 appraisal, which included, as a step in Mr. Van Horn's calculation of liquidation values, the cost to remove abutments and retaining walls; (B) "control sheets" containing valuation section, map and parcel number, municipality, county and street location, acreage and zoning; (C) maps; and (D) comparable sales information.

GPs Opening Brief at D–43; *see* Motion, and Supporting Memorandum, of the Government Parties for an Order to Show Cause Why Central Jersey Industries, Inc. Should Not Be Compelled to Produce Certain Work Papers Relating to Their Real Estate Base Values, January 19, 1982, at 3–7. While not denying that the materials Van Horn furnished to Hannoch and Heaney contained all of this information, CNJ has argued that the GPs should not be granted access to these materials because Hannoch and Heaney only relied on them to determine the cost to remove abutments and retaining walls. *See* Objections of Central Jersey Industries, Inc., and Brief in Support Thereof, to Government Parties [sic] Motion of January 19, 1982, to Compel Production of Certain Documents, January 25, 1982, at 6. In an order giving the GPs access to these materials, Judge Thomsen

reserved any ruling on the admissibility of the contents. *See* Order on Motion of the Government Parties for an Order to Show Cause Why Central Jersey Industries, Inc. Should Not Be Compelled to Produce Certain Work Papers Relating to Their Real Estate Base Values and Objections of Central Jersey Industries Thereto, January 27, 1982, Paragraph 2. CNJ has not objected to the admission of these materials. *See* Third Order Governing Receipt of Written Testimony, Deposition Transcripts and Other Materials in Evidence, November 19, 1982, Paragraph 2.

**23.** *See* Van Horn Deposition, February 16, 1982, at 45.

**24.** *Id.* at 119–20.

**25.** In their brief, the GPs contend that Van Horn relied solely upon data from sales prior to the valuation date in making his appraisals. GPs Opening Brief at D–70. The evidence indicates, however, that Van Horn did consider some sales after April 1, 1976. *See* CNJ Reply Brief at 83 n. *; Van Horn Appraisal (GPs), June 2, 1982, at 5.

**26.** *See* note 22.

property qualified him to perform such an appraisal, but also that Hannoch's and Heaney's work relied heavily on Van Horn's data. Moreover, Van Horn spent five months updating figures he had compiled over a period of several years. By comparison, Hannoch and Heaney conducted their entire appraisal in about four months.

Another factor that recommends the Van Horn figures as accurate reflections of the base values of the CNJ real estate is that the GPs have recognized the Van Horn study as having been based on more acceptable assumptions than the Hannoch and Heaney study. During oral argument, the GPs stated that one way to quantify the effect that the CNJ's continued rail service and topographical assumptions had on the Hannoch and Heaney figures is to compare them with those of Van Horn because the Van Horn study did not make the same misguided assumptions. Transcript at 255. Furthermore, the GPs imply in their brief that they felt that Van Horn was much more qualified to appraise the CNJ property than Hannoch and Heaney. *See* GPs Opening Brief at D–41 to 45.

■ We find that Van Horn's 1978 estimate of the base value of CNJ's real estate in the three disputed counties is the most accurate indication of that property's value. Van Horn was familiar with the property and had appraised the property on several occasions in the past. If he made mistakes with regard to the physical attributes of that property, those mistakes probably infected Hannoch and Heaney's appraisal as well, because of their reliance on the Van Horn work papers. The assumptions used by Van Horn in conducting his study were superior to those used by both the CNJ and GPs appraisers. Finally, the GPs have implicitly recognized that the Van Horn figures have, at least, some validity. We find the base values in the disputed counties to be:

| | |
|---|---|
| Essex | $3,279,800 |
| Hudson | 2,653,700 |
| Union | |
| Elizabethport | 10,162,700 |
| Other | 8,369,000 |
| Total | $24,465,200 |

### B. Adjustments to Base Value

#### 1. Title Defects

The GPs contend that the base value of CNJ's conveyed real estate must be reduced to eliminate the base values of conveyed parcels for which CNJ would not have had marketable title in a nonrail use liquidation of the real estate.[27] The GPs would also deduct the cost, including the cost associated with the delay in receiving proceeds from sales, of bringing quiet title actions for parcels, title to which would be defective but curable. To estimate these adjustments for title defects, the GPs introduced testimony of Paul E. Lacouture, an attorney of considerable experience in real estate titles. He reviewed 102 valuation maps of CNJ conveyed property, representing over 90% of the base value appraised by the GPs, as well as title deeds and other documents in the possession of Conrail.

Lacouture found that CNJ, in assembling its original rights of way more than a century ago, acquired many easements, licenses, and determinable and conditional fees subject to reversion upon cessation of rail use. For all such rights of way, Lacouture concluded that CNJ would have had no title to transfer in a nonrail use liquidation and, thus, this property should be assigned no value.[28] Also CNJ had terminable or limited interests in land in some cases raising title problems which could be cured by quiet title actions. John H. McDermitt, an attorney with thirty years' experience in New Jersey title litigation, testified that quiet title actions for curable defects could be successfully completed in an average of twenty-three months at an average cost of

---

**27.** In arriving at base values, CNJ and the GPs instructed their appraisers to assume that CNJ had fee simple title to all conveyed parcels.

**28.** Lacouture made no further deduction for the decrease in value of the remainder of a larger,

otherwise marketable parcel when a small portion of it was found to have a title defect, even if the unmarketable portion provided frontage or access to the rest.

$5,258. Combining the elimination of sale proceeds where title defects were insurmountable and the cost of cure and delay in receipt of proceeds for lesser defects, Lacouture concluded that CNJ's real estate base value should be reduced by 7.187%.

■ CNJ's principal argument in opposition to a deduction for title defects is that unless reversion of title to any such parcel was imminent as of the valuation date, CNJ as the holder of a defeasible interest in the parcels was entitled to compensation for their full value. The great majority of the title defects uncovered by Lacouture were reversionary interests taking effect on cessation of rail use. CNJ argues that cessation of rail use on the conveyed properties in the absence of the Rail Act was never contemplated and thus that injustice would result if we were to carry our assumption of a nonrail use liquidation to its logical conclusion of divesting CNJ of title to real estate that would in fact never have gone out of rail use. The authorities cited by CNJ support the proposition that where, as a consequence of a condemnation proceeding, a defeasible interest that would otherwise have subsisted indefinitely is extinguished, the holder of the defeasible interest is entitled to compensation as if possessed of an estate in fee simple absolute, *Terminal Coal Co. v. United States,* 172 F.2d 113, 116 n. 5 (3d Cir.1949); *United States v. 635.76 Acres of Land,* 319 F.Supp. 763, 767 (W.D.Ark.1970), *aff'd.,* 447 F.2d 1405 (8th Cir.1971) (per curiam); Restatement of the Law of Property § 53, comment b (1936). The authorities, however, are not apposite since the condition of indefinite subsistence apart from the condemnation is not met. The only prospect of continued rail use of CNJ's lines lay in condemnation by or sale in lieu of condem-

nation to the federal government or New Jersey. Thus reversion of title was neither remote nor speculative: it was imminent unless there was intervention by some authority with eminent domain power and willingness to carry on a losing operation. Where, but for the action of a condemnor, the condemnee's determinable or conditional title to real estate would most likely be lost in the near future, no compensation is required. We therefore eliminate the base values of those portions of CNJ's real estate which would have reverted upon cessation of rail use.[29]

■ CNJ further argues that the GPs' deductions, if permissible, are greatly overstated. Its appraisers testified that less than 3% of the conveyed acreage was subject to title defects, but gave no estimate of the value of this real estate. CNJ also introduced a letter from a New Jersey title insurer who reviewed 10 "representative" title deeds and opined that those merely imposing "restrictions" that parcels be used for railroad purposes and those reserving to grantors a right of reentry might under certain conditions be insurable.[30] While we recognize that the successors in interest of the original grantors may well have disappeared in the intervening century, this does not justify an award to CNJ on the basis of marketable title where it has no title or would have to incur the costs and delay incident to a quiet title action prior to any sale—even though the result is that the GPs will be paying no compensation for certain property that Conrail is using. CNJ did point out, and the GPs conceded, an error of $6,240 in Lacouture's deduction from the GPs' base values. To reflect this correction we will make an adjusted deduction of 7.162% from base value for title defects.[31]

---

**29.** Our decision is in accord with the reasoning of Judge Posner writing for the Seventh Circuit in *Chicago & North Western Transp. Co. v. United States,* 678 F.2d 665, 670–71 (1982), which denied compensation for C & NW real estate held by adverse possession when state law provided reversion to previous owners if such land should cease to be used as railroad right of way.

**30.** The title insurer would inquire first into the disposition of the grantor's adjoining property and would, in any case, require indemnification by the seller.

**31.** CNJ adds a contention that owners of adjoining land who hold automatic reversionary rights would pay some price to remove clouds on their title created by CNJ's former interests. We concur in the GPs' response that no compensation is warranted for any "hold up" price

### 2. Selling Costs

Apart from its general objections to the deduction of selling costs, which we reject in Section VI.B. under the heading "Liquidation Organization and Disposition Costs", CNJ argues that in the ordinary condemnation proceeding employing the "comparable sales" approach with respect to real estate, no deduction for the costs of selling a parcel of real estate would be made. *See, e.g., State v. Brooks,* 152 So.2d 637, 641 (La.App. 1963). However, the GPs insist that where, as here, the sale is of a large tract which must be broken into parcels, the costs of sale must be deducted. We need not encumber this opinion with citation of the GPs' many authorities, since the Supreme Court's opinion in *New Haven Inclusion Cases, supra,* 399 U.S. at 436–37, 90 S.Ct. at 2081, is ample precedent for the deduction of holding and selling costs when railroad property is to be divided and sold over a long period of time.

The GPs estimate the deduction at $3,002,000 as against a base value of $25,166,500. CNJ's figure is only $190,000 as against a base value of $40,093,770. The enormous difference comes from two factors: CNJ contends that the organization it was obliged to retain to sell its non-conveyed properties could have done much of the work incident to the sale of the conveyed properties at no additional expense. It contends also that its own experience in selling its retained real estate indicates that the GPs' estimated selling costs are much too high. We deal with these contentions under the following categories:

(a) Cost of Sales Force.

(b) In-House Disposition Costs.

(c) Surveys, Transfer Taxes, and Attorneys' Fees.

(a) *Cost of Sales Force.* The GPs introduced testimony of Arnold S. Tesh, USRA's Director of Real Estate. Tesh concluded that the most effective method of disposition of CNJ's developable properties would be to supplement CNJ's in-house sales force with a central marketing agent who would develop overall plans and contact and supervise real estate brokers. Tesh thought that the fees of the central marketing agent, including brokers' commissions, together with the expense of the in-house staff would amount to 10% of the gross sale proceeds. Testimony of Eastdil Realty Inc. supported Tesh's 10% estimate for developable properties. This figure is in line with estimates of selling costs in the 1968 Wyer Dick study (up to 10%),[32] the 1974 Peabody study (12½%, including other closing costs), and the 1974 Hyde study (10%). Tesh further testified that sale of abutter properties would have been more difficult, requiring 15% of gross proceeds to compensate independent local brokers and a limited in-house sales force. Sales expenses set any lower than this, Tesh believed, would lead to a slower pace of sale and, with the effect of discounting, would result in a lower figure for net proceeds.

■ We are not persuaded that a figure higher than 10% is warranted for the sale of abutter properties. Perhaps, as the GPs contend, a broker must be more persistent in his efforts to persuade an abutting owner to buy and would demand higher commissions since the amount of each sale is relatively small. At the same time the broker expends no effort or advertising expense in locating his prospective buyer, and this would work the other way. Furthermore, as Tesh conceded, a larger proportion of sales of abutter properties would be made by CNJ's in-house staff. We conclude that no sales force expense greater than 10% should be deducted for any of CNJ's conveyed real estate.

CNJ would have us further reduce the rate of selling expenses in the light of its own experience in selling well over half of its 2000 acres of retained real estate. From

CNJ may have hoped to receive on this account.

**32.** The DeLeuw Cather report called Wyer Dick's total real estate liquidation expenses "much too low", but did so on the basis that

salaries of in-house personnel were computed only for a five year period. DeLeuw Cather did not find fault with the 10% figure for brokerage fees and related expenses.

April 1, 1976, to the end of 1981, according to testimony of John Van Horn, CNJ received nearly $21 million in proceeds of real estate dispositions of retained properties while incurring no in-house expenses and only $455,000 (or 2.17% of gross proceeds) in fees and commissions paid to the firm of Van Horn & Dolan. However, more than $17 million of these proceeds derived from two condemnations by the State of New Jersey (one still in litigation) and a sale to the Port Authority of New York and New Jersey, transactions which the GPs argue are "not representative". In sales to private purchasers, Van Horn's commissions ranged from 6% to 10%, a range that Van Horn testified to be "typical" in sales of vacant land in New Jersey. Lower commissions were incurred with respect to the more expensive properties. While CNJ's experience in disposing of its retained real estate is impressive, this is another instance where CNJ has failed to provide us with an alternative figure to substitute for that supplied by the GPs. CNJ has not shown what proportion of its conveyed properties would, upon liquidation in the absence of the Rail Act, have been condemned by public authorities at little or no selling expense, or how much or how little litigation expense would have been incurred. Without an informed estimate from CNJ, we apply the figure of 10% as the best available calculation of the expense attributable to brokers' commissions, marketing agents' fees, and salaries of in-house sales personnel.

■ (b) *Post-1977 In-House Disposition Costs.* The GPs would have us deduct $3.7 million in "additional management costs" that they estimate would be incurred in completing "the disposition of CNJ's conveyed real estate" in the fourteen years after May 31, 1977, the date by which all facilities and equipment would have been sold. GPs Opening Brief O–19. Discounted to present value, this deduction would amount to about $2.5 million as of April 1, 1976. Testimony of Russell F. Murphy, a consultant and former USRA Director of Financial Analysis, reveals that this deduction reflects the estimated cost of legal, accounting, finance, and personnel depart-

ments attributable to CNJ's conveyed real estate after May 1977, Murphy Testimony, February 16, 1982, at 24, but does not include expenses of the Trustee and his staff, an item for which the GPs concede no deduction should be made, *id.* at 46b n. 3. In setting this amount Murphy sought to avoid duplicating Tesh's calculation of the salaries and expenses of an in-house staff assisting in the sale of real estate included in his deduction of 10% from the proceeds of developable properties and 15% from those of abutter properties. Still, his result is a top-heavy setup of four management departments, in addition to the Trustee and his staff, lingering on for fourteen years to supervise a limited number of in-house personnel charged with assisting CNJ's marketing agent and independent brokers in disposing of a dwindling supply of real estate. We conclude in Section III.B.3, *infra,* that 55% of the real estate would have been sold in the first two years, 85% by the end of the fifth year, and the rest by the end of the eighth year of disposition. We are convinced that ample provision has been made by Tesh for all in-house expenses that would have been incurred by CNJ in disposing of the small balance of its conveyed real estate remaining after the fifth year. The few remaining in-house personnel could surely have reported directly to the Trustee, and their compensation could have been handled by his staff. Murphy's additional deduction for "management costs" through the fifth year is considered and substantially reduced in the portion of the opinion dealing with liquidation organization and disposition costs. All such costs after the fifth year are disallowed.

■ (c) *Surveys, Transfer Taxes, and Attorneys' Fees.* On behalf of the GPs, Tesh estimated that an additional 2% should be deducted from gross real estate proceeds to account for "the seller's customary share of closing costs, such as transfer . . . taxes and closing attorney's fees, as well as the costs of performing surveys, as necessary". Tesh Testimony, February 16, 1982, at 18. CNJ reports that in selling almost $21 million worth of retained real estate it has expend-

ed only $140,000 (or about 0.7% of total proceeds) in legal costs, exclusive of a pending condemnation case,[33] nothing for surveys or title searches, and nothing for transfer taxes. CNJ argues that surveys, like title searches, are ordinarily paid for by the buyer in the New Jersey real estate market, and that transfers by a bankruptcy Trustee are exempt from the 0.35% New Jersey transfer tax. Tesh admitted in deposition that he had assumed CNJ was not in bankruptcy and hence was liable to pay the transfer tax. 2 CNJ App. at 1641. It seems more likely that CNJ would have been in reorganization at the relevant time, and thus would qualify for the exemption granted to transfers by "a receiver, trustee in bankruptcy or liquidation, or assignee for the benefit of creditors" in N.J.S.A. 46:15–10(g) (1982). We find therefore that no transfer taxes would have been incurred, that some of the cost of surveys would have been reimbursed by buyers, that closing attorneys' fees would have been incurred, and that legal fees would have been incurred in connection with condemnation, for a combined deduction of 1% of gross proceeds.

### 3. Discount to Present Value

We here discuss whether the proceeds of CNJ's real estate estimated to be realized after April 1, 1976, should be discounted to their value as of that date, and, if so, by how much.[34] We shall do this under three principal subheads:

(a) Should there be such a discount as a matter of principle?

(b) If so, when and in what amounts would the proceeds of the sale of real estate have been realized?

(c) If so, to what extent is the amount otherwise deductible in order to arrive at the present value of future proceeds offset by appreciation from the appraised values as of April 1, 1976? We shall also deal briefly with related matters such as real estate taxes, other holding costs and interim income during the holding period.

(a) *The Need to Discount.* Admittedly, the normal method of finding the market value of a parcel of real estate being condemned is to determine its "market value" on the date of taking, usually on the basis of extrapolation from sales of comparable parcels. No discount is taken for the fact that in the real world the owner will often spend some months finding buyers and negotiating the best price even if only one parcel is being sold. The typical appraisal methodology avoids discounting by simply assuming that a willing buyer is available as of the date of the condemnation. The cases do not explain why such an assumption is made. Perhaps the matter is regarded as *de minimis,* since the prospective condemnee would often have started his hypothetical quest for purchasers and begun negotiations with them before the actual taking and sale could have occurred almost immediately thereafter. Perhaps the thought is that prediction of the actual sale date for a single parcel is beyond the scope of reasonable estimate. Perhaps it is deemed unfair that an often unwilling condemnee should be penalized for the time it would have taken him to find a purchaser. In any event we have been cited to no instances in which a court has considered the application of a discount in cases of this sort.

Here all parties concede that CNJ could not have sold the more than 3000 acres of its conveyed real estate as one parcel except perhaps to a wholesaler who would have broken up the tract into parcels, such as the bulk buyer hypothesized by the I.C.C. in the

---

**33.** The State of New Jersey has paid into court over $7 million for property taken in 1976 from CNJ in the Liberty Park area of Jersey City. CNJ has litigated this condemnation award, thus far with success, and has not included its considerable litigation expense in the computation of selling expenses as a percentage of gross proceeds.

**34.** The parties have stipulated that whenever a party seeks to apply a risk inclusive discount rate to proceeds figured in real dollars, that rate shall be 9.13% per 12-month period, and that whenever a party seeks to apply a risk inclusive discount rate to proceeds figured in nominal dollars, that rate shall be 15.22% per 12-month period.

remand in the *New Haven Inclusion Cases, supra,* 334 I.C.C. at 60–61; 399 U.S. at 468–73, 90 S.Ct. at 2097–2100.[35] The GPs contend the real estate would have been sold as 364 parcels; CNJ estimates it would have been sold as 962. Both sides agree that the process would have consumed some years, and the GPs argue that the normal implicit assumption of a willing buyer in existence as of the condemnation date is inapplicable. The GPs contend that under such circumstances the proper course is to estimate the amount of sales in each year, add interim income and appreciation if any to the estimated date of sale, deduct taxes, other holding expenses, and selling costs to the same date, and then discount the result to value as of April 1, 1976.

This seems indeed to be the accepted method of appraisal in the case of large tracts of raw land which are proposed to be subdivided and sold. *See United States v. Iriarte,* 166 F.2d 800, 804 (1st Cir.), *cert. denied,* 335 U.S. 816, 69 S.Ct. 36, 93 L.Ed. 371 (1948); *Drakes Bay Land Co. v. United States,* 459 F.2d 504, 510–11 (Ct.Cl.1972); *United States v. 100 Acres of Land,* 468 F.2d 1261, 1266 (9th Cir.1972), *cert. denied,* 414 U.S. 822, 94 S.Ct. 119, 38 L.Ed.2d 54 (1973); American Institute of Real Estate Appraisers, The Appraisal of Real Estate 64–65, 148 (7th Ed.1973); College of the Fellows of the American Society of Appraisers, The Applicable Method for Valuation of Undeveloped Land for Which There Is No Current Market Value, 1975 ASA Valuation 88. A good deal of CNJ's land would have required much time and work to be sold for the projected highest and best uses.[36] As to such land there would seem to be no question that the discounting process

proposed by the GPs is required. The deferral in the receipt of payment is as much a cost as expenditures required to place the property in its highest and best use, which clearly must be taken into account, *see* 4 Nichols, Eminent Domain § 12.3142[1], [2] (Rev. 3d ed. 1981); Norvell, Property, 35 N.Y.U.L.Rev. 1494, 1500 (1960). However, we agree with the GPs that this process should extend not only to the indeterminate amount of land requiring extensive work in preparation for sale but to all CNJ's real estate.

The cases stress that where the taking is of many parcels, the sale of which would stretch over several years, it is inappropriate to make an award on the basis of summing the market values of each on the date of the taking. *See Morton Butler Timber Co. v. United States,* 91 F.2d 884, 888 (6th Cir.1937); *United States v. Cunningham,* 246 F.2d 330, 333 (4th Cir.1957); *United States ex rel. TVA v. Phillips,* 50 F.Supp. 454, 456 (N.D.Ga.1943); *City of Caldwell v. Roark,* 92 Idaho 99, 437 P.2d 615, 617–18 (Idaho 1968). CNJ cites no contrary authority. It relies rather on the statement of its witnesses Hannoch and Heaney, 2 CNJ App. at 19, corroborated by that of Professor Stewart C. Myers, 2 CNJ App. at 1166, that "the value of real estate is created by the anticipation of future benefits and the appraisal seeks to reduce those anticipated future benefits to their present value" and that "[t]he comparable sales utilized in the appraisal process provide a measure of the present value of all anticipated future benefits with respect to the given property which was the subject to the sale." We do not doubt that this is true with respect to what a buyer would pay for

---

**35.** We need not consider this possibility since such a buyer would have demanded a discount to compensate for the time he would have needed to resell the parcels and for other purposes considerably as great or greater than the discount considered here.

**36.** One example is the most valuable single piece of property—CNJ's Elizabethport Yard. This property, a freight and passenger car repair facility, contained 232 acres of conveyed property. In order to prepare the Elizabethport Yard for the industrial use which was

agreed to be the highest and best, four abandoned and uninhabitable buildings would have to be demolished and several obstacles and abutments would have to be removed in order to create adequate access. Similarly, according to Hannoch and Heaney, the highest and best use for several of CNJ's other parcels (such as Ib/26/4 and Ib/26/2) was as parking lots. In order to make even this modest conversion, the properties would have to be cleared, levelled, and given adequate drainage.

any particular parcel; what it ignores is that when condemned property consists of many parcels, the condemnee would not receive the payments until some time after the condemnation date. In other words, the Hannoch-Heaney analysis would be valid only if they had been able to predict that sales prices would have risen sufficiently over their appraisal values to counteract the factor of time lag in receipt of the proceeds. This also is the answer to CNJ's seemingly pertinent question why a parcel in its hands should have a fair value less than it would if owned by another. CNJ owned not simply one parcel but an immense tract incapable of sale as such, and it is chargeable with the time lag necessary to effect the sales of the many parcels in the tract.

Such precedents as there are with respect to railroads support the GPs. The most important are the *New Haven Inclusion Cases,* culminating in the Supreme Court's decision reported in 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970), which, although not condemnation cases, were treated by all concerned as if they were. In these hotly contested proceedings neither the parties, the Interstate Commerce Commission, nor the three reviewing courts, in one of which a member of this court participated, ever questioned that it was necessary to divide the property into parcels, estimate the amounts that would be received over a period of years, and then discount for the time that this would take, 331 I.C.C. 643, 663 (1967). The ICC also followed a practice of discounting in *Chicago & North Western Transp. Co.—Abandonment between Ringwood, IL and Geneva, WI,* 363 I.C.C. 956, 960–61 (1981), affirmed without discussion of this point in *Chicago & North Western Transp. Co. v. United States,* 678 F.2d 665 (7th Cir.1982).

The CNJ advances a special contention with respect to the GPs' applying a discount to the $2,091,220 base value of land in 9 counties where such values were stipulated. The stipulation stated that the figures "represent the market value, *i.e.,* most probable selling prices, as of April 1, 1976, for nonrail use of all the parcels of land stipulated to have been conveyed by CNJ in the counties listed," Sp.Ct.Rptr. N–37753. CNJ contends that the stipulation prevents the GPs from arguing that it would have realized not these prices but only their discounted amounts. However, the stipulation was stated to be predicated on various assumptions, one being:

> the values are the sum of individual parcel appraisals, and the parties recognize that they take different positions as to whether the availability for sale of CNJ's conveyed property (other than the single parcel considered by each appraisal) and/or the property conveyed by the other transferors would have affected the final net realizable nonrail use value of the property covered by this stipulation
> . . . .

Although this qualification seems to have been framed primarily to preserve the issue of glut, the language is sufficiently broad to permit the GPs to argue that the sum of individual parcel appraisals is not the correct measure for any reason, including that here considered.

(b) *The Pace of Disposal.* The GPs presented evidence with respect to the pace of disposal through two sets of witnesses. Four officers of Eastdil Realty Inc., a specialist in real estate and management services, testified with respect to the estimated pace of sales for CNJ's developable properties.[37] Harry A. Wiedeman, a Conrail real estate manager, and Alf Moody, chief real estate appraiser for USRA, determined the pace at which the Transferors' abutter properties could have been sold. The result of their studies is represented by the following:[38]

---

**37.** Developable properties are properties that are marketable generally. Abutter properties are marketable, if at all, only to adjacent landowners.

**38.** Wiedeman and Moody, who testified on behalf of the GPs concerning the pace of disposition of abutter right of way, assumed that a fixed percentage of abutter property would be sold each year. For CNJ properties located in Somerset, Middlesex, Camden, Burlington and Atlantic Counties, it was assumed that 20% of remaining abutter property would be sold each

GPs' Estimate of Pace of Sale of CNJ Real Estate
(in constant 1976 dollars)

| Year | Developable* | 20% Abutter | 15% Abutter | Total | Total % Sold |
|---|---|---|---|---|---|
| 1 | 4,836,598 | 731,909 | 907,217 | 6,475,778 | 26% |
| 2 | 3,786,522 | 585,527 | 771,181 | 5,143,230 | 20% |
| 3 | 2,781,975 | 468,422 | 655,504 | 3,905,901 | 16% |
| 4 | 633,380 | 374,737 | 557,178 | 1,565,295 | 6% |
| 5 | 633,380 | 299,790 | 473,601 | 1,406,771 | 6% |
| 6 | 663,380 | 239,832 | 402,561 | 1,275,773 | 5% |
| 7 | 617,318 | 191,866 | 342,177 | 1,151,361 | 5% |
| 8 | 528,979 | 153,492 | 290,850 | 973,321 | 4% |
| 9 | 447,202 | 122,794 | 247,223 | 817,219 | 3% |
| 10 | 167,943 | 98,235 | 210,139 | 476,317 | 2% |
| 11 | 96,910 | 78,588 | 178,619 | 354,117 | 1% |
| 12 | 96,910 | 62,871 | 151,826 | 311,607 | 1% |
| 13 | 96,910 | 50,296 | 129,052 | 276,258 | 1% |
| 14 | 83,260 | 40,237 | 109,694 | 233,191 | 1% |
| 15 | 17,665 | 32,190 | 93,240 | 143,095 | .5% |
| 16 | 0 | 128,759 | 528,360 | 657,119 | 2.5% |
| | 15,458,332 | 3,659,545 | 6,048,476 | 25,166,353 | 100% |

\* Eastdil Testimony, Feb. 16, 1982 at 41.

Taking the two types of properties together, the estimates were that CNJ would have sold 62% of its real estate in all counties in the first three years and that even after ten years, 7% of its properties would have remained unsold.[39] The effect of applying the stipulated discount of 15.22% over so long a period is to reduce the GPs' estimate of the base value of CNJ's property by almost one-third.

■ CNJ did not offer a timetable of its own but submitted a long list of criticisms of the qualifications and methodologies of the GPs' experts. Although we believe a good many of CNJ's criticisms are well founded, we are satisfied that the GPs' projected time periods are excessive on other grounds.

A good starting point is the ICC's handling of the problem in the *New Haven Inclusion Cases, supra,* 331 I.C.C. at 661. There the New Haven Trustees proposed a six year period for discounting to net present worth, which they recognized as being optimistic. Penn Central assumed that ten years would be required. The Commission adopted the Trustees' figure.[40]

More important than this is the GPs' failure to take account of the fact that CNJ would not have had to wait until April 1,

year. For the CNJ properties located in all other counties, it was estimated that only 15% of inventory would be sold each year.

**39.** These percentages relate only to those CNJ properties that the GPs concluded had positive economic value. The GPs divided CNJ's property into smaller parcels it called valuation units. These valuation units were then categorized as either "major properties," "abutter properties," "developable properties," or "other properties." No value was assigned to valuation units labelled as "other properties" as they were considered unsaleable. Seven per-

cent of CNJ's land in the disputed counties was categorized as "other property."

**40.** The ICC also applied a "discount" to the market value of the New Haven's land "on the assumption that a certain portion of the land would remain unsold at the commencement of the final year of liquidation and full market value would not be realized." 331 I.C.C. at 662. Apparently the word "discount" was there used in the sense of a mark-down to move the properties rather than a discount to reflect the lesser worth of future as against present payments.

1976, to start lining up purchasers. In the *Rail Use Opinion,* 531 F.Supp. at 1311, dealing with properties that would have continued in rail use, we said:

> The process of disposing of rail properties would have begun in February 1973. Studies by acquirers of the properties and negotiations would have taken ten to twelve months, and ICC deliberations would have taken twenty to twenty-four months. Taking into account the possibility of judicial review, the properties would have been conveyed about April 1, 1976.

The considerations underlying that conclusion apply with equal force to the properties here at issue. We find that in the absence of the Rail Act the CNJ Trustee would have continued to negotiate with the State of New Jersey until say November 1, 1974, but that if these negotiations had not culminated in an agreement by that time—an assumption on which the GPs necessarily ask us to proceed—the Trustee would have filed the necessary abandonment applications [41] and begun the planning and negotiations which would be a necessary preliminary to sale. While we recognize that negotiations are hindered by even slight uncertainty whether a seller will be able to deliver, the Trustee could have done much preliminary work. The contrary spectacle, urged by the GPs, of the Trustee sitting on his hands until April 1, 1976, and doing nothing in the way of starting dispositions conditioned on orders of abandonment he was practically certain to be able to obtain, is utterly unrealistic.[42] Taking similar factors into account, Hannoch and Heaney, in the course of explaining why their "market value" approach was advantageous in eliminating such uncertainties as future sales prices and the time of sale, went on to say, 2 CNJ App. at 20 n. *:

However, based on our knowledge of the properties and advice from counsel that we may assume that CNJ would have had an approximately two year period prior to April 1, 1976, to begin marketing activities looking toward sales commencing April 1, 1976, we believe that properties representing well in excess of half of the total values estimated could have been sold on or promptly after such date. (2 CNJ App. at 20).

A second factor is that CNJ would have concentrated its attention on the most valuable parcels. A sale of even 15% of the acreage in Year 1 thus might well involve 35% of the value.

A third common sense observation concerns the exceedingly long time estimated by the GPs to be required for the sale of abutter properties. For reasons explained in earlier portions of the opinion, these properties are difficult to sell in the sense that there are only a few potential buyers; they are sold not by advertising campaigns or by canvassing long lists of companies that might be interested in acquiring property in the area but by direct communication with a handful—often as few as one, two or probably at most three—potential buyers. The paucity of buyers would, of course, have a negative effect upon the price and the appraisal witnesses properly took this into account. But we fail to understand why that factor should prolong the period of negotiation to as long as 16 years; if anything, it should shorten this. As Hannoch testified, "if [the adjoining property owner] is going to buy it, he's going to buy it and if he's not, he's not." 33 GPs Supp. App. at 426. Counsel for the GPs suggested at argument that the sale of this kind of property would require a salesman who would not content himself with a couple of conversations "across the fence" but would cultivate the prospective buyer, go out to

---

**41.** Indeed, CNJ might have filed for abandonment even while negotiating, if only as a bargaining chip.

**42.** In fact, negotiation with the State of New Jersey would doubtless have continued, and might have lessened both the zeal of the Trustee in pursuing other sales and the likelihood of

interesting prospective buyers. But the GPs cannot have it both ways. If, as they argue, the price New Jersey would have paid is to be determined by what CNJ could have obtained from others, the continued presence of New Jersey as a potential purchaser cannot fairly be taken into account as a price depressant.

his home, and drum the advantages of the purchase into him. We do not know whether such hard sell tactics are effective but, if they are, a few years of such treatment would suffice. We suspect that the long periods that have been required to sell abutter properties in the case of railroad abandonments are due to the fact that the probable proceeds hardly merit the effort or to the fact that the properties could not be sold at all.

We conclude that the GPs' efforts at scientific forecasting of the pace of sale are unrealistic and produce incredible results. We think that, taking the above factors into account, a more realistic schedule would be:

> Year 1 – 35% [43]
> Year 2 – 20%
> Year 3 – 10%
> Year 4 – 10%
> Year 5 – 10%
> Year 6 – 5%
> Year 7 – 5%
> Year 8 – 5%

While we recognize that some of the abutter properties would never be sold, sufficient allowance for this has been made by Van Horn's elimination of certain properties as valueless.

(c) *Appreciation.* As indicated, the GPs' theory, which we have adopted, is that if CNJ's parcels of real estate are to be valued at what prospective buyers would have perceived their value to have been on April 1, 1976, a determination must be made as to when these proceeds would have been received, and these proceeds less real estate taxes and other holding costs plus interim income are then discounted back to April 1, 1976. An important item of interim income is any appreciation in the value of the parcels that would have been realized over the value perceived on April 1, 1976. This is particularly clear when, as here, the discount rate is high, reflecting a considerable allowance for inflation. To the extent that CNJ's real estate appreciated in an amount equal to the inflationary component of the

discount rate, that component would be wholly offset.

In their Table 1 comparing their own and the CNJ's nonrail use value of the conveyed properties by asset account and item of expense, GPs Opening Brief at B–7, the GPs, apparently acknowledging this, propose the addition of appreciation of 0–5% per year. However, they do not indicate where they have landed within this broad range and do not make any attempt to quantify it or show any addition for it. The testimony of their expert Eastdil does little to clarify this. At one place Eastdil states:

> In projecting the revenue that the sales of the developable properties would have produced over time, we considered the possibility of price appreciation between April 1, 1976 and the dates of the projected sales contracts.

Eastdil Testimony, February 16, 1982, at 37. However, the immediately succeeding portion of the statement says:

> Such a projection of future appreciation depends largely upon how buyers and sellers perceived future market developments as of April 1, 1976.

The experts concluded that "most of the markets in which Transferor properties were located exhibited no potential for price appreciation during the projected disposition period", *id.* at 38, the only exception being industrial properties in Northern New Jersey (Non-Central Cities), where a 3% annual appreciation rate was used, two of the counties (one stipulated and one contested) where a 5% annual rate was used for commercial properties and a third stipulated county where that rate was used for both residential and commercial use, *id.* Eastdil stated that "[t]he anticipated appreciation to be applied to our sales revenue projections is reflected in the discounted cash flow analysis submitted by other witnesses", *id.* at 39. However, the only example we have found of this is the Wiedeman-Moody study on the abutter properties where, although the authors believed that "[i]n general, once abutter right of way has

---

**43.** This seemingly high figure reflects the large amount of preparatory work that would have

been done in the 15 months preceding April 1, 1976.

been offered for sale, it is not possible to sell the property for a higher price, even at a later date", Wiedeman Testimony, February 16, 1982, at 17, they seem to have applied an Eastdil overall appreciation rate of 2.5% per annum to increase the base values, *id.* at 17–18, as supplemented.

CNJ has done little to help us understand either what was done by the GPs or what it thinks should have been done. It stressed that Eastdil did not investigate what had actually occurred, something literally impossible since the conveyed properties were not offered for sale, but was interested only in "what persons in 1976 are claimed to have expected appreciation to be". CNJ Opening Brief at 277. Beyond that and pages of potshots at various GPs witnesses, CNJ contents itself with a statement of GPs witness Barkan that land values in April, 1976 were depressed, but had "started to move out of that depression in the latter part of the seventies", 2 CNJ App. at 1232, and a statement of GPs witness Von Ancken that 1976 was one of the lower periods in valuation and that since then there had been a tremendous upward push in the value of industrial land in New Jersey. Against this the GPs cite statements by CNJ witness Van Horn that only a small degree of appreciation occurred in the Elizabeth area from 1974 to 1979, 39 GPs Supp. App. at 48E, and by CNJ witness Hannoch that during the latter half of the 1970's "there wasn't a big change in land values in downtown Newark, and in many instances, they were down rather than up", 33 GPs Supp.App. at 137.

Eastdil's method is only a partial method of measuring appreciation for the purpose here relevant. To the extent that otherwise determined base values were factored upward to take account of appreciation as perceived on April 1, 1976, that is well and good but not sufficient. Take, for example, a property whose base value without allowance for appreciation would have been $100,000. If it was estimated to be sold in the third year and it was one of the few cases for which a 5% allowance for appreciation would have been made, it would be assigned a base value of $115,762 and that much appreciation would have been credited. If, in fact, property values actually rose so that its sales price in the third year would be $150,000, the additional $34,338 should be taken into account. Such considerations apply with even greater force where little or nothing was added to base values for appreciation perceived on April 1, 1976.

■ The GPs might answer that even if the answer to our question is "Yes", such recognition is impracticable, since it would involve a revaluation of the inventory of unsold properties at the end of each year. CNJ could reply with Hannoch's and Heaney's caution, cited above, that avoidance of any need for this is one of the great merits of their "market value" approach. We find that, as a matter of judgment applied to the record, 3% per annum should be added to real estate base values to reflect appreciation not taken into account in the GPs' figures.

*Other Factors.* We deal here with three subjects related to holding the real estate during the period required for sale—property taxes and other holding expenses on the negative side and interim income (other than appreciation) on the positive side.

■ (i) *Property Taxes.* Chief among the real estate "holding costs" that would have been incurred annually by CNJ for each unsold parcel were local property taxes.[44] CNJ would become liable for these

---

44. CNJ would have us disregard property taxes entirely on several grounds. First, CNJ argues, local property taxes are already taken into account in arriving at the appraised base value of the real estate. Be that as it may, the taxes still must be paid until the property is sold, and we have determined that the conveyed real estate could not all have been sold on April 1, 1976. Second, CNJ contends that property taxes are· completely offset by interim income from leases running on the conveyed estate, the last of the topics to be considered in this section. With the parties' estimates for both items before us, we can make that determination for ourselves. Finally, CNJ argues that difficulties of proof make both property taxes and interim income impossible to quanti-

taxes when it discontinued rail operations on its properties. For the GPs, Tesh produced a table of average effective tax rates as of April, 1976, in the 15 counties in which CNJ's conveyed properties were located. These ranged from 2½% to 6¼%. Tesh then applied the county-wide rates to CNJ's remaining real estate inventory over the projected period of disposition, keeping effective tax rates level but taking appreciation of the real estate into account. For CNJ, Van Horn made a similar computation, arriving at an overall effective rate of just under 4%, slightly higher than Tesh's overall effective rate. We adopt the GPs' figures.[45]

Two points of dispute remain. First, CNJ would have us reject Tesh's assumption that 1976 property tax rates would have continued without diminution into future years. Tesh introduced tables showing a mixed pattern of increases and decreases in local effective rates from 1973 and 1976 and testified that as of April 1, 1976, higher effective rates would have been predicted. We adopt the compromise position that effective property tax rates would have continued unchanged for the period of real estate disposition. Second, Van Horn noted that some delay could be expected before the local authorities would get around to putting CNJ's properties back on their tax rolls. While that may have been CNJ's actual experience with its retained real estate, it is a minor and unquantifiable item. Accordingly we follow the GPs in computing property tax liability as of April 1, 1976.

■ (ii) *Insurance, Maintenance, and Security Expenses.* The GPs estimate an annual deduction for miscellaneous holding costs of 1% of the base value of the remaining unsold real estate. On behalf of CNJ, Van Horn calculated that for retained real estate such costs had included $50,000 annually for insurance, $1,256 annually for se-

curity, and one-time expenses of about $9,000 for maintenance, alterations, and utilities. Without an estimate of the value of CNJ's retained real estate, we cannot derive from his testimony a percentage comparable to that put forward by the GPs for the conveyed properties. The GPs' figure of 1% per annum is within reason for the many necessary expenses of insuring, protecting, and maintaining unsold properties, and will be deducted from the value of real estate inventory over the disposition period.

■ (iii) *Interim Income.* Tesh, testifying for the GPs, estimated interim income from leases on the conveyed properties at $557,000 in the first year and declining thereafter with the value of real estate sold. Van Horn, using CNJ's inventory of conveyed leases, computed interim income at $778,500 for the first year. All but $38,000 of the difference was accounted for when Tesh explained that he disregarded income from leases that would terminate on cessation of rail operations, and Van Horn explained that he included such income. Tesh's assumption is consistent with nonrail use valuation and thus is the correct one for this case. We resolve the remaining $38,000 difference in the GPs' favor. Their witness used data from the leases in Conrail's possession, while Van Horn relied on an inventory of leases in CNJ's possession.

CNJ disputes not only the initial figure for annual interim income but also the rate at which that figure is applied to declining real estate inventory in future years. Neither party attempted to predict when the individual leased parcels would be sold. Instead, Tesh estimated that interim income would decline in proportion to the value of real estate sold, while CNJ argues that "loss of income from such typical types of railroad leases as crossing agreements would more plausibly appear to relate to the rate

---

fy. Again the parties' estimates, quite close in result, belie the claim.

**45.** In taking appreciation of real estate into account in estimating local property taxes, Tesh adopted the appreciation forecasts of Eastdil for developable properties and Wiede-

man and Moody for abutter properties. Because we have decided that these appreciation forecasts were too low, the real estate tax estimates should be adjusted to reflect the additional 3% annual appreciation mandated by this opinion.

at which acreage is conveyed rather than proceeds received", CNJ Opening Brief at 304 n. *. Once leases contingent on continuing rail use are excluded, however, interim income would follow more closely the value of property than its size. Tesh's methodology for reducing the amount of interim income in years after 1976 is therefore approved.

The absolute amount of all three of these items must, of course, be recalculated to take account of the shorter holding period we have determined.

## IV. FACILITIES AND OTHER ASSETS

### A. *Ballast and Fill*

The CNJ and GPs vary greatly on the value assigned to the ballast and fill material underlying the CNJ's tracks. Based on the testimony of Storm, who has observed the removal of ballast and fill from the CNJ's conveyed lines by Conrail, the CNJ has valued this material at close to $2.3 million. CNJ argues that Conrail's sale of this material demonstrates its positive value and that the CNJ would have had an advantage in marketing these materials in urban New Jersey due to a lack of fill sources in these areas.

Storm valued the ballast and fill by adjusting downward the market price on April 1, 1976 of $1.00 per cubic yard. Storm made a "blanket adjustment" of 70 percent for fill (down to $.30 per cubic yard) and 50 percent for ballast (down to $.50 per cubic yard) to account for any difficulties in removing and marketing this material. CNJ argues that this downward adjustment accounts for all the problems of removal, such as problems of access, compaction of

material, and clearance of trees and brush. Storm's prices for ballast and fill were multiplied by the amounts of these materials that Storm estimated were available under CNJ's tracks (estimated to be 6.4 million cubic yards of fill and 754,435 cubic yards of ballast) to reach a total value of $2,294,000.

The GPs contend that the ballast and fill material has no value. The GPs note that none of the four valuation studies of the CNJ assigned any value to the fill and that only two of these studies, the Wyer Dick study and Peabody study, assigned any value to ballast.[46] The GPs contend that a zero value for ballast and fill is warranted because removal and transportation costs preclude the realization of positive value from their sale. The GPs point out that the narrowness of CNJ's roadbed, the height of the embankments involved, the compaction of the top layer of ballast and fill, and the presence of trees and brush on many embankments would have made removal difficult in many locations.

The GPs also attack Storm's testimony and contend that it is inconclusive with respect to the value of ballast and fill. The GPs argue that Storm's testimony with respect to his observation of removal operations does not show how much fill was removed, who was removing it, what happened to it, or if any price was paid for it. Storm could not testify conclusively that Conrail was paid anything for the ballast and fill removed from CNJ's conveyed lines. *See* Storm Deposition, March 21, 1982, 1246–1262, 35 GPs Supp.App. at 311–26.[47]

■ We agree with the GPs that the CNJ has failed to prove that its ballast and

---

**46.** Wyer Dick valued the ballast of CNJ at $208,000 in its study completed in 1970. In 1974, the Peabody Study adopted the Wyer Dick value for ballast as appropriate.

**47.** Storm's testimony with respect to the five removal sites that he or his associates observed is inconclusive. At the Newark Bay Bridge site and at the parcel near Doremus Ave. and the Passaic River, the only two sites where Storm actually saw removal operations, Storm did not know who removed the fill, what happened to it, or how much Conrail received for it. Storm

Deposition, March 21, 1982, at 1249–51, 35 GPs Supp.App. at 314–16. With respect to the Newark/New York line removal site, Storm relied on the testimony of his associate Plum, who did not know who removed the material, when removal occurred, or how much was paid. Plum also did not know who removed ballast and fill from the EL's conveyed track or how much was paid for it. On a former LV line, Storm testified that he saw the results of fill removal but he did not know what happened to it, or whether it was paid for.

fill had positive value. The testimony of Storm and his associates did not establish why Conrail removed this material or if Conrail was able to remove this material at a profit. The CNJ has also failed to support its assumption that the downward adjustment of the $1.00 per cubic ton takes into account the considerable problems of removing the fill. The CNJ would have faced problems of clean-up after removal and of possible erosion from the removal sites. Storm did not consider these problems in giving this material a positive value. Storm Deposition, April 15, 1982, at 2130–32, 35 GPs Supp.App. at 517–19. We also find it highly significant that none of the four studies gave any value to fill and that two of the studies placed a small value on the ballast while the two other studies found it to be worthless. Because of the inability of the CNJ to present convincing evidence of past sales or specific data regarding the market for ballast and fill in the relevant areas, we conclude that the value of ballast and fill is zero.

B. *Ties in Track*

Another major disagreement between the parties concerns the value of the ties in the CNJ's track. The CNJ contends that its ties have value for rail reuse and for landscape purposes, and it has valued these ties at $5,130,000. The GPs contend that the glut of ties that would have resulted from the dismantlement of the Transferors in the absence of the Act would have made the CNJ's used ties valueless. The GPs also argue that the CNJ overstated the number of ties suitable for rail reuse and use in landscaping.

CNJ conveyed 1,295,155 mainline ties and 641,867 ties in yards and sidings. Of the mainline ties, Storm concluded that 50% were marketable for rail reuse at a net price of $5.00 per tie and that the remaining 50% were marketable for landscape use at a net price of $3.00 each. Of the ties in

yards and sidings, Storm concluded that 50% would be reusable as landscape ties but that only 6,700 would be suitable for rail reuse. Storm based his tie classification upon track inspection, his review of CNJ subsequent tie replacements, and his general experience. He assumed that all ties suitable for reuse would be purchased for reuse.

The GPs assigned no value to ties based on the opinion of their expert Mewhinney. Mewhinney is president of Gillis & Co., one of the oldest and largest marketers of used and industrial ties in the country. Mewhinney testified that the number of ties entering the market in the absence of the Act, which the GPs estimated to be 9.9 million ties, would have flooded the market and prevented the Transferors from realizing any value for their used ties. Mewhinney testified that the used tie market for rail reuse is limited because railroads install new ties in main tracks and cascade their used ties into yards, sidings, and low density lines.[48] Mewhinney also testified that it was his experience that dealing in landscape ties was unprofitable. This testimony led the GPs to conclude that CNJ would have left its ties along its roadbeds because the cost to remove and market them would have exceeded proceeds from sale.

For a number of reasons, we find neither the position of the CNJ nor the GPs to be tenable. With respect to the CNJ's evidence on ties, Storm could not fully explain how he concluded that over 1.3 million of CNJ's 1.9 million ties were fit for landscape or rail reuse. The GPs presented evidence that roughly 86% of these ties were over 10 years old and would not have been considered fit for reuse. Storm also was unable to cite specifics justifying his reliance on track inspections in determining if ties were fit for reuse and failed to provide the criteria he used in assessing the suitability of a tie for reuse.[49] Finally, Storm's conclu-

---

**48.** Cascading is the process of reusing rail, other track material, and ties that are replaced when lines are renovated with new or better quality materials. The replaced material is reused, or cascaded, in tracks having lighter duty requirements.

**49.** The GPs also point out that Storm did not assign any value to the EL's ties for landscape

sion that 1.3 million ties were reusable is contradicted by Mewhinney's testimony that usually only three reusable ties were found in each 39-foot rail section during the dismantlement of track. Mewhinney Deposition, April 8, 1982, at 275, 34 GPs Supp. App. at 174. On the basis of Mewhinney's rule of thumb of three reusable ties per 39-foot rail section, the expected number of reusable ties per mile is 406. If this figure is multiplied by the amount of conveyed main line track (395.8), which would have contained the ties best suited for reuse, the number of reusable ties based on Mewhinney's rule of thumb would have been 160,-756.

The GPs' evidence concerning ties does not fare much better than that of the CNJ. Mewhinney's conclusion that there would be no value for used ties is a result of the assumption that 9.9 million ties of the dismantled Transferors would have entered the market for used ties beginning on April 1, 1976. The GPs, however, cannot maintain that all of these would have been suitable for reuse and flood the market while arguing that only slightly over 10% of the CNJ's ties were suitable for reuse. If what the GPs assert is true with respect to the suitability of CNJ's ties, certainly far less than 9.9 million ties would have been suitable for reuse and actually been fit to market. The GPs also ignore the DeLeuw Cather study for USRA which concluded that there was a substantial demand for used ties in the northeast for rail and other uses. DeLeuw Cather, Development of Standard Usage Salvage Values 23–24, 3 CNJ App. at 418–19. Although this study was undertaken in the presence of the Act, its conclusion undercut the GPs' argument that the market for used ties was so limited that the ties from any one dismantled Transferor would flood it.

Our examination of the evidence on ties leads us to conclude that the CNJ could have sold a limited number of its ties profit-ably. We conclude that the most accurate valuation of the CNJ's ties was performed in 1978 by Rodola, who served as Wyer Dick's project manager for the study of the CNJ's liquidation value. Rodola participated in the inspections of ties in the 1974 RCNLD Study and apparently reviewed the inspection papers in preparing his 1978 valuation of ties. See Storm Deposition, March 18, 1982, at 793–94, 35 GPs Supp. App. at 175–76. He concluded that 162,335 of CNJ's ties could have been sold for rail reuse [50] at a net price of $2.50 per tie. Rodola assumed that 115,453 ties (10% of the remaining ties), could have been sold for landscape use at a net price of $2.00 per tie. The total value for reuse and landscape ties in Rodola's calculations was $636,743.

We find these calculations to be reasonable. The 162,335 ties that Rodola found would be suitable for rail reuse corresponds closely to the 160,756 ties that would be expected during dismantlement if Mewhinney's rule of thumb of three ties per 39-foot rail section is applied. Rodola's figure also is far closer to the 266,000 ties that the GPs found fit for rail reuse than it is to Storm's figure of 524,809. With respect to landscape ties, Rodola's assumption that 10% of the remaining ties could be sold for landscape use is warranted. Storm testified that he was aware of the demand for landscape ties, and the DeLeuw Cather Study for the USRA anticipated a substantial market for the nonrail use of ties. Given the heavy competition from the other dismantling Transferors, the assumption that the CNJ would have been able to sell only 10% of its ties into the nonrail market for ties seems reasonable.

We also conclude that the prices of $2.50 net for rail reuse ties and $2.00 net for landscape ties are reasonable. Based on Storm's testimony, the CNJ assumed a net price for rail reuse of $5.00 per tie and for

use when he served as overall project director of the Wyer Dick study to determine the EL's liquidation value as of 1976.

50. Rodola determined that the CNJ would have sold 174,430 ties for rail reuse and then subtracted from this amount 12,095 ties that had been installed with funds received under Section 215 of the Rail Act.

landscaping of $3.00 per tie without attempting to take into account the effect of the increased supply from the other dismantling railroads.[51] Although we disagree with the GPs' contention that glut would render CNJ's used ties valueless, we conclude that the effect of this increase in supply would be to drive down the prices of used ties. We are also less optimistic than the CNJ about the demand for rail use ties because these ties would not be placed in main lines but only in sidings and light density lines. Rodola's net prices correspond to our estimate of the probable effects of increased supply and decreased demand on the prices that CNJ urges this court to adopt. We conclude that $636,743 is the proper value to be placed on the CNJ's ties in track.

## C. Rail and Other Track Material (OTM)

The CNJ and GPs are far apart on their valuation of rail and OTM.[52] CNJ values this material at $27.6 million; the GPs value it at $16.8 million. This disparity results from disputes over the quantities of rail and OTM to be reused as opposed to be scrapped, the marketability of these materi-

als, and the scrap prices for the rail and OTM not suited for reuse.

### 1. The Suitability of CNJ's Rail and OTM for Rail Use

A substantial difference in the value of rail and OTM is due to the amount of these materials each party classified as suitable for rail reuse. Suitability for reuse is essentially an engineering question focusing on the actual physical quality of the rail to determine if it can be safely and economically relaid. To determine suitability, Storm developed the CNJ's rail classification system based on the table for headwear standards developed by the American Railway Engineers Association (AREA).[53] Storm developed four different classes of relay rail into which rail would be classified, depending upon the condition of the track.[54] His associate, Rodola, evaluated the condition of CNJ's track using headwear data from the Bechtel Study[55] and field notes from his own track inspections and from the inspections of others, including those of Storm. Rodola then classified segments of the CNJ's track based on their condition

51. Mewhinney testified that he sold good quality reusable ties at prices in the $5.00—$5.50 range to railroads during 1973 and 1974. DeLeuw Cather, anticipating that there would be a severe shortage of used ties, estimated the market prices at $6.60 per tie for reusable rail ties and $5.50 per tie for other uses. DeLeuw Cather, Development of Standard Unit Salvage Values, 23–24, 3 CNJ App. at 418–19.

52. The track of a railroad consists of the ballast, ties, rail, and other track material (OTM) formed into a structure on which trains operate. OTM is the material which holds the track together, and it comprises spikes, tie plates, joint bars, bolts, and anchors. Turnouts are switches that divert trains from one track to an adjoining line.

53. Headwear is the wear to the surface of the rail that comes into contact with a train's wheels. The AREA table sets out four classes for use of rail: main line (Class I), branch line (Class II), light branch line (Class III), and yards (Class IV). For each class, the table assigns figures for maximum allowable headwear, both vertically and horizontally, for various weights of rail. The AREA table is a guide for determining the class of track in which a

given rail can be relaid. See Rail Use Opinion, 531 F.Supp. at 1239 & n. 95.

54. Storm's classifications were modifications of the AREA standard. Storm retained the four classes of rail but modified this classification system to eliminate the distinction between heavy and light branch line use. The stipulation of a single price for relay rail eliminated the need to distinguish between the various kinds of relay use. Storm's system also classified track by mile rather than by a specific piece of rail. See Storm Deposition, March 21, 1982, at 1363, 38 GPs Supp.App. at 575.

55. The Bechtel Study was conducted in 1974 by six independent engineering firms for the USRA. The purpose of the Bechtel Study was to provide the USRA with an objective assessment of the condition of the Transferors' properties. During the Bechtel Study, qualified railroad maintenance engineers sampled a seven-rail section (273-feet) of the track structure and right of way every two miles on each main and running track on the Transferors' lines. These engineers recorded the condition of the rails, ties, ballast, surface, alignment, drainage, and vegetation for each sampled section.

into the four categories developed by Storm.

For each of the four track-condition classes, Storm developed a system to determine what percentage of rail of a certain weight would be suitable for reuse. For example, Storm determined that 70% of Class I track of over 130 pounds would be suitable for relay in main line track, 20% would be suitable for relay in branch lines, and 10% would be scrapped. Storm's system also made overall deductions in tonnage to account for track defects, such as engine burn, and a 5% deduction for wear and tear (by stipulation of the parties). *See* Storm, Assumptions for Classifying Rail, August 22, 1978, 34 GPs Supp.App. at 523.

For OTM, Storm assumed that its condition would follow that of the associated rail. If the rail in a particular segment of track was classified as relay quality, the OTM and turnouts in the segment were also classified as relay. There are two exceptions to this classification. First, all bolts, spikes, and rail anchors were assumed to have only scrap value. Second, Storm concluded that turnouts in yards were maintained better than the surrounding track in order to prevent derailments. *See* Storm Deposition, April 14, 1982, 1991–92, 35 GPs Supp.App. at 491–92. For the most part, however, the CNJ's classification of its rail determined the classification of its OTM.

Rather than rely on standards tied to the AREA table for headwear, the GPs developed their own system to classify rail. The GPs' rail classification system did not focus on the engineering question of suitability, but mixed criteria to determine the fitness of the rail with marketing criteria not intended to evaluate the rail based on its condition. The GPs concluded that only rail which was suitable for reuse in main and important branch lines would have been sold for reuse. The GPs concluded that there was no market for any other quality

rail, and they designed their classification system to eliminate all rail that could not be relaid in main lines.

The GPs' first criterion was to eliminate all rail which was less than 115 pounds.[56] The GPs concluded that this rail was too light for main track use and that even though it might be fit for reuse in yards, sidings, and light density branch lines, there was no market for this rail. According to the GPs, rail purchasers would have generated enough rail internally through the process of cascading to meet their needs for yards, sidings, and light density branch lines. The GPs classified all rail in this category as scrap.

The GPs' remaining criteria focus more on the actual condition of the track rather than its marketability. First, the GPs eliminated all rail which did not meet the vertical headwear limits for main and important branch lines under the AREA standards. Second, the GPs eliminated all rail which had been cropped twice. This rail was 36-feet in length and had already been removed twice from the track. Because the GPs concluded that this rail would not be suitable for reuse in main and important branch lines, they classified it as scrap. Third, the GPs focused on end batter—the wear and tear on the ends of rail caused by the wheel as it moves across the gap between rails that exist in bolted rail. The GPs classed as scrap all rail with end batter exceeding ¼ inch.[57]

The GPs' next criterion was controlled cooling. Controlled cooling is a process developed in the 1930's to help prevent internal defects from forming in rails. The GPs concluded that purchasers of used rail for main and branch lines would have insisted that the rail be controlled-cooled. In its analysis, the GPs assumed that all rail rolled before 1942 was non-controlled-cooled and classified pre-1942 rail as scrap.

---

**56.** The GPs, like the CNJ, relied on the Bechtel Study as their source of information on the condition of the CNJ's rail.

**57.** The GPs used the ¼ inch measurement because it is the maximum end batter that the

Federal Railroad Administration allows for Class IV track. Class IV track is capable of carrying trains at speeds of 40–60 miles per hour, which is the appropriate speed for main lines and high density branch lines.

The GPs' final criterion was defects per mile. The GPs concluded that rail with more than two defects per mile per year was not suitable for reuse. The GPs' experts contend that industry standards call for the removal of track with this level of defects and recommend that it not be relaid in main line track. Morgan/Gabriel Deposition, March 29, 1982, at 115–116, 34 GPs Supp.App. at 284–85.

For OTM, the GPs agreed with the CNJ that all bolts, spikes, and anchors should be scrapped. The GPs classified all joint bars as scrap because purchasers would have cropped and welded used rail and not had a need for joint bars. For turnouts and tie plates, the GPs assumed that the CNJ would have had enough reusable tie plates and turnouts to match the quantity of rail that was considered marketable for relay.

The end result of the two different approaches of the GPs and CNJ is that the GPs found far less of the CNJ's rail suitable for reuse. Based on our examination of the different methodologies employed, we conclude that the CNJ's approach is superior. The basic thrust of the CNJ's methodology was to focus on the actual physical condition of the rail based on inspections and the Bechtel data, to classify rail based on that condition, and to determine the percentage of rail within a class that could be reused based on knowledge of CNJ's rail. The GPs' methodology was to begin with the assumption that only rail greater than 115 pounds in weight and that was capable of reuse in main lines and high density branch lines would be suitable. The GPs then constructed criteria to weed out rail that did not fit this mold.

▮ The problem with the GPs' approach is that suitability for reuse, which is essentially a question of engineering concerning the physical quality of the rail, became intertwined with its marketability, which is a separate but important issue. Rather than examining all of CNJ's rail to determine if it was suitable for reuse at some level according to industry engineering standards, such as the AREA headwear table, the GPs assigned the vast majority of rail that is in good physical condition to the scrap heap based on marketability. The CNJ's approach, an engineering analysis of the condition of the rail, was more appropriate to establish suitability for reuse.

There are also flaws in the GPs' methodology. The GPs used only the headwear limits for the main and branch lines in the AREA tables but did not apply the headwear limits from the lower end of the table to determine if CNJ's rail was suitable for use on lines that were not main or high density branch lines. Similar problems exist in the rail length criterion. AREA guidelines permitted use of less than 36-foot length rail in relay, and the Pennsylvania Railroad Specifications for Grading Secondhand Rail recognizes that less than 36-foot lengths are appropriate for relay rail in main line trackage. Morgan/Gunderson Study, January 31, 1979, at III–38, 3 CNJ App. at 427. The GPs assumed that no one would want this rail rather than determining if it is suitable for use. Two of the GPs' other criteria, end batter and defects per mile, are flawed because the practice of cropping rail before reuse would eliminate end batter[58] and many of the defects per mile.[59]

We also find fault with the GPs' controlled cooling criterion. The 1942 cut-off date was based on Morgan's belief that by 1942 all new rail going to Class I railroads was controlled-cooled. Yet, even Morgan conceded that controlled-cooled rail was used well prior to 1942. Morgan/Gabriel

---

**58.** The GPs' expert, Morgan, argued that the end batter criterion is appropriate because end batter could indicate other defects in the rail. We are more convinced by the testimony of Storm, who stated that end batter results from poor joint maintenance rather than poor rail maintenance and can be eliminated by cropping.

**59.** The GPs' data did not show the placement of the defects used to disqualify rail for reuse. Many such defects undoubtedly were located in the end of the rail because the rail joint is the most difficult area of the rail to maintain and contains defects not found in other parts of the rail, such as bulk hole cracks.

Deposition, February 16, 1982, at 94, 3 CNJ App. at 160. There is also no AREA prohibition against non-controlled-cooled rail, but only a recommendation that it be welded separately from controlled-cooled rail. Storm Rebuttal Testimony, June 2, 1982, at 17–18, 3 CNJ App. at 474. Finally, any defects in non-controlled-cooled rail should have appeared well before now.[60] Morgan's testimony shows that most defects would appear before 20 years. *See* Morgan/Gabriel Deposition, March 29, 1982, at 92–93, 3 CNJ App. at 158–159.

For OTM, we conclude that its condition will be the same as the rail it is associated with. If the track and rail in a given segment are in good shape, it follows that the OTM in that segment would have been well-maintained and suitable for reuse. We reach the same conclusion with respect to turnouts, despite CNJ's contention that the turnouts in its yards are in far better condition than the rail it is associated with. The only evidence CNJ produced to support this contention is Storm's testimony that turnouts in yards were in better condition than the poor state of the rail in these areas in order to prevent derailings. *See* Storm Deposition, April 14, 1982, at 1991–92, 35 GPs Supp.App. at 491–92. CNJ never produced any data to substantiate Storm's opinion, such as inspection notes or data from the Bechtel Study, and in the absence of objective verification of his opinion, we conclude that turnouts are in the same condition as the rail with which they are associated. In determining the amount of rail and OTM suitable for reuse, we will use the CNJ's figures, and for turnouts we will assume that the percentage of turnouts and rail suitable for reuse will be the same.

## 2. The Marketability of CNJ's Rail and OTM

The major difference between the parties' values for rail and OTM results from conflicting views over how much of this material would have been marketable. The

CNJ contends that it has proved the marketability of all of its rail and OTM that was suitable for reuse in accordance with the Stipulation Regarding April 1, 1976 Unit Price of Relay Rail and Reusable Other Track Material, Sp.Ct.Rptr. N–37336 ("Rail Stipulation"). The Rail Stipulation provides:

1. The unit price as of April 1, 1976, which is to be applied to all rail found suitable and marketable for relay on main lines, branch lines, or yards and sidings, is $207.50 per net ton.

2. The reuse unit price of other track material consisting of angle or joint bars and tie plates as of April 1, 1976 is $227.50 per net ton.

\* \* \* \* \* \*

5. The parties hereto further agree that this stipulation in no way precludes or prevents the Government Parties from:

(a) introducing evidence concerning the quantities of the transferors' rail that would have been suitable for relay, suitable for reroller, and suitable for scrap purposes;

(b) introducing evidence as to how much of the rail classified as suitable for relay purposes would have been marketable at a relay price in light of the addition to the market of the amount of rail being disposed of by the transferors;

(c) introducing evidence that in transactions where other track material is sold together with relay rail, the price of the other track material per net ton would be the same as the price of the relay rail.

6. Likewise, this stipulation in no way precludes or prevents the transferors from introducing evidence contrary to the Government Parties' evidence referred to in paragraph 5.

According to the CNJ, the Rail Stipulation places on the GPs the burden of showing that rail suitable for relay use would not have been marketable.

---

**60.** The value of controlled-cooled rail is largely in the elimination of transverse defects. Such defects are more likely to show up early in the life of the rail. Morgan/Gabriel Deposition, March 29, 1982, at 91–92, 3 CNJ App. at 157–58.

The GPs contend that they have shown conclusively that the only rail that would have been marketable for reuse is the rail suitable for reuse in main and important branch lines. Morgan testified that rail purchasers would have generated enough rail that was suitable for use in yards, sidings, and light density branch lines through cascading when they replaced main line rail. Morgan/Gabriel Testimony, February 16, 1982, at 13–14. As a result, the only rail these purchasers would have been interested in is rail for main or branch lines. CNJ's rail already in yards and sidings would be in no better, and possibly in worse condition, than the cascaded rail of the purchaser. Applying this marketing criterion, the GPs eliminated as unmarketable all rail under 115 pounds, all non-controlled-cooled rail, and all rail that had been cropped twice because this rail would not be used on main lines or important branch lines. The GPs do not acknowledge the existence of a market for CNJ's rail that is suitable for reuse in light density branch lines, sidings, or yards.

After the GPs presented their evidence on marketability, the CNJ attempted to rebut this evidence with testimony of Storm. Storm concluded that demand exists for lighter rail based on evidence (1) that cascading of rail could not be expected to satisfy demand for lighter rail; (2) that Class I railroads had very substantial quantities of lighter rail in track; and (3) that the rail replacement standards of many carriers permit the use of light rail. The CNJ also points out that DeLeuw Cather concluded that lighter weight rail could be sold [61] and that the Missouri-Pacific continued to relay rail as light as 90 lbs. in all classes of its tracks. *See* Morgan/Gunderson Study, January 31, 1979, at III–34 to –36, 3 CNJ App. 424–26. Based on this evidence, the CNJ contends that it has shown that all of its rail suitable for reuse would have been marketable.

CNJ's final contention on marketability concerns fairness. CNJ contends that the Rail Stipulation recognized that there are numerous grades of rail relay and that the CNJ was not required to limit its claims to rail suitable for use in place of new rail. The stipulation price reflected an average price (less than what the CNJ would have proven for its best relay and more than the price for its worst relay) designed to simplify computation but not meant to alter the attractiveness of the lesser-grade rail to potential buyers by pricing it higher. According to the CNJ, the GPs are trying to deprive it of the bargain worked out in the Rail Stipulation by allowing it a low price for its best rail while denying it any compensation at all for lesser-grade rail. The CNJ contends that the Rail Stipulation requires compensation at the agreed price for its lesser-grade rail to balance out the lower price it agreed to for its best rail.

Determining the marketability of the CNJ's heavier rail is not difficult. For rail over 130 lbs., the parties agree that all of this rail suitable for reuse would be marketable.[62] Nor do the parties disagree substantially over the marketability of the 130–lb. rail that is suitable for reuse. The major differences stemmed from the GPs' elimination of all rail that was non-controlled-cooled or that contained more than two defects per mile per year as unsuitable for reuse. We have already rejected these

---

61. DeLeuw Cather reached this conclusion in a report to determine the net liquidation value of a portion of the Rock Island. The Rock Island's relay rail being considered for reuse weighed between 110 and 119 lbs. Report to the Southern Pacific Transportation Company on the Net Liquidation Salvage Value of the Missouri-Kansas Division—Chicago, Rock Island and Pacific Railroad Company, Volume 1—Facilities, November 25, 1977, at 29.

62. Of the rail 131 lbs. and over, Morgan and Gabriel classified 23,231.2 net tons out of a total of 26,526.2 net tons as suitable and marketable for reuse. Storm classified 22,939.38 net tons out of a total of 25,558.67 net tons as suitable and marketable for reuse. The difference results from Storm's decision to abandon in place all rail in grade crossings whereas Morgan and Gabriel assumed it would be recovered. Because we find the CNJ's methodology on suitability to be superior to that of the GPs, we conclude that Storm's figure is the appropriate one to use on rail weighing over 130 lbs.

contentions of the GPs, and we conclude that there would have been a substantial market for this rail because its heavy weight would have made it attractive to purchasers for reuse in any class of track, including main lines.[63] We therefore adopt the CNJ's conclusion with respect to the amount of 130–lb. rail that would be marketable for relay.[64]

A more difficult issue is the amount of the CNJ's lighter rail which would be marketable. We agree with the GPs that there would have been virtually no market for this lighter rail. The GPs presented substantial testimony that railroads would not have been interested in the CNJ's lighter rail, which weighed from 70 to 100 lbs., because of the overwhelming use of heavier rail on main and important branch lines. *See* Morgan/Gabriel, June 2, 1982, at 7. Cascading of rail from these lines would have fulfilled the demand for rail to be relaid in light density branch lines or sidings. There also would have been substantial amounts of heavier used rail generated by the dismantling Transferors which would have been available to rehabilitating railroads for use on these lines that would have further lessened the need for CNJ's light rail.

We also find that Storm's testimony with respect to the marketability of CNJ's lighter rail is unconvincing. Storm's testimony that there is a substantial amount of lighter track in use and that the engineering standards of railroads allow its use does not

prove that railroads would buy this type rail but only that they bought this rail in the past and consider it acceptable. The main examples Storm gave of purchases of light rail showed a limited demand for rail weighing between 110 and 115 lbs. and not a demand for rail weighing 70 lbs. to 100 lbs. *See* GPs Opening Brief at H–32.

■ Finally, we reject the CNJ's fairness argument that the Rail Stipulation requires compensation for its lesser grade rail at the stipulated price. The language of the Rail Stipulation is clear that the issues of both marketability and suitability could be contested by the GPs, and the GPs properly presented evidence that this lighter rail was not marketable. Neither the letter nor the spirit of this agreement was violated. We hold that none of the CNJ's rail weighing 100 lbs. or less would have been sold as relay.

■ With respect to OTM, we conclude that the amount which CNJ would have sold is determined by the amount of rail sold. If a railroad purchased relay rail it would have desired the OTM necessary to install the purchased rail. We conclude that purchasers would have desired used tie plates and turnouts in the quantities needed to install with the rail [65] but would not have purchased angle bars or joint bars, because these are not needed in laying continuously welded rail.[66] For example, because the CNJ has proved that 89.8% of its rail weigh-

---

**63.** The CNJ contends, based on its analysis of rail replacement rates, that as much as 75% of all track is non-controlled-cooled. *See* CNJ Reply Brief at 164. Because engineering standards discourage the use of controlled and non-controlled-cooled rail together, the availability of non-controlled-cooled rail would have presented railroads a unique opportunity to upgrade this kind of rail in their tracks. CNJ also presented substantial evidence showing that there would be a substantial demand for high quality relay rail to replace worn-out rail due to the general deterioration of the American railroad system in recent years. *See* Storm Rebuttal Testimony, June 2, 1982, at 8–9, 3 CNJ App. at 466–67.

**64.** It is difficult to determine from the record the exact amount of 130-lb. rail that the CNJ

would have sold. We have calculated that Storm considered 16,930.178 tons of 130-lb. rail to be suitable and marketable for relay.

**65.** Both sides agreed that bolts, spikes, and anchors should be valued at scrap because this OTM would have deteriorated from wear or have been damaged during dismantlement.

**66.** Morgan and Gabriel for the GPs and Storm for the CNJ all agreed that the purchasers of CNJ's rail would have relaid this rail as continuously welded rail. Because the rail is welded, there is no need for angle bars or joint bars to hold the rail together. The CNJ failed to produce any convincing evidence that angle bars and joint bars would have been marketable separate from the rail with which they were associated.

ing over 130 lbs. is marketable and suitable, an equivalent percentage of the total amount of tie plates and turnouts associated with the over 130-lb. rail should be valued as marketable and suitable.

■ We also conclude that the CNJ failed to prove that joint and angle bars could have been sold for reuse separate from the rail they were taken from. Storm made a judgment that such a market existed, but he was unable to provide any basis for his judgment. Storm Deposition, April 14, 1982, at 1974–75, 35 GPs Supp.App. at 478–79. A more reasonable judgment is that railroads could have generated the limited number of angle and joint bars needed to repair their jointed rail track through cascading. We hold that all of the CNJ's joint and angle bars should be treated as scrap.

### 3. Summary of Conclusions on Suitability and Marketability

We will not attempt to calculate the exact amounts and values of rail, OTM, and turnouts that we have determined would have been purchased. The determination of value is left to the parties to be calculated in accordance with this opinion. To summarize, we have concluded that the CNJ correctly determined the amounts of rail weighing 130 lbs. or greater that would have been sold at the relay price. We conclude that all of CNJ's rail weighing less than 130 lbs. should be valued as scrap (the price of scrap is discussed *infra* at Section IV.C.4.) For OTM, the amount of tie plates associated with the rail which would have been purchased for reuse should be valued at the reuse price. Angle bars, joint bars,

bolts, spikes, and anchors should be valued at scrap. For turnouts, the turnouts accompanying rail purchased for reuse should be valued at the reuse price; the remainder should be valued as scrap.

The reusable rail and OTM should be valued at the prices set forth in the Rail Stipulation. We reject the GPs' contention that they have proved that OTM and rail would have been sold together at $207.50 per ton.[67] The GPs' experts testified that OTM and rail generally are sold together at the same price, yet they also stated that prices vary widely and that each sale is unique. Testimony of Mauro, Michaels, and Kovalchick, October 26, 1981, at 9–10, 4 CNJ App. at 732–34. This testimony is too inconclusive to warrant not using the stipulation price. To value turnouts, the parties should apply the incremental reuse values that both sides have agreed are appropriate. *See* Morgan/Gabriel Testimony, February 16, 1982, at 25; Testimony of Shannon, Meyer, Storm, Dunn, October 26, 1981, at 6–7 (submitted on behalf of EL).[68]

### 4. Scrap Values

The final issue in valuing rail, OTM, and turnouts is to determine a price for the material to be scrapped. The CNJ determined scrap prices by averaging quoted market prices for the various classes of scrap for the first six months of 1976. CNJ obtained its quotes from *Iron Age*, a weekly publication of steel prices, and each unit price reflects the average of twenty-six quoted prices. The result of the CNJ's methodology was to price scrap rail of random lengths at $84 per ton, scrap rail two

---

**67.** The Rail Stipulation did not preclude the GPs from "introducing evidence that in transactions where other track material is sold together with relay rail, the price of the OTM per net ton would be the same as the price of the relay rail."

**68.** The valuation of turnouts is more complicated than the valuation of rail use and OTM. First, the rail and OTM in turnouts was classified for reuse or scrap in accordance with the classification of the rail they were associated with. Then, an excess (or incremental) value for the additional material in the turnout was

calculated because the unique items in turnouts exceed in weight and cost the equivalent length of track material which they replace. The amount of excess weight and cost varies according to the weight of the rail and the size of the turnout. These incremental materials (the excess of materials in turnouts over materials in equivalent length of track) are valued at 75% of cost. These values are found in Appendix B of Storm's Testimony Concerning the NLV of the LNE, October 26, 1981, 3 CNJ App. at 453.

feet and less in length at $96 per net ton, and scrap OTM and turnouts at $86 per ton.

The GPs' price for rail was determined in a multistage process. Ralph Michaels, an expert on the scrap metals industry, conducted research on the nature of the scrap market and the grades of scrap metal which could have been recovered from rail properties.[69] Dr. James Kneasfey analyzed the effect of glut on the scrap market for the GPs. Based on his analysis of historical trends in the scrap market, Kneafsey concluded that for each 1% increase in the supply of primary grades of ferrous scrap, there would have been a .5% decline in scrap prices. George T. Mauro used prices in the first three months of 1976 to determine a base price for scrap of $76 per net ton for rail and $85 per net ton for reroller rail. Mauro then applied Kneafsey's formula using the GPs' figures for the quantities of scrap that would have been generated by the dismantlement of other Transferors. Mauro concluded that the price of rail would have dropped to $71 per net ton and the price of reroller rail to $79 and $80 per net ton.

The analysis of scrap prices presented by the parties presents numerous problems. The methodologies of both the CNJ and GPs contain serious flaws. The most serious flaw in the CNJ's data is its failure to account for the effect of glut in the scrap market caused by the dismantlement of other Transferors. This flaw is mitigated to some extent because the effect of glut obviously is not as great in the scrap metal market as it would be in other markets for railroad assets, such as in the market for reusable rail or for locomotives.[70]

The GPs' methodology also is flawed. Their model did not include any data on the export market even though it accounts for a substantial portion of the total market. The GPs also did not consider any sales to scrap dealers in their model because these dealers resell scrap to end users. The GPs' failure to analyze the demand of scrap dealers ignores the possibility that these potential purchasers may have wanted to beef up their inventories of scrap.

Another serious problem in the GPs' methodology stems from their rail classification system. The GPs' rail classification system overstated the amount of rail from CNJ and the other Transferors that would have been scrapped. Mauro relied on these overstated figures to determine the impact of glut on prices in the scrap market caused by the dismantlement of the Transferors' lines. Although we cannot determine the exact effect on the GPs' scrap price caused by overstating the amount of rail that was to be scrapped, the obvious effect would be to lower the scrap price calculated using the GPs' model.[71]

 Neither of the scrap prices presented is without flaws. We conclude, however,

---

**69.** All of the GPs' witnesses relied on the *American Metal Market* to find prices for scrap. Michaels testified that this publication is the most authoritative source of scrap steel prices and that the vast majority of scrap merchants rely on it. Michaels' Testimony, October 26, 1981, at 5.

**70.** The GPs make other criticisms of the CNJ's methodology. The GPs contend that the use of *Iron Age* instead of the *American Metal Market* caused the CNJ to set their unit prices $4 higher than the GPs. Neither side, however, really explains the difference in prices or attempts to prove which one is correct. The GPs also contend that the CNJ's use of scrap prices for the three months after April 1, 1976 inflated the price for scrap.

**71.** The CNJ makes other criticisms of the GPs' approach to determining the scrap price. CNJ argues that Kneafsey's model ignored that the Transferors may have enjoyed a distinct advantage over other scrap sources because of the large quantity of uniform grade scrap that the dismantlement process would generate. Kneafsey gave no consideration to the fact that the Transferors' scrap may be easier to gather than other kinds of scrap. Kneafsey Deposition, April 15, 1982, at 53, 3 CNJ App. at 28. The CNJ also points out that there were scrap shortages in 1972 and 1973 and that some sources anticipated that these shortages would recur later in the 1970's. *See* Hearings: Ferrous Scrap Export Controls Before the United States Senate Committee on Banking, Housing, and Urban Affairs, 93 Cong., 1st Sess. 273 (1973) (statement of Paul B. Akin, President of Laclede Steel Company, on behalf of members of the American Iron and Steel Association).

that the CNJ's methodology is less flawed and sets a fair price for scrap rail, OTM, and turnouts. The GPs' methodology simply is open to question on too many fronts. The CNJ's methodology was straight forward, and that it did not take glut into account is not fatal given that the effect of glut in the scrap market would not be as pronounced as it would be in other markets for the assets of dismantling Transferors. We also note that the price of No. 1 railroad heavy melt, expressed in constant dollars, ranged from $73.343 to $168.99 per net ton during the period from October 1973 to April 1976. See Kneafsey Testimony, February 16, 1982, Table 1, 3 CNJ App. at 9. The price on April 1, 1976 was $89 per net ton. The CNJ's figures are in the lower end of the range of prices for iron scrap during the relevant time period, and we hold that the CNJ's scrap prices should be used in determining the value of rail, OTM, and turnouts that would have been scrapped.

### D. *Ties in Inventory*

The CNJ had approximately 190,000 [72] new ties in its inventory, and the great majority of these ties were at tie treatment plants rather than at CNJ facilities. The CNJ contends that the liquidation value of its new tie inventory is equal to their cost, which is $1,723,172. The CNJ argues that no deductions should be made from this amount because no costs would be involved in selling ties that were already at treatment plants.

The GPs, based on Mewhinney's testimony, valued the CNJ's untreated ties at 75% of the prevailing raw materials price for ties in the Northeast and treated ties at 75% of the prevailing market price for new ties. The value arrived at is $866,732,

which is $856,440 less than the inventory value. The GPs' lower value for ties stems from several sources. Mewhinney testified that railroads would not have been willing to disrupt normal purchases to obtain ties from the CNJ, which would limit the CNJ's market. The GPs argue that the untreated ties needed prompt treatment to avoid deterioration, which would force the CNJ to accept below market prices. The GPs also argue that shipping and handling costs would have driven down the realizable value both for treated and untreated ties. The effect of these factors was a greatly reduced value for ties.

We conclude that the value for new ties falls between the figures of the two parties. The CNJ cannot realistically say it would have incurred no costs whatsoever in disposing of these ties, yet we find it unreasonable for the government to argue that deductions are warranted for shipping ties to be treated when the vast majority of ties are located at treatment plants. We also find it unreasonable to assume that railroads would have had no interest in the CNJ's ties out of a desire not to disrupt normal supply channels. The precarious financial state of most railroads would certainly have made them interested in potential bargains on ties. Our compromise is to value the CNJ's ties in inventory at 85% of their costs.[73] This reduction in price should account for the CNJ's selling and disposition costs as well as any reductions in price necessary to sell the ties. We hold that the ties in the CNJ's inventory are worth $1,464,696.

### E. *Rail in Inventory*

The CNJ valued the rail in its inventory at $813,400. The CNJ assumed all rail listed in its inventory as relay would sell at the

---

**72.** The CNJ had 173,390 untreated cross ties and 1,559 untreated switch ties in its inventory. Approximately two-thirds of these were located at the Kerr-McGee treatment plant in Avoca, Pennsylvania, with the remainder at a yard in McAllisterville, Pennsylvania. The inventory also contained 12,265 treated, unused cross and switch ties stored in CNJ's warehouses. *See* Morgan/Gabriel Testimony, February 16, 1982,

Exhibit 4, at 7–8. (Report by Mewhinney Concerning Marketability of Reuse Ties).

**73.** The GPs reduced the base price of the CNJ's ties by 25% to account for all costs associated with disposition. As stated, we found this deduction to be too high. Our 15% figure reflects our approximation of a more realistic figure for the disposition costs of these assets.

stipulated relay price, and it priced all rail listed as scrap in its inventory at the scrap price. The GPs valued all of this rail as scrap, contending that it was all secondhand rail of mixed sizes and weights that would not be purchased for reuse.

■ Due to a lack of evidence on the fitness of this rail for reuse, we hold that all of it should be priced as scrap. Neither side inspected this rail to determine its actual suitability for reuse. Storm merely assumed that all rail listed in the inventory by linear feet was relay and that rail listed by ton was scrap. He had no basis for this assumption because he did not inspect the rail. Storm/Dunn Testimony, March 19, 1982, at 894–95, 35 GPs Supp.App. at 230–32. All of this rail had been removed from the first position. There was also evidence that some of this rail was: (1) of odd lengths, see CNJ Workpaper 000390, 35 GPs Supp.App. at 562; (2) less than 130 lbs. in weight, see id.; (3) lying out alongside the CNJ's track, Storm/Dunn Testimony, March 19, 1982, at 903, 35 GPs Supp.App. at 239; and (4) specially drilled, see id. at 897, 35 GPs Supp.App. at 233. This evidence compels the conclusion that the rail should be valued at scrap. We conclude that this material has a net liquidation value of $275,248.[74]

### F. Other Materials and Supplies

Outside of its new tie and used rail inventory CNJ also has a number of other asset accounts that have been grouped together under the name "Other Materials and Supplies." This category mainly consists of CNJ's inventory of replacement parts for its equipment and used OTM and turn-

outs.[75] CNJ assigns a value of $1,537,585 to these assets, while the GPs argue for a value of $888,400.

The CNJ appraisers arrived at their figure by taking the book value of the other materials and supplies accounts and making a 40% across-the-board reduction. CNJ argues that the replacement parts easily could have been sold to the parties purchasing used CNJ equipment. With regard to OTM, CNJ contends that the GPs are bound by the prices they stipulated for OTM.[76] CNJ maintains that the government should value used turnouts at 75% of their cost to be consistent with their valuation of CNJ turnouts located in track. Finally, CNJ contends that it has anticipated any problems in marketing the remaining materials and supplies in its arbitrary 40% reduction of book values.

The GPs rely on their appraisers' detailed analysis of the asset accounts at issue. They contend that CNJ, rather than taking the time to conduct an individualized study of the accounts, adopted an arbitrary and unsupportable reduction in value. The GPs also refer to evidence that railroads rarely buy used parts from other railroads and that any sales would be expensive to consummate. After making adjustments for the difficulty of sale and the lack of demand for individual asset categories, the GPs appraisers' estimate of the aggregate value of CNJ's other materials and supplies came to about 35% of the book value of the asset.

We accept the GPs' premise that other railroads would be hesitant to purchase replacement parts from the CNJ. The GPs

---

**74.** It was unclear from the record how much rail was in the CNJ's rail inventory. We concluded this amount was 3276.76 net tons, and we valued this material at $84 per net ton. If this amount is incorrect, we are certain that the parties will make an adjustment for our error.

**75.** In their efforts to value the other materials and supplies accounts, both the GPs and CNJ relied on an inventory listing provided by CNJ with the help of its auditors, Haskins & Sells. The GPs discovered several inaccuracies in the inventory listing and would have us infer from those mistakes that the entire listing is tainted

and the result of creative accounting. Because of the insignificant dollar amount of the errors the GPs discovered, the absence of an alternative inventory listing, and our general agreement with the values the GPs propound, we need not consider the GPs' challenge of the inventory.

**76.** Because the stipulated value of the OTM in inventory exceeds the book value of that asset, CNJ adopts the book value as its base value. CNJ's estimate of value of OTM is $171,219.68 greater than the GPs' figure.

have presented sufficient evidence to indicate that the practice within the rail industry is to purchase such parts at the time new equipment is acquired. Even if purchasers of CNJ locomotives were willing to purchase the corresponding replacement parts from CNJ, we find that they would not have paid much more than the scrap value of those parts. We also find the GPs' particularized approach preferable to CNJ's arbitrary 40% reduction in establishing the NLV of the remaining assets in the other materials and supplies category.

■ Turning to OTM inventory, we need not consider CNJ's contention that the GPs' valuation of OTM in track should apply with equal force to OTM in inventory. These stipulated values only apply to OTM that is sold for reuse. As we indicated in our discussion of OTM and turnouts located in track, these items could have been sold for reuse only to the extent that the corresponding rail would have been sold for reuse. Because we hold that the rail inventory would have been sold as scrap, OTM inventory must receive a scrap value as well. We also see no inconsistency in the GPs' valuation of the turnout inventory. Accordingly, we adopt the GPs' estimate of the value of other materials and supplies.[77]

## G. Miscellaneous Assets

### 1. General

We have grouped within this category office furniture and equipment, police and fire equipment, and other miscellaneous items. CNJ argues that these assets have an aggregate value of $107,000. CNJ did not provide testimony as to the value of the individual items in its inventory or as to how much of its $107,000 figure is attributable to Police and Fire Equipment and how much to Office Furniture and Equipment.

The GPs have estimated the value of the assets to be $20,573. The GPs' figure consists of $18,117 for Office Furniture and Equipment, and $2,456 for Police and Fire Equipment. CNJ values most of these assets by taking their value as listed on its books and reducing that amount by an arbitrary figure to reflect any difficulties that it would incur in selling them. For the most part the arbitrary adjustment is a deduction of 40% of the book values of the assets. While recognizing that the GPs take a particularized approach to these assets, CNJ contends that the GPs failed to inspect physically the assets to arrive at a reasonable NLV. The GPs counter that they were unable to take physical characteristics of each asset into account because CNJ provided a list of these assets without any description of their condition or whereabouts. In addition, the GPs point out that the CNJ has requested $50,000 for assets which it has not even listed.[78]

■ Under Paragraph 2 of the Sixth Pretrial Order we required each Transferor "to file a statement by July 15, 1981 identifying and describing with particularity each asset transferred pursuant to the Rail Act which has not been the subject of an inventory stipulation and for which the transferor claims nonrail use value." We hold that with respect to the miscellaneous assets, CNJ has failed to comply with the Sixth Pretrial Order. While CNJ did provide an inventory listing for these items, this list is so lacking in essential details as to be of no use in any meaningful appraisal. In fact, virtually no descriptive information is set forth in the CNJ inventory list. In many cases there is no indication whether the desks, tables, chairs, and other furniture were made of wood or metal. There is also no way of determining the age, model, size,

---

**77.** In arriving at its estimate of the value of CNJ's other materials and supplies, the GPs concluded that many of the assets could have been sold only for scrap value. Because of our holding above relating to the price of scrap steel on April 1, 1976, an adjustment of the GPs' valuation will be necessary. We trust that the parties can agree on the amount of any required adjustment.

**78.** CNJ argues that it should receive compensation, estimated at $50,000, for such items as "pictures, prints, framed paintings and other railroad memorabilia". CNJ requests payment even though "it was not feasible to further pursue valuation" of these assets or to give an item-by-item breakdown of this account.

or condition of the typewriters, calculators, adding machines, air conditioners, space heaters, and other mechanical equipment listed. Therefore, we accept the GPs' valuation of these assets.

### 2. Signals and Communications

CNJ argues that signals and communications assets are worth $110,000. The GPs set the value of this category of assets, which includes freight locomotive radios, vehicular radios, and copper wire at $27,000. We find the GPs' analysis to be more credible and, therefore, adopt their figure.

■ A large part of the dispute between the parties results from differences as to the net value that should be assigned copper wiring that would be removed from these assets and sold separately. Storm estimated the cost of removal and disposition of this wire at 25% of gross value, resulting in a figure of $23.00 per wire mile. Storm/Dunn Deposition, March 19, 1982, at 970, 35 GPs Supp.App. at 253. Wyer Dick used a $30.00 per wire mile figure to calculate the same kinds of costs as of 1968. The GPs on the other hand conducted a detailed analysis of the procedures and costs involved in removing and disposing of these assets which we adopt.

## V. EQUIPMENT

### A. Locomotives

According to both the GPs' and CNJ's valuation, locomotives represent by far the most valuable equipment account. Unfortunately, there is a wide discrepancy between the parties' respective figures. CNJ has valued the locomotives at approximately $7.9 million and the GPs have valued them at approximately $3.3 million.[79]

The fundamental explanation for this discrepancy is the parties' disagreement over how many of the 78 locomotives conveyed by CNJ would have sold for rail reuse or, alternatively, for scrap. Both CNJ and the GPs agree that CNJ could have sold at

reuse prices its twenty high horsepower diesel road locomotives built in 1965 and 1967. The parties disagree, however, with respect to the remaining 58 locomotives which CNJ owned and conveyed, all switchers built between 1939 and 1953. Of these 58 units, CNJ contends that 32 would have been sold for reuse and 26 at about twice scrap value for their usable parts. The GPs, on the other hand, assert that they would have been marketable only at scrap prices.

In reaching their conclusion the GPs have assumed that only yard locomotives less than 15 years old would have been sold for reuse. Although CNJ has gone to great lengths in its briefs to attack the validity of this 15 year "breakpoint," such an approach is not particularly material because the 58 units in question were considerably older than 15 years. Rather, the appropriate inquiry is whether CNJ could have sold for reuse any of its locomotives which in 1976 were between 23 and 37 years old.

The GPs assert that CNJ's older units would not have been marketable for reuse for three basic reasons. First, they contend that the older locomotives have been superseded by a "second generation" of diesel-electric locomotives built during the mid-1960s, and that by modern standards the older units are "technologically crude." GPs Opening Brief at K–9. Second, they contend that in 1976 there was a substantial surplus of locomotives due to a severe decline in traffic since 1973. Third, the GPs argue that wholly apart from the alleged surplus, as of April 1, 1976, the market would have been flooded by the release of the many locomotives not needed for the proffered lines of Penn Central, Erie Lackawanna, and Reading Railroads.

Although the parties disagree about whether the new "generation" of locomotives was built during the early or mid-1960s and whether it should properly be considered a "second" or "fourth" generation, it is clear that a new and better breed

---

**79.** Both figures represent the valuation prior to deduction of outstanding equipment obligations.

of locomotive did come on the market sometime in the 1960s. It is also clear that CNJ's 58 older units lacked many of the technological refinements found in the more modern models. Among these refinements were turbochargers, improved wheel slip control, solid state controls, alternators in place of direct current generators, improved traction motors, etc. CNJ does not seriously dispute that these refinements represented improvements in operating performance, reliability, and maintenance.

It is CNJ's position that by failing to consider that new technology may be incorporated into older units, the GPs have overstated the impact of technological development on the value of CNJ's older fleet. Although it certainly is possible to retrofit the older units with much of the most recent technology, it is doubtful that such a possibility would have significantly enhanced the value of these 58 units in 1976. Assuming that advanced technology can be successfully incorporated into older units to the extent that CNJ contends, there is little reason to believe that its 58 switchers would have been attractive candidates for a retrofit program. The expense of technological improvements is most sensible in units with a substantial service life remaining, and this dispute concerns CNJ locomotives built from 1939 to 1953. The life expectancy of switchers such as CNJ's is not clear; a CNJ witness gave the national average age of yard switchers as something in excess of 30 years. In the light of the limited nature of yard work, we find that the life expectancy of the CNJ yard switchers was 30 years. The average service life of a road switcher would be somewhat less.

The CNJ units built between 1939 and 1942 would have been between 34 and 37

years old in 1976 and would have been near the end of their service life. The switchers built between 1950 and 1953 would have been between 23 and 26 years old, and would have had about one quarter of their useful years remaining. Units that old are not likely candidates for retrofit, but even if they were, the competitive position of the CNJ units was poor. CNJ owned no locomotives built between 1954 and 1964. Even if any of CNJ's 58 locomotives could have been modernized for reuse, they would have had to compete not only with comparable units, but also with the many newer units owned by other Transferors. In terms of reliability and maintenance, CNJ's units would not have compared well with the younger models.

The GPs' second contention is that a "substantial surplus" of locomotives existed in 1976 due to a simultaneous decline in traffic and increase in size of the national equipment fleet. Although CNJ's reply argument misses the mark,[80] the GPs' showing with respect to the alleged surplus is inadequate. As evidence of the surplus, the GPs merely observe that in 1975 originated tonnage and freight train miles had declined from 1973 levels while the number of freight cars and locomotives had increased by about 1%. Although originated tonnage levels reflect freight car requirements to some extent, and freight train miles reflect locomotive usage, the GPs' statistics do not reflect any clear trend in the industry.[81]

The GPs further argue that the alleged surplus is demonstrated by the fact that new locomotive acquisitions in 1976 were considerably lower than the preceding three years. The market for used locomotives does not necessarily parallel that for new

---

**80.** To rebut the claimed locomotive surplus, CNJ asserts that in 1973 there was a "dire shortage of railroad equipment." CNJ Opening Brief at 417. However, the discussion and quotations in its accompanying footnote indicate that the shortage was of freight cars, not locomotives. *Id.*

**81.** As the GPs observe, originated tonnage did decline from 1973 (1,532,165,000) to 1975 (1,395,055,000), while the number of freight cars increased. 36 GPs Supp.App. at 175, 177.

In 1976, originated tonnage increased slightly (1,406,732,000), and the number of freight cars dropped by an amount greater than the overall 1973–1975 increase. *Id.* The GPs also point out that freight train miles declined from 1973 (468,992,000) to 1975 (402,557,000), while the diesel-electric fleet grew about 1%. In 1976 freight train miles increased (424,571,000), and the size of the diesel locomotive fleet dropped by 1.6%. *Id.* at 176, 177.

locomotives; the evidence shows that installations of new locomotives have increased in certain years when installations of used units were declining, and vice versa. *See*, e.g., figures for 1962–1963, 1973–1974, and 1975–1976, 36 GPs Supp.App. at 179.

The GPs note that the market in which CNJ's locomotives would have been valued would have included not only CNJ's units, but also locomotives of Penn Central and other Transferors. The GPs contend that the proper approach in calculating alternative scenario nonrail use values is to follow a so-called "residual scrap model" and "price the property remaining in rail use by looking at a market affected by the simultaneous scrapping of all properties that would be withdrawn from rail use." They argue that as of April 1, 1976, the market would have been flooded with used rolling stock released by the other Transferors, and that potential buyers would have had their choice of good equipment at bargain prices.

An accurate assessment of the market effect of the Transferors' disposition of all properties withdrawn from rail use would require a detailed analysis of the amount, time and pricing of such dispositions. The court has heard no such evidence, but the difficulties of proof do not mean that the GPs' point should be ignored altogether.

The GPs have asserted, and CNJ has not attempted to rebut, that Penn Central, Erie Lackawanna, and Reading would have released some 1,652 locomotives not needed for their proffered lines. They further argue that, when combined with the units released by the other Transferors, this supply might have risen to 2,291 locomotives. Although the figures may be somewhat inflated, a lesser supply would have had a significant effect on the marketability and value of all rolling stock—especially older units such as CNJ's.

CNJ has failed to address the question of market demand. It assumes marketability for reuse with respect to all models, but makes no serious attempt to identify potential purchasers who might have paid the prices which CNJ suggests. The other Transferors would have had enough old units of their own for yard use. Certain railroads in the south or west might have been interested, but even if that market existed, CNJ's units would have had no competitive advantage.

■ The four EMD SW1 switchers built between 1939 and 1942 and two EMD NW2 switchers built in 1942 would have been between 34 and 37 years old in 1976. They had very few, if any, years of useful service remaining in 1976. With only 600 (SW1) and 1000 (NW2) horsepower, these units were underpowered by current standards. The Wyer Dick study made in 1968 for CNJ appraised these units at scrap value; it is not plausible that in 1976 a purchaser would have paid a reuse premium for any of them.

■ In the next category are fifteen EMD SW7 and SW9 switchers built between 1950 and 1952. These 1200 horsepower units were between 24 and 26 years old in 1976. In 1968, when these units were sixteen to eighteen years old, Wyer Dick found that they could have been sold for a total of $333,000, or $22,000 each. CNJ now contends that eight years later, with other bankrupt railroads abandoning many of their lines, these same units would have been sold for $60,000 each. That figure is unreasonable. We find that the valuation of CNJ's diesel locomotives and freight cars contained in the 1968 Wyer Dick study (Account 52) is credible and entitled to considerable weight. Prepared pursuant to orders from the CNJ reorganization court, the study was carefully executed—taking over two years and 2900 hours to complete and supported by thousands of pages of detailed workpapers. Each of CNJ's locomotives and freight cars was individually evaluated. This study represents the most thorough evaluation of CNJ's equipment in the record. While the Wyer Dick study placed its primary emphasis on age when evaluating CNJ's locomotive fleet, the study also considered such factors as usage, potential for rebuilding and the condition of major components in making its evaluations. Weighing all factors, we find that eleven units built in 1951 and 1952 would have sold for reuse at Wyer Dick's price of $22,000 each.

The four built in 1950 would only have been sold for scrap.

■ CNJ also owned eleven EMD GP7, 7P road switchers built in 1952. Wyer Dick determined in 1968 that there was a resale market for them at a price of $30,000 each. CNJ's contention that in 1976 they could have sold for $90,000 each is not reasonable. The GPs argue that all would have been sold for scrap. We find that six of the eleven switchers would have been sold for scrap, and the other five could have sold for $30,000 each over a period of time.

■ CNJ owned 26 ALCO RS2 and RS3 road switchers built between 1950 and 1953. For a variety of reasons, these were among CNJ's least desirable models. First, ALCO ceased domestic production in the late 1960s, making replacement parts difficult to obtain. Second, the unrebutted testimony of GPs' witness George P. Leilich shows that ALCO units are "significantly more expensive to maintain and operate than comparable locomotives" such as EMDs. Third, CNJ's own witness (Dunn) stated that EMD models are preferable to ALCO models because "they're better built, crews like them better and maintenance practices over the years have shown that the EMDs are less costly to maintain." Dunn also conceded on cross-examination that these 26 ALCO locomotives would have been cannibalized for spare parts rather than sold for reuse, 35 GPs Supp.App. at 152. Finally, the Wyer Dick study valued these units at scrap in 1968, and there is no reason to conclude that over the course of the next eight years these locomotives had become any more attractive to a purchaser for reuse. They should be valued at scrap.

■ The twelve high powered EMD SD35 road freight locomotives built in 1965 could have been sold for reuse. CNJ contends that the twelve locomotives were worth approximately $2.9 million; the GPs' figure is just under $1.6 million. Wyer Dick's careful study appraised these locomo-

tives at $2.18 million. We adopt its conclusion.

■ The final category embraces eight MD SD40 road freight locomotives built in 1967. The parties agree on marketability for reuse but differ on price. The CNJ valuation is approximately $2.16 million; the GPs' figure is $1.25 million. These 3000 horsepower locomotives, CNJ's newest and highest powered units, were unquestionably the fleet's single most valuable model. The Wyer Dick study appraised these locomotives at $1,971,000, a figure considerably closer to CNJ's valuation than the GPs'.[82] It represents the best choice under the circumstances.

## B. *Freight Cars and Cabooses*

After locomotives, CNJ's 753 conveyed freight cars and cabooses represent the next most valuable equipment account. CNJ contends that 257 of its cars (including 29 cabooses) would have been sold for reuse, and that the conveyed fleet should be valued at $2,085,000. The GPs argue that only eleven cars (those fifteen years old or less in 1976) would have been sold for reuse, and that the conveyed fleet should be valued at $937,000.

The GPs contend that in the absence of the Rail Act the market would have been glutted with used rolling stock withdrawn from service by the other Transferors; they assert that Penn Central, Erie Lackawanna, and Reading would have released some 55,-040 freight cars not needed for their proffered lines and that, combined with the units released by the other Transferors, the supply might have risen over 77,000. Although the court does not adopt these figures, the problem of market glut in the absence of the Rail Act cannot be ignored.

The GPs also argue that CNJ's conveyed equipment was undesirable to other railroads because of its advanced age, high maintenance cost, and poor reliability. This is supported to some extent by the evidence that CNJ's conveyed freight cars were in

---

**82.** The Wyer Dick figure of $1,971,000 is also in line with the $2,066,664 average of the valuation estimates provided by Silcotte, Jenkins and Bennett.

the worst condition of any of the Transferors.

The normal life expectancy of boxcars, gondolas, and hoppers is 30 years; apart from the cabooses, this dispute primarily concerns 224 cars between nineteen and twenty years old in 1976. On the basis of age alone, these units are not too old for reuse.

CNJ's strongest argument is that in the mid-1970s there actually were numerous sales of freight cars older than fifteen years at prices in excess of scrap. CNJ has produced data showing that from 1973 to 1976, some 700 freight cars about thirty years old were sold for reuse. The majority of the cars sold were gondolas, and the prices ranged from $2,100 to $4,600. The GPs have not challenged the accuracy of these data.

Although CNJ's market data indicate that some of its older cars would have been marketable for reuse in 1976, CNJ's appraisal does not take into account the fact that its equipment would have been competing in the market with equipment of other Transferors; for this reason a substantial downward adjustment is necessary.

■ The first category contains 46 boxcars built between 1956 and 1957. CNJ has introduced evidence of sales for reuse of some 700 older freight cars, but none of those cars sold were boxcars. Solvent railroads would have been especially hesitant to purchase used boxcars or flatcars because during the previous decade the trucking industry had permanently captured much of the traffic formerly carried in cars of that type. The lack of usefulness of this type of car is further evidenced by workpapers contained in CNJ's appendix concerning sales of freight cars. The vast majority of sales catalogued were of gondolas. Only sixteen boxcars were mentioned. Four of these were sold for scrap, and one was sold for only $2500.00. The eleven sold for reuse were not only considerably younger than the boxcars conveyed by CNJ, but had been extensively modified for coil aluminum service. See 3 CNJ App. 835–39. The CNJ boxcars should be valued at scrap.

■ CNJ conveyed 51 gondolas, of which 47 were built in 1957 and four were built in 1965. The GPs do not dispute the marketability of the four newer units. CNJ's contention that there was a reuse market for the older units is buttressed by two important facts. First, CNJ has produced a substantial amount of market data showing sales of used gondolas from 1973 to 1976. In most cases, the units sold were ten years older than CNJ's were in 1976. Second, both the Wyer Dick and DeLeuw Cather studies classified CNJ's gondolas for reuse and assigned them the highest unit value of any car in its fleet ($5,330 and $4,185, respectively).[83] On the basis of these showings, we find that in 1976, CNJ could have sold all of its gondolas at the Wyer Dick price of $5,330 each. This price is consistent with the sales prices reported for gondolas of similar age in the GPs' own workpapers. See workpapers USR 92051–00000004–14; 3 CNJ App. 835–39.

■ CNJ also owned and classified for reuse 131 covered hoppers built in 1957. These hoppers were also classified for reuse by Wyer Dick and DeLeuw Cather, but both of these appraisers assigned them the lowest unit value of any resalable model ($3,453 and $4,433, respectively). CNJ's market data shows that in 1976, 100 twenty-eight year old covered hoppers were sold for $3,095 each. In the light of the applicable market data and the appraisals of Wyer Dick and DeLeuw Cather, we find that eighty-seven, or two thirds, of these units would have been sold for reuse at an average price of $3,453 each.

■ In the last category are 29 cabooses built in 1942 and valued by CNJ at $4,000 each. These units were 34 years old in 1976, were heated by pot-bellied stoves, were not air-conditioned, and lacked toilet facilities. Not only were they of outdated design, but they would have come on the market at a time when newer, more modern cabooses were readily available. Also, ca-

---

**83.** These figures represent the combined valuation of both the older and newer gondolas.

booses are normally built to conform to the purchaser's specific work rules, and CNJ's cabooses would not have been suitable to many potential purchasers. CNJ argues that Conrail's conversion program to renovate and standardize conveyed cabooses demonstrates the value of these units, but the cited testimony does not support CNJ's position. Accordingly, they should be valued as scrap.

## C. *Outstanding Equipment Obligations*

There is also dispute between the parties on the matter of outstanding equipment obligations. CNJ claims that these obligations total $1,356,000 while the GPs claim an outstanding balance of $1,624,000. These obligations stem from March 31, 1976 outstanding balances on certain locomotives and freight cars conveyed by CNJ which were subject to Conditional Sales Agreements.

In determining the amount of its outstanding equipment obligations, CNJ utilized the information contained in its own books and records used for the purpose of making its March 31, 1976 R–1 report to the Interstate Commerce Commission. The GPs, on the other hand, utilized a combination of their own hand calculations and computer printouts to calculate this figure, Murphy workpapers, 3 CNJ App. at 996–1011. We find that CNJ's figure is accurate and contains none of the flaws of the GPs' figures. For example, the GPs charge CNJ $35,135 in interest for Conditional Sales Agreements 3 and 4 which both sides agree would have been disaffirmed. Also, while the Conditional Sales Agreements call for level semi-annual payments, the GPs erroneously assumed declining payments for CNJ Sales Agreements 1 and 2. Workpaper USRA 9206500000032 and 00000028; 3 CNJ App. at 1011, 1007. Therefore, we adopt CNJ's figure for Outstanding Equipment Obligations.

## D. *Other Machinery and Equipment*

The remaining seven equipment classifications are Roadway Machines, Roadway Small Tools, Shop Machinery, Power Plant Machinery, Passenger Cars, Work Equipment and Miscellaneous Equipment. CNJ values these items at a total amount of $1,743,000 and the GPs at $649,000. Each of these classifications is discussed below.

### 1. *Roadway Machines*

The larger items in CNJ's Roadway Machines account include units such as Caterpillar Road Graders, Nordberg Hydrospikers, Kershaw Tie Cranes and Fairmont Rail Lifters, all of which are used by railroads for the purpose of maintaining track and roadbed. This account also includes smaller items such as rail drills, plate placers, tie saws, and rail saws. The GPs' valuation of these roadway machines is $400,000. CNJ values this asset category at $997,000. We find the GPs' valuation the more credible, and we therefore adopt it.

The testimony of Richard Browner, former CNJ Superintendent Work Equipment, was relied on by both sides and is by far the most detailed and persuasive evidence on this account. CNJ asserts that its valuation methodology was "based in large part" on 1974 meetings between Dunn and Browner in which Browner is said to have provided estimates of the market values of CNJ's roadway machinery. Browner's unrebutted testimony, however, is that these discussions did not concern market value, but only "original" cost and in some cases replacement cost. In its reply brief, CNJ failed to present a satisfactory explanation of how it might have reached its determinations of market value.

Moreover, Browner's testimony is not supportive of CNJ's contentions. Browner's testimony reveals not only that CNJ's roadway equipment was put to heavy use and was subject to rapid depreciation, but also that much of it was old and, in some cases, obsolete. Although some of the larger items could be maintained to last as long as 20 years, as CNJ contends, this does not indicate marketability. It is clear that much of CNJ's equipment was rebuilt and kept operational well beyond its expected service life simply because CNJ could not

afford to replace it. Even though such equipment was adequate to meet CNJ's continuing needs, the evidence is persuasive that it would not have been attractive to prospective purchasers in a competitive marketplace.

### 2. Roadway Small Tools

The next account item concerns CNJ's roadway small tools, which CNJ's Dunn valued at $14,000 and the GPs' Leseur at $2,000. This account contained such items as shovels, sledgehammers, pick axes, small power tools, air compressors and table saws for which there is a large ready market both within the railroad industry and without. CNJ's method of valuing these tools was as thorough and conservative as can be expected given the wide variety, scattered locations and relatively low value of the items in this account. CNJ took the $52,000 book value for these items, and trended them using the Bureau of Labor Statistics Indices to obtain estimated 1976 replacement costs. This figure was reduced by 50% to reflect depreciation and condition and then reduced another 90% to reflect the high cost of disposition due to the widely scattered locations of the tools on the railroad and the difficulty of collecting them for sale. CNJ Opening Brief at 449–50; 3 CNJ App. at 556–7, 651.

### 3. Shop Machinery

Evaluating this asset category is particularly difficult as CNJ never maintained shop machinery valuation records in any reliable manner. CNJ valued its shop machinery at $379,000, while the GPs assigned a value of $117,750 to this asset category. Again we adopt CNJ's valuation as we find it conservatively done and inherently credible. This asset category contains forklift trucks, lathes, drill presses, pipe threaders, small tools and other machinery "commonly found in any industrial shop". 3 CNJ App. at 657. Due to the lack of adequate records, CNJ witness Dunn used the 1969 inventories made by Wyer Dick eliminating machines retired in the interim and adding new ones. This list was then checked against a list prepared by the mechanics department in 1973. After this inventory list was developed, CNJ used the same basic methodology for determining the value of this asset category as it did for Roadway Small Tools. The 1976 replacement costs were reached by trending the indices of the Bureau of Labor Statistics. These figures were then reduced by 75% to reflect possible theft, collection costs, general depreciation and other factors. Machines that were found to be "functionally obsolete or out of service" were deleted from the inventory. 3 CNJ App. at 655. The GPs' lower figures are based on a variety of factors including CNJ's "heavy usage" of the machines, the limited resale value to other railroads and a strong glut effect on the used machinery market. 3 CNJ App. at 934, 964–69. We reject these contentions. There was no evidence that CNJ used these machines more than one eight-hour shift per day. Furthermore, these machines had wide utility outside the railroad industry and therefore any glut effect would have been greatly reduced.

### 4. Power Plant Machinery

Power plant machinery refers to power plant equipment in Elizabeth, New Jersey. The GPs failed to offer a valuation for this account. We therefore adopt the CNJ figure of $4,000. CNJ valued this asset as scrap, assuming no resale value. 3 CNJ App. at 564.

### 5. Passenger Train Cars

CNJ conveyed four passenger train cars. The GPs and CNJ have both placed a total value on these cars of $6,000, which we adopt.

### 6. Work Equipment

The GPs valued CNJ's work equipment at $88,700 and CNJ valued this asset category at $290,000. This difference is largely due to the fact that the GPs classified all of these items (primarily service cars and locomotive cranes) as scrap. CNJ classified 35 items as scrap for a total value of $59,500 and 21 items for resale at a combined value of $230,500. CNJ per-

suasively contends that the GPs' valuations of this asset category are placed in doubt by the inconsistencies between its prices for CNJ's work equipment and the prices placed on similar, though older and smaller equipment of other Transferors. CNJ Opening Brief at 457. The GPs valued 28 Diesel Locomotive Cranes of the Erie Lackawanna at $25,000 but classified CNJ's 7 newer and larger capacity cranes as scrap. *See* 3 CNJ App. at 736.

The remaining differences between the two parties are minor except for the valuation of two "air dumps." CNJ assigned a value of $6,000 each to these items. The GPs value these items as scrap but, as a GPs' workpaper, USR 9205100000015; 3 CNJ App. at 840, indicates, the CNJ figure is entirely credible. *See* CNJ Opening Brief at 458. Thus we adopt CNJ's estimate of $290,000 as the value of its work equipment.

### 7. *Miscellaneous Equipment*

██ The GPs value CNJ's miscellaneous equipment at $29,700 while CNJ values this equipment at $53,000. This asset category contains 12 trucks and a small amount of truck equipment which the parties agreed was saleable for reuse. While we readily admit that precise, item by item valuations are often not possible for large asset categories consisting of many disparate items, in this instance there was no reason for the GPs to lump together these few items into three categories ("Automobiles and Trucks," "Special Equipped Trucks" and "Hi Rail Equipment"). CNJ's analysis, which was done item by item, is inherently more credible and we adopt it. *See* 3 CNJ App. at 672. CNJ witness Dunn estimated resale values ranging from $400 each for CNJ's three 1968 Dodge vans to $15,000 each for two 1974 radio-equipped Ford dump trucks which cost $20,000 each in 1974.

We, therefore, find the liquidation value of CNJ's equipment, after deduction for related obligations, to be $6,053,041. The details are set forth in the following tables:

### Locomotives

| Description | Year Built | No. of Units | Unit | Total |
|---|---|---|---|---|
| EMD Switcher SW1 | 1939–42 | 4 | 9,100 | 36,400 |
| EMD Switcher NW2 | 1942 | 2 | 9,100 | 18,200 |
| EMD Switcher SW7 | 1950 | 4 | 9,100 | 36,400 |
| EMD Switcher SW9 | 1951–52 | 11 | 22,000 | 242,000 |
| EMD Road Switcher GP7, 7P | 1952 | 11 | 5 x 30,000 | 150,000 |
| | | | 6 x 9,100 | 54,600 |
| ALCO Road Switcher RS2 | 1950 | 8 | 9,100 | 72,800 |
| ALCO Road Switcher RS3 | 1951–53 | 18 | 9,100 | 163,800 |
| EMD Road Freight SD35 | 1965 | 12 | 182,000 | 2,184,000 |
| EMD Road Freight SD40 | 1967 | 8 | 246,375 | 1,971,000 |
| | | 78 | | 4,929,200 |

### Freight Cars & Cabooses

| Description | Year Built | No. of Units | Unit | Total |
|---|---|---|---|---|
| Box Cars | 1957 | 34 | 1,200 | 40,800 |
| Equipped Box Cars | 1956–57 | 12 | 1,200 | 14,400 |
| Gondolas | 1957–65 | 51 | 51 x 5,330 | 271,830 |
| Covered Hoppers | 1956–57 | 131 | 87 x 3,453 | 300,411 |
| | | | 44 x 1,400 | 61,600 |
| Cabooses | 1942 | 29 | 1,100 | 31,900 |
| | | 257 | | 720,941 |
| Scrap value of remaining cars | | 496 | | 612,900 |
| | | 793 | | 1,333,841 |

### Other Equipment Accounts

| Description | |
|---|---|
| Roadway Sm. Tools | 14,000 |
| Roadway Machinery | 400,000 |
| Shop Machinery | 379,000 |
| Power Plant Machinery | 4,000 |
| Passenger Cars | 6,000 |
| Work Equipment | 290,000 |
| Misc. Equipment | 53,000 |
| | 1,146,000 |

### Summary

| | |
|---|---|
| Locomotives | 4,929,200 |
| Freight Cars and Cabooses | 1,333,841 |
| Other Equipment Accounts | 1,146,000 |
| | 7,409,041 |
| Equipment Obligations | −1,356,000 |
| | 6,053,041 |

## VI. DEDUCTIONS FROM VALUE OF FACILITIES AND EQUIPMENT

### A. Winddown Costs

Winddown is described by the GPs as a discrete phase of activity that any operating railroad seeking to withdraw completely from the rail business would have to go through. During winddown the transferors would have issued embargoes or cancelled tariffs, completed the handling of the remaining freight traffic they were required or chose to accept, terminated passenger operations, and begun the processes of clearing their lines of foreign cars and assembling their own rolling stock for sale after it was no longer needed for rail service. At the same time, they would have accelerated preparations to dispose of assets—collecting, inspecting, and inventorying equipment, materials and supplies, advertising

and pursuing contacts with potential buyers—and would have made sales whenever possible. GPs Opening Brief at O–3.

The GPs contend that CNJ would have had to begin winddown on April 1, 1976, when permission to abandon rail service would have been received. Notices could then be sent out informing the public that all freight and passenger service would cease within a few weeks. Revenues would decline sharply during winddown, but operating costs could not be reduced in proportion to this fall. According to the GPs' consultant L. Michael Kenny, net operating losses could be minimized by conducting winddown in as brief a period as possible, with one month the minimum time in which an operation of CNJ's size could be halted. The GPs calculate that if CNJ had received permission to abandon effective on April 1, 1976, it would have incurred net operating losses of $744,803 during that month, of which $703,583 would be allocable to the conveyed assets. This amount, the GPs contend, should be deducted from the total liquidation value of the conveyed assets to arrive at net *realizable* liquidation value.

CNJ responds that no such expense would have been incurred after April 1, 1976 since all rail services would have ceased by that time. Winddown activities could have been conducted in prior months, particularly during the months immediately preceding April 1, 1976, with employees planning and preparing for a shutdown on that date while freight and passenger service continued in a diminishing degree.

In other words, the GPs assume a railroad operation running full tilt on March 31, 1976, with all aspects of the winddown remaining to be done after that date, whereas CNJ assumes a "dead railroad" on April 1, 1976, with the winddown already completed. The GPs appear to base their argument for a post-April 1, 1976 winddown on the assumption that CNJ could not have known precisely when the ICC would permit abandonment and would have had to operate normally until the permission to abandon was obtained. CNJ, on the other hand, contends that it would have known long

prior to April 1, 1976 that its abandonment could commence on or about that date.

As we have stated elsewhere with respect to sales of real estate, we consider CNJ's assumption to be the more plausible. In the *Rail Use Opinion,* we found that in the alternative scenario all "proposed sales and abandonments probably would have been completed on, but not before, April 1, 1976." 531 F.Supp. at 1294. Congress would likely have established some such date as the deadline for ICC action on all conveyances and abandonments. *Id.* at 1304. Hence CNJ is correct in supposing that the abandonment date would have been known in advance. We conclude that under the alternative scenario rail operations would not have continued on CNJ's conveyed properties for any significant period after April 1, 1976, and thus that the net operating losses due to winddown after that date would not have been substantial.

It may be true, on the other hand, that execution of a winddown program prior to April 1, 1976, would have augmented CNJ's losses for that period, despite CNJ's contention that the final weeks would have witnessed a surge of traffic which shippers would have wished to move while rail service remained available. But there are several reasons why we cannot translate such increased losses into an expense deductible from the otherwise realizable value of the conveyed properties. One is that the GPs, preferring to stake all on their position that the winddown would not have begun until April 1, 1976, have proffered no evidence of the extent to which losses prior to April 1, 1976 would have been augmented if CNJ had chosen to accomplish the winddown, in whole or in large part, before that date. Another is CNJ's claim that augmented losses prior to April 1, 1976, if any, would have been offset at least in part by federal interim assistance. *See Rail Use Opinion,* 531 F.Supp. at 1299. The GPs counter that federal subsidies would have been offered only to Transferors committed to preserving rail service on their lines and that once CNJ's hypothetical resolve to abandon rail service was known, interim financial aid

would have been cut off entirely. While there is some conceptual plausibility in this argument, we are not so sure that Congress would have made this distinction rather than provide a subsidy for all affected carriers [84] until any hope of continued rail service was lost. Finally, increased losses in the period prior to April 1, 1976 are not properly viewed as an expense which CNJ would have incurred in disposing of the property taken from it on that date. They would have resulted rather in a depletion of the current assets retained by the CNJ Trustee. CNJ could argue that such a depletion, if not reimbursed, might have qualified as a claim for compensable unconstitutional erosion, see *CUE Opinion*, 439 F.Supp. at 1356—against which the GPs might argue that, to the extent that the Rail Act relieved CNJ of such expenses by providing for continued rail service after April 1, 1976, this would constitute an element of "value of other benefits", see *CMV Opinion*, 445 F.Supp. at 1042–43, a subject which we have deferred for subsequent consideration if that should become necessary. It is greatly to be hoped that, as was the case with the many settlements we have approved, the parties can agree that CUE and VOB cancel each other out. In any event, arguments as to the effect of a hypothetical winddown prior to April 1, 1976 are not appropriate for consideration here.

The GPs' winddown deduction will therefore not be allowed.

B. *Liquidation Organization and Disposition Costs*

The GPs insist that, in order to calculate the net realizable value of CNJ's conveyed assets, a deduction must be made for all the expenses required to sell the assets. In other portions of this opinion we adopt the GPs' general position with respect to the costs of holding and selling CNJ's conveyed real estate. We have reduced the amount of the claimed deduction, and have con-

sidered and rejected, on the facts of this case, the GPs' proposal for a deduction of $703,583 for "winddown" expenses. We deal here with the GPs' proposed deductions for the costs of collecting, sorting, and safeguarding the conveyed facilities and equipment prior to sale, making emergency repairs, and negotiating sales of these assets. We also consider their contention that other costs of liquidating CNJ's total operation, such as settling interline accounts, closing out accounts receivable and payable, adjusting claims, and all other legal, accounting and management tasks involved in a liquidation, should be deducted.

CNJ contests the propriety of making any deduction from the sale price of its assets for the expenses of disposition and liquidation. The bases for this are (1) that its conveyed properties were not in fact dismantled and sold in a nonrail use liquidation, and (2) that they would not have been dismantled in the absence of the Rail Act since New Jersey would have bought them for continued rail use. The former argument requires little discussion since the question in any condemnation valuation is what the properties would have realized in the absence of condemnation. The latter argument is readily answered once CNJ's perception theory is rejected. New Jersey would have paid, or been required to pay in condemnation, only what CNJ could have obtained by liquidation. We proceed therefore to CNJ's alternative argument, in which we find considerable merit, namely, that the GPs' estimate of $5,434,794 for the deductions here under consideration is far too high.

It is unfortunate that the GPs did not develop independent estimates for the disposition and liquidation costs here considered, as they did for the asset values themselves, but relied instead on the study commissioned by CNJ's former Trustee from transportation consultants Wyer, Dick

---

**84.** The exercise in speculation about interim subsidies which the GPs ask us to pursue is particularly uninviting since, in the absence of the Rail Act, CNJ would have been proposing not an abandonment but a transfer of most or all of the conveyed lines to the State of New Jersey. The concept of abandonment of rail service exists with respect to CNJ only as a mechanism for establishing what New Jersey would have paid.

& Co. to value the railroad and its affiliated lines as of June 30, 1968. This study estimated the liquidation value of non-real estate assets at $40,067,500 and related liquidation expenses at $3,243,600 [85] (approximately 8.1% of liquidation value). Russell F. Murphy, a transportation consultant and former financial officer of USRA, testified for the GPs that he adjusted Wyer Dick's liquidation expense figure for inflation, the decrease in CNJ's size between 1968 and 1976, and possible double-counting, then allocated the resulting figure between CNJ's conveyed and retained properties, and discounted to present value as of April 1, 1976. Murphy's result, $5,434,794 in facilities and equipment disposition and liquidation costs, was approximately 32% of the GPs' estimated facilities and equipment liquidation value of $16,758,000. This fourfold increase in the ratio of disposition and general liquidation expenses to total non-real estate assets being valued [86] prompted CNJ to offer the testimony of Charles J. Meyer, now president of Wyer, Dick & Co. and principal author of the 1968 study, criticizing Murphy's adjustments at nearly every point. We here scrutinize Murphy's work for the flaws Meyer suggests, but do not subscribe to Meyer's and CNJ's broader conclusion that the potential flaws in Murphy's analysis make realistic adjustment of Wyer Dick's 1968 study impossible.[87]

### 1. Adjustment for Inflation

█ Murphy took as his starting point Wyer Dick's estimate of $3,803,050 [88] in liquidation expenses for CNJ and nine small affiliated lines. These expenses were largely attributable to labor costs, and most of the remainder, for supplies, space, and fringe benefits, had been computed as a percentage of labor costs. Murphy adjusted this figure upward for inflation between June 30, 1968, and April 1, 1976, calculating item by item on the basis of cost indices for railroads in the eastern United States. Murphy's result was $7,467,612, an increase of 96.4% over the 1968 figure.

CNJ disputes the increase first on the ground that whatever the other railroads were doing, CNJ substantially delayed wage increases beginning in 1971 and would have frozen wages altogether in the alternative scenario, and therefore should not be held to an industry-wide inflation index that showed wages rising 98% between 1968 and 1976. CNJ refrained from submitting evidence, presumably readily available to it, showing what wages the employees who would have been engaged in liquidation were actually receiving on April 1, 1976, and thereafter. The GPs, on the other hand, submitted an exhibit showing that CNJ had incurred wage increases of 53% between January 1971 and March 1974, 39 GPs Supp.App. at 188. We thus have no sufficient basis for scaling down Murphy's inflation adjustment by any determinable amount for the reason here considered.

CNJ's other argument against Murphy's inflation adjustment is that while Murphy assumed that nonproffered lines of the other Transferors would be disposed of for nonrail use, he made no study of the number of railroad laborers left unemployed by such dispositions and concluded that CNJ's labor costs over the disposition period would not be affected by any ensuing "labor glut". This contention, while rather amusing as an

85. The figure of $3,243,600, applies to CNJ alone. The Wyer Dick study estimated that the CNJ system, including nine small affiliated lines, would incur $3,803,050 in liquidation expense, excluding costs of selling real estate and real estate taxes. *See* Murphy Testimony, Feb. 16, 1982, at 4–64.

86. The increase in ratio is not quite so out of line as mere statement would make it appear; part of the difference is due to the GPs' much lower estimates of what was realizable.

87. CNJ's witness Storm estimated a mere $190,000 in disposition and liquidation ex-

penses not covered elsewhere in estimates of liquidation value and stipulated costs. Of this total, $164,000 was attributed to a small mechanical department staff retained for six months to assist in sales of equipment and $26,000 was provided for consultants to inspect dismantlement of trackwork. CNJ's reasons for excluding all other items of disposition and liquidation expense are examined in the remainder of this section.

88. *See* note 85, *supra*.

**1328**

effort by CNJ to hoist the GPs by one of their own petards, is not persuasive. The "labor glut" would not occur until April 1, 1976, and Murphy made no upward adjustments for inflation after that date. Any "glut" in the labor market thereafter might have slowed the rate of further inflationary increase, but would hardly have driven wages below the April 1, 1976 levels applied by the GPs throughout the disposition period. Finding no error in the GPs' inflation analysis within our ability to correct from the evidence, we accept Murphy's adjustment of Wyer Dick's figure upward to $7,467,612 to account for inflation from June 30, 1968, to April 1, 1976.

### 2. Adjustment for Reduction in Size of CNJ by 1976

Murphy next considered the decrease in CNJ's property and assets from 1968 to 1976. From mid-1968 to March 1976, CNJ curtailed its operations substantially (ceasing all operations in Pennsylvania), eliminated its affiliated lines, reduced its payroll from 3,536 employees to 1,779, and disposed of 67% of its rolling stock. Its real estate and amount of track showed less of a decline, from 481 road miles (for CNJ and affiliated lines) in 1968 to 327 in 1976, and from 1,108 track miles in 1968 to 680 in 1976.

Murphy made no reduction in the $7,467,612 disposition and liquidation expense figure for this decrease. It was his conclusion that Wyer, Dick & Co. "significantly understated" the costs of liquidating the larger CNJ system in 1968 and that the staffing of executive, legal, accounting, transportation, engineering, mechanical, purchasing, security, labor relations, and claims departments in the 1968 study was barely adequate to "carry out an orderly and efficient liquidation" of a railroad of CNJ's reduced size in April 1976, Murphy Testimony, February 16, 1982, at 20. It seems unfortunate that upon making this judgment Murphy did not begin afresh; certainly his approach of using the Wyer Dick study where it suited and rejecting it where it did not calls for careful scrutiny on our part.

Murphy's "best example" of inadequate staffing in the Wyer Dick study was the maintenance-of-equipment staff of five (three superintendents and two clerks) for the first six months of disposition, with one superintendent and one clerk remaining in the second year. He doubted that so small a staff would be adequate to sell off the locomotives and other rolling stock CNJ conveyed in 1976, given the repair functions he expected they would have to perform. However, as CNJ's witness Meyer demonstrated and the GPs have conceded, Murphy was in error when he supposed that this staff would have had repair duties. The Wyer Dick study made it quite clear that the costs of this mechanical department staff did "not include estimated equipment repair costs", which were included elsewhere in the study. The staff envisioned in Wyer Dick's study would have adequately handled the maintenance-of-equipment crew's remaining duty, the sale of locomotives and freight cars for reuse, and the Purchasing & Stores staff would have assisted in sales for scrap value.

Murphy's other examples of inadequate staffing are Wyer Dick's inclusion of a single train crew for gathering loaded cars from and returning empty cars to the dismantlement work trains and the inclusion of a maintenance-of-way staff of six to handle wreck-train service and emergency track maintenance. Again Meyer pointed out that Wyer Dick made ample provision for these functions in the form of a dismantlement force consisting of four work train gangs (revealed in Wyer Dick's workpapers to amount to 116 persons).

We find no specific support, therefore, for Murphy's conclusion that "excessively" tight staffing throughout Wyer Dick's study made its personnel tables appropriate for liquidating a much smaller CNJ in 1976. On the other hand, we recognize that a railroad cannot employ fractions of persons or expect to find individuals with expertise spanning several departments. According to the summary of Wyer Dick workpapers in Appendix 4A, pp. 4A–21 to 4A–24 of Murphy's testimony, most staff

functions were to be performed by single individuals for varying lengths of time. Still, with a 67% reduction in rolling stock and a 39% reduction in track miles, a 40% reduction in personnel and a proportionate reduction in other expenses would seem reasonable. We thus carry to the next round of adjustments in Murphy's testimony the reduced liquidation cost estimate of $4,480,567.

### 3. Adjustment for Division Between Conveyed and Retained Properties

Murphy's sequence of adjustments would next have us subtract those costs that would otherwise be "double-counted" because of inclusion elsewhere in the parties' Stipulation Regarding the Cost of Dismantlement and Transportation for Conveyed Trackwork dated December 11, 1981, and the GPs' proofs. Because all the costs addressed elsewhere in the stipulation for track dismantlement, real estate selling costs, and so forth are confined to CNJ's conveyed assets, and the figure of $4,480,-567 has not yet been allocated between conveyed and retained assets, to subtract for double-counting at this point would be a

clear error in computation. We therefore proceed directly to the allocation between conveyed and retained assets. We begin by noting that Murphy based his allocation of total liquidation costs solely on the proportions of track (92.1%, by track mile), rolling stock (100%), and real estate (78.6%, by acre) conveyed by CNJ. This resulted in an overall attribution of 85.6% of the liquidation costs to conveyed properties.[89]

Meyer testified on behalf of CNJ that the Wyer Dick study included many other categories of assets, all of which were retained by CNJ after April 1, 1976. Management of liquid assets, collection of accounts receivable, and liquidation of CNJ's investments in its affiliated lines are among functions left out of an allocation formula which focuses solely on proportions of real estate, rolling stock, and track. To the extent, therefore, that liquidation costs are attributable to these assets, Murphy's methodology misallocated them. We agree that a different allocation is necessary and conclude that the record permits the following division of Wyer Dick's valuation estimates between "conveyed" and "retained" asset types:

| | 1968 Value | "Retained" | "Conveyed" |
|---|---|---|---|
| Current Assets | 12,371,200 | | |
| Materials & Supplies | | | 2,018,200 |
| Other Current Assets | | 10,353,000 | |
| Special Funds | 1,037,500 | 1,037,500 | |
| Investments | 9,187,600 | 9,187,600 | |
| Properties | | | |
| Real Estate (78.6%) | 56,255,500 | 12,038,667 | 44,216,823 |
| Rolling Stock (100%) | 6,747,800 | | 6,747,800 |
| Track, Etc. (92.1%) | 7,749,700 | 612,226 | 7,137,474 |
| Other Assets & Charges | 2,972,700 | 2,972,700 | |
| TOTAL | 96,321,990 | 36,201,693 | 60,120,297 |
| (Percentage) | | (37.6%) | (62.4%) |

By this calculation, 62.4% of gross liquidation value was accounted for in Wyer Dick's study by asset and property categories corresponding to those conveyed in 1976, rath-

---

89. Murphy's estimate of undiscounted liquidation costs for the whole of CNJ, after elimination of double-counting and after substantial upward "corrections", was $8,688,701. The amount allocated to the conveyed properties was $7,441,168. Murphy Testimony, Feb. 16, 1982, at 46b, 47–50.

er than the 85.6% estimated by Murphy using divisions of real estate, rolling stock and track alone. It is true that some of Wyer Dick's disposition and liquidation costs, such as mechanical and engineering staffs, would be tied more or less completely to the facilities and equipment assets, while other costs, such as those for legal work (at $2,068,900, after adjustment for inflation, the largest single item in the study), accounting staff, and top management, are shared more evenly between these and the various asset categories wholly retained by CNJ, or even, as CNJ argues, are tilted more heavily toward the latter. Considering the breakdown of asset values and of liquidation expenses, we find that an allocation of 62.4% of total expenses to CNJ's properties and assets conveyed on April 1, 1976, is proper on the basis of the evidence. We therefore carry forward $2,795,874 to the next stage of adjustment.

### 4. Adjustment for Double-Counting

 We take up now the elimination of those costs of disposition and liquidation already accounted for in the stipulations and proofs submitted by the parties, as well as other corrections proposed by the parties in arriving at a proper estimate of liquidation expenses for the conveyed properties. Murphy deducted $243,655 attributable to real estate disposition costs already calculated by Tesh, $163,354 duplicative of the GPs' winddown estimate, $254,606 in transportation and train costs post-dating the end of the stipulated dismantlement period, and the whole of the expense allocated to the Trustee's Office, $1,030,561. When the last of these figures is reduced to the portion attributable to conveyed properties, a total of $1,304,685 would be subtracted from the figure carried forward, which would leave $1,491,189 in liquidation expenses net of double-counting. However, our disallowance of winddown expenses requires that Murphy's deduction of $163,354 for double-counting expenses of clerical forces and train costs required to return freight cars of other railroads at the end of winddown must be restored, making our running total $1,654,543.

CNJ, of course, does not take issue with these subtractions, but does contest Murphy's two further "corrections" adding $1,885,077 for management costs after the fifth year of liquidation activity and $333,705 for an increased security staff to deter pilferage and vandalism in the first year. As to the former, the expenses would relate solely to sale of remaining real estate, and have been rejected in another portion of this opinion. Any coordination of the few remaining in-house real estate sales personnel could have been handled by the Trustee's Office, for which the GPs correctly made no deduction. With respect to the latter correction, CNJ argues that an increase in security staff over that provided in Wyer Dick's study would not be warranted, especially in the light of the decrease in CNJ's assets between 1968 and 1976. Despite this we believe some increase in Wyer Dick's figure was warranted and allow an added $175,000 for security costs. Our figure for liquidation expenses is increased, therefore, to $1,829,543.

CNJ contends further that many expenses arguably covered by the Trackwork Dismantlement Stipulation are duplicated in expenses included in the Wyer Dick study and Murphy's security cost correction. The Stipulation, however, while providing for $5,400,000 in trackwork dismantlement and transportation costs, states in paragraph 4 that it does not cover the costs of:

> An engineering group to oversee the entire dismantlement process; a transportation group; maintenance of equipment group; personnel and payroll group; financial and accounting support; legal and management services; security forces; sales forces and expenses (other than freight); clerical forces above the field dismantlement level; taxes (other than payroll taxes for field dismantlement personnel), or the separate activities necessary for the winddown of rail operations.

In response, CNJ points to paragraph 7 of the Stipulation:

> The parties agree that the stipulated cost of dismantlement and transportation

would have been the amount stated [$5,400,000] regardless of the composition, number, kind or *employer* of work crews that would or might reasonably and feasibly have been used to dismantle trackwork. [Emphasis supplied.]

CNJ argues on the basis of paragraph 7 that the Stipulation contemplates a dismantlement by a contractor who purchases the trackwork in place and absorbs all supervision, management and clerical costs. This interpretation would fly in the face of paragraph 4, rendering all its exclusions meaningless, and would moreover require recalculation of the sale value of track material in order to compensate the contractor for his additional costs and risks. We reject CNJ's contentions of double-counting based on the Trackwork Dismantlement Stipulation.

Through Meyer's testimony CNJ made two larger points that can be treated as variations on the double-counting argument. The first is that the liquidation value of CNJ's conveyed properties should not be decreased by costs duplicating those CNJ has already incurred in the real world to wind up its rail operations on the retained properties. CNJ asserts that it has settled interline accounts, collected its receivables and paid its payables, adjusted claims against it, managed its liquid assets, and maintained its books and records at its own expense while undergoing reorganization. Although CNJ has not provided an estimate of these expenses, it contends that they duplicate most of the legal, accounting, and managerial functions assigned in the Wyer Dick study. At bottom, this argument on CNJ's part is that the costs of winding up corporate affairs and going out of business, as opposed to the direct costs of collecting and selling off the conveyed assets and properties, should be allocated wholly to the retained properties because in fact CNJ accomplished all these tasks on its own. Our allocation of only 62.4% of the total estimated costs of liquidation to the conveyed assets takes sufficient account of CNJ's argument. CNJ could not have escaped substantial additional legal, managerial, and accounting expenses in selling its conveyed assets in a nonrail use liquidation of the entire railroad.

CNJ's second broad double-counting argument is that the expenses it actually incurred in conveying its properties to Conrail, including the expenses of litigating this action, should offset any deduction for disposition costs and liquidation expenses. Such items are not appropriate for consideration in determining what CNJ could have obtained by sale of the conveyed properties for nonrail use. As the Supreme Court has said, "[a]ttorneys' fees and expenses are not embraced within just compensation for land taken by eminent domain", *Dohany v. Rogers,* 281 U.S. 362, 368, 50 S.Ct. 299, 302, 74 L.Ed. 904 (1930); *United States v. Bodcaw Co.,* 440 U.S. 202, 99 S.Ct. 1066, 59 L.Ed.2d 257 (1979).

#### 5. *Adjustment to Present Value*

Murphy's final adjustment, one welcomed by CNJ, is the reduction of the liquidation organization and disposition costs to their present value on April 1, 1976. Applying the stipulated discount rate of 9.13% to the figure of $1,829,543 at which we have arrived, and adopting the percentage allocations through the fifth year of disposition as estimated by Murphy in Appendix 10 of his testimony, table 10–8, we reach a figure of $1,683,592.

### VII. LEHIGH & NEW ENGLAND RAILWAY CO.

#### A. *Introduction*

The Lehigh & New England Railway Co. (L&NE) was operated for many years as part of the CNJ rail system. Jack D. Storm, in testimony submitted on behalf of L&NE, stated that his estimate of the net liquidation value of its conveyed properties was based on the same methodology employed in valuing the CNJ. Moreover, L&NE's seven-page brief "adopts those portions of the CNJ brief analyzing the Government Parties' evidence with respect to facilities and equipment", L&NE Brief at 4, and "the analysis and conclusions reached by the CNJ" with respect to deductions

from real estate base values for title defects and selling expenses. *Id.* at 6–7. Our task in resolving the difference between the GPs' valuation of L&NE's conveyed property, $927,000, and L&NE's own valuation of $3,459,000, is lightened by L&NE's nearly complete reliance on contentions of CNJ discussed in prior sections of this opinion.

### B. Real Estate

#### 1. Base Value

L&NE conveyed 433.9 acres of real estate, over 90% of which the GPs' appraisers characterized as "abutter" property marketable only to adjoining landowners. L&NE and the GPs have stipulated that the base value of this conveyed real estate is $642,198. Sp.Ct.Rptr. N–38960. The stipulation, however, expressly provides that the state of L&NE's title to the property is not considered, and that the figure represents the sum of individual parcel appraisals without discounting. The parties also agree that the stipulated base value takes no account of holding or selling expenses. L&NE adopts CNJ's position that no deduction for title defects or discounting should be made, and takes a 12.5% deduction for all costs of disposition.

#### 2. Adjustments to Base Value

■ (a) *Title Defects.* The GPs' largest deduction from the stipulated real estate base value is 44.531% for title defects. As we held in Section III.B.1, *supra,* some deduction for lack of title or the cost of curing title is necessary. However, the magnitude of the reduction in L&NE's case requires further scrutiny. Lacouture, the GPs' expert witness on title defects, examined 72.4% of L&NE's valuation maps to arrive at the 44.531% figure, making L&NE's title problems by far the worst of the five Trans-

ferors he considered.[90] The comparable reduction for CNJ's title defects was 7.187%. Lacouture explained the wide variation in title defect reductions as the result of two factors. First, L&NE's conveyed property included only rights of way assembled in the nineteenth century with whatever limited interests the railroad could then acquire, and no "major properties" such as CNJ's Elizabethport Yard, which was constructed later with more attention to the need for obtaining good title. Second, Lacouture found a correlation between lower per-acre value of properties and greater numbers of title defects. L&NE's conveyed real estate was substantially lower in value, at somewhat under $1500 per acre, than CNJ's, which came to more than $8300 per acre even by the GPs' appraisal. Additionally, L&NE's conveyed real estate consisted of rights of way along two branch lines likely to have been assembled around the same time with consistent inattention to the quality of title obtained, while CNJ's much larger conveyed property would be expected to show greater variation in quality of title. L&NE made no specific answer to these arguments. We conclude that Lacouture has satisfactorily explained L&NE's substantially larger reduction for title defects, and accordingly deduct 44.531% from the stipulated base value, leaving $356,221.[91]

■ (b) *Selling Costs.* We concluded in Section III.B.2, that the total deduction for CNJ's selling costs should be 11% of real estate base value. Storm testified on behalf of L&NE that 12.5% was deducted for the costs of disposition. L&NE's slightly higher figure is warranted because the per-acre value that could be realized from L&NE's conveyed property is lower. We noted in connection with CNJ's selling costs

---

**90.** As with CNJ, Lacouture's estimate of L&NE's title defect reduction includes two components: elimination of the base value of property subject to automatic reversion and other noncurable title defects, and deduction of the cost of removing the cloud on title to property subject to curable title defects. The latter was estimated by Alvin Freiberg, a Pennsylvania attorney with considerable real estate expe-

rience, at $5,980 in litigation costs, plus delay of 21.5 months in receipt of proceeds.

**91.** An even more drastic reduction for title defects, eliminating the base value of 114 acres of 208, was approved by the Interstate Commerce Commission, *Chicago & North Western Transp. Co., supra,* 363 I.C.C. at 959, and by the Seventh Circuit, 678 F.2d at 670–71 (1982).

that higher sales commissions are incurred with respect to less expensive properties. Accordingly, 12.5% is deducted from the remaining base value of L&NE's real estate, leaving a net figure of $311,693.

■ (c) *Discount to Present Value.* As our discussion in Section III.B.3 indicates, discounting is appropriate where the taking is of many parcels requiring several years to sell. We recognize, however, that sale of L&NE's 433.9 conveyed acres along two branch lines would be a much less complicated task than sale of CNJ's more than 3000 conveyed acres. We conclude that L&NE's real estate could all have been sold in a sufficiently short period to make unnecessary discounting of the proceeds or deduction for holding costs less appreciation.

## C. Facilities and Other Assets

Amounts of ties, rail, turnouts, other track material, and ballast along L&NE's 62.8 miles of track were stipulated by the parties. Sp.Ct.Rptr. N–37177 to N–37186. In accordance with the principles adduced in Part IV of this opinion, we assign value to these assets as follows:

### 1. Ballast

■ On behalf of L&NE, Storm calculated that the stipulated 140,510 cubic yards of ballast on L&NE's tracks could be sold at $1 per cubic yard, with costs of removal and sale totalling more than 50%, for an effective recovery of $70,000. The GPs ascribed no value to the ballast on conveyed property of CNJ and L&NE. For the reasons stated in Section IV.A, we conclude that the ballast had no value.

### 2. Ties in Track

■ Storm valued the stipulated 188,400 ties in L&NE's track at $496,000. The GPs contended that L&NE's ties were worthless. Although Storm's estimate of the number of ties reusable for rail purposes and for landscape purposes was more conservative than that employed in his valuation of CNJ's ties, we find it necessary to apply our conclusions in Section IV.B, *supra*. Adopt-

ing the estimate of 406 reusable ties per mile derived from the testimony of Mewhinney, we arrive at 16,768 ties along L&NE's 41.3 miles of main and branch track suitable for rail reuse. Applying Rodola's conclusions from his 1978 valuation, we value these ties at $2.50 each for a total of $41,920. We also take Rodola's estimate of 10% of the remaining ties, or 17,163, as a reasonable number for landscape use. At $2 each, the landscape ties could have been sold for a total of $34,326. The combined value of L&NE's ties is therefore $76,246.

### 3. Rail and OTM

■ The amounts of L&NE's rail and OTM of varying weights have been stipulated, and the valuations range from L&NE's $2,070,000 to the GPs' $871,000. We reiterate our conclusion in Section IV.C, *supra*, that rail weighing 130 lbs. or more could be sold for reuse, and adopt Storm's categorization of the proportions of 130–lbs. and 140–lbs. rail suitable for reuse and for scrap. As we noted in Section IV.C, *supra*, testimony established a limited reuse demand for rail weighing 110 to 115 lbs. Although CNJ conveyed no rail in that category, L&NE conveyed some 3,130 tons of 112–lbs. and 115–lbs. rail. Of the L&NE rail of this intermediate weight categorized by Storm as suitable for reuse, we determine that half could have been marketed for reuse and the rest would have been sold for scrap. Of L&NE's rail lighter than 110 lbs., all should be valued at scrap prices. We further apply the price of $207.50 per ton for reusable rail and the prices determined by CNJ for scrap. There is little difference between L&NE's estimate of $531,000 in track dismantlement costs and the GPs' estimate of $528,000. We adopt L&NE's figure. As we found in Section IV.C, *supra*, turnouts and OTM should be valued along with the rail they accompany.

### 4. Other Materials and Supplies

■ Storm's $21,000 valuation of L&NE's inventory of replacement parts, rail, OTM and ties is not supported by evidence in the record and cannot be adopted.

It was based on a letter received by Storm from L&NE's Trustee stating that a computer listing showed L&NE's physical inventory of materials and supplies as of March 31, 1976 at $34,893.39. Storm never received the computerized inventory from L&NE, but instead merely rounded this figure to $35,000 and applied a 40% across-the-board reduction to reach his $21,000 estimate. This showing fails to meet the requirement of "particularity" in the Sixth Pretrial Order. The GPs are correct, therefore, in assigning no value to L&NE's other material and supplies.

### 5. Miscellaneous Assets

■ L&NE's Trustee communicated to Storm an estimate of $2,000 for office equipment, furniture, and appurtenances, again with no effort at particularity. We adopt the GPs' contention that these assets should be given no value. Storm ascribed a "nominal value" of $1,000 to L&NE's communications facilities, while the GPs offered a more careful calculation of reuse, scrap, and dismantlement estimates to arrive at $660. We adopt the latter figure.

### D. Equipment

#### 1. Locomotives

■ L&NE conveyed two locomotives, both GP–7 road switchers built in 1952 and rebuilt in 1959 after they fell into New York Harbor. These locomotives are identified in a stipulation between the parties, Sp.Ct.Rptr. N–18110 to N–18113. L&NE values the locomotives together at $200,000 for reuse, while the GPs assign a scrap value of $17,000 for the pair. We determined in Section V.A, *supra,* that of the eleven CNJ switchers of the same vintage and model, six would have been sold for scrap and five would have been sold for reuse at $30,000 each. We conclude that L&NE's two locomotives, because of their refitting in 1959, could also have been sold for reuse, thus making their total value $60,000.

### 2. Cabooses

■ L&NE conveyed four cabooses, all built in 1937, and no other rolling stock. Sp.Ct.Rptr. N–37165 to N–37168. Storm valued the cabooses at $4,000 each, a price at which he thought hobbyists, hunters, and fishermen might purchase them. We conclude that the GPs are correct in assigning L&NE's cabooses a scrap value of $1,000 each, for a total of $4,000.

### 3. Roadway Small Tools, etc.

■ L&NE valued its Roadway Machines inventory, consisting of a tamper and a welder, Sp.Ct.Rptr. N–37169 to N–37172, at $7,000; its Roadway Small Tools inventory at $2,000; its Work Equipment at $7,000; and its Miscellaneous Equipment, consisting of two 1974 trucks, Sp.Ct.Rptr. N–37173 to N–37176, at $10,000. The GPs determined that no value should be given to Roadway Small Tools or Work Equipment, but that a combined $600 would compensate L&NE for its Roadway Machines and Miscellaneous Equipment. We find it implausible that L&NE's items of roadway machinery and trucks would be worth a mere $150 each and its other equipment categories not worth the effort of collection, sorting, and sale. We therefore accept L&NE's values for these asset categories.

### E. Winddown and Liquidation Organization and Disposition Costs

■ Murphy, testifying for the GPs, estimated that the costs of winding down operations and liquidating the conveyed portions of L&NE along with CNJ would have amounted to an incremental deduction of $85,000 over and above the costs of liquidating CNJ alone. He testified that liquidation of L&NE as an independent entity would have been much more expensive. Murphy stated in deposition that $15,000 of the $85,000 total would have been attributable to L&NE's winddown. In the light of our conclusion in Section VI.A, *supra,* that no deduction for winddown is warranted, this amount is subtracted from Murphy's estimate, leaving $70,000 as our estimate of

the costs of liquidating and disposing of L&NE's conveyed facilities and equipment.

## VIII. CONCLUSION

Petitions for reconsideration may be served and filed on or before 21 days from the filing of this opinion. Such petitions shall be limited to instances where the court is thought to have misapprehended evidence or to have erred in computations and shall not repeat arguments that have been made at length in the opening briefs and reply briefs and in oral argument and have been fully considered, see 531 F.Supp. at 1383. Such petitions shall be based solely on the record and shall not contain proffers of new evidence. Answers to such petitions shall be filed within 14 days.

We direct the parties, within 21 days from the filing of our ruling on any petitions for reconsideration (or, in the event that no such petitions are filed, within 35 days from the filing of this opinion), to submit an agreed judgment fixing the net liquidation value of the properties conveyed by CNJ in accordance with this opinion (and any opinion on the petitions for reconsideration) or if the parties are unable to agree, separate proposed judgments together with memoranda explaining the points of difference. The court considers the rulings in this opinion to be sufficiently definite and the amounts open to argument to be sufficiently small that the parties should be able to submit a single agreed judgment. Submission of the proposed judgment or judgments here directed will, of course, be without prejudice to the rights of the parties to review of our rulings by the Supreme Court of the United States. At the time when such judgment or judgments are submitted, the parties shall also indicate whether they agree that the court may take the net liquidation value as the base value of each certificate of value under § 306(c)(4) of the Act or whether either side desires to litigate the issues of the value of other benefits and compensable unconstitutional erosion as provided in §§ 306(c)(4)(B) and (C). This opinion shall not constitute a "finding or determination" within § 303(d) of the Rail Act until final judgment is entered.

### On Petition for Reconsideration

PER CURIAM:

In accordance with the first paragraph of Part VII of our opinion filed July 12, 1983, CNJ, the L & NE and the GPs have filed petitions for reconsideration and the adverse parties have responded. We rule as follows:

### I. Locomotives and Freight Cars

#### A. Scrap Steel Prices

██ CNJ objects to our pricing the steel in locomotives and freight cars that would be scrapped at $76 per ton, the figure that the GPs had proposed for all steel scrap, rather than at the CNJ's figure of $84 per ton, which we adopted for rail (pp. 1311–1313). The GPs concede the point and we accept the concession. However, we agree with the GPs that the $84 price should be applied to the tonnages calculated by the GPs' experts Mauro and Michaels rather than to the somewhat higher tonnages estimated by CNJ.

██ The GPs object to our valuation of eight MD SD40 road freight locomotives which admittedly were marketable for reuse (p. 1319). We adopted the Wyer Dick valuation of $1,971,000 which had been calculated on the basis of $219,000 for each of 9 locomotives. In fact one had been disposed of before the Wyer Dick study. The $219,000 figure should thus be applied to only 8 such locomotives for a total of $1,752,000.

The CNJ objects to our use (p. 1320) of a figure of $5,330 per unit for its gondola cars and says the correct figure is $6,569. It is unnecessary to state the reasons since the GPs agree.

In its answer to the GPs' petition for reconsideration CNJ urges for the first time that the GPs' expert Dunn erred in valuing at zero 112 [1] of the 496 freight cars valued

---

1. These were 105 covered hoppers and 7 gondolas, see Opinion pp. 1320 and 1324. The

as scrap because their value was less than the balance owing under a Conditional Sales Agreement (CSA), a methodology which we accepted—concededly without objection from CNJ. CNJ argues that the only deduction should have been for $94,181, the amount of CSA payments accruing after April 1, 1976, rather than the full amount of the CSA payments. The basis for this is a claim that "These overdue payments were satisfied by CNJ at the time of its reorganization and only the final installment on the CSA (due 10/1/76) was to be paid by ConRail." We do not pass on the merits of the argument since it comes too late for consideration in this valuation proceeding and the factual assertion is without record support. Our ruling is without prejudice to CNJ's advancing a claim against Conrail for unjust enrichment from this transaction in any court of appropriate jurisdiction if so advised.[2]

The following tables represent our recalculation of the value of CNJ's locomotives, freight cars and cabooses and other equipment accounts:

### Locomotives

| Description | Year Built | No. of Units | Unit Value 4/1/76 | Total |
|---|---|---|---|---|
| EMD Switcher SW1 | 1939–42 | 4 | 9,700 | 38,800 |
| EMD Switcher NW2 | 1942 | 2 | 9,700 | 19,400 |
| EMD Switcher SW7 | 1950 | 4 | 9,700 | 38,800 |
| EMD Switcher SW9 | 1951–52 | 11 | 22,000 | 242,000 |
| EMD Road Switcher GP7, 7P | 1952 | 11 | 5 x 30,000<br>6 x 9,700 | 150,000<br>58,200 |
| ALCO Road Switcher RS2 | 1950 | 8 | 9,700 | 77,600 |
| ALCO Road Switcher RS3 | 1951–53 | 18 | 9,700 | 174,600 |
| EMD Road Freight SD35 | 1965 | 12 | 182,000 | 2,184,000 |
| EMD Road Freight SD40 | 1967 | 8 | 219,000 | 1,752,000 |
| | | | | 4,735,400 |

### Freight Cars and Cabooses

| Description | Year Built | No. of Units | Unit Price 4/1/76 | Total |
|---|---|---|---|---|
| Box Cars | 1957 | 34 | 1,300 | 44,200 |
| Equipped Box Cars | 1956–57 | 12 | 1,300 | 15,600 |
| Gondolas | 1957–65 | 51 | 6,569 | 335,019 |
| Covered Hoppers | 1956–57 | 131 | 87 x 3,453<br>44 x 1,500 | 300,411<br>66,000 |
| Cabooses | 1942 | 29 | 1,300 | 37,700 |
| | | 257 | | 798,930 |

GPs' petition for reconsideration had not injected the issue, as CNJ's answer intimates; the GPs simply followed a methodology to which CNJ had never objected and which CNJ had used in its opening brief.

2. If the GPs should consider CNJ's claim to be meritorious, they are, of course, free to accept it in this proceeding, in whole or in part.

### Freight Cars and Cabooses

| Description | Year Built | No. of Units | Unit Price 4/1/76 | Total |
|---|---|---|---|---|
| Covered Hoppers | | 176 | 1,500 | 264,000 |
| " " | | 105 | CSA | 0 |
| Flat Cars | | 9 | 1,700 | 15,300 |
| Box Cars | | 163 | 1,300 | 211,900 |
| Open Hoppers | | 26 | 1,500 | ·39,000 |
| Cabooses | | 10 | 1,300 | 13,000 |
| Gondolas | | 7 | CSA | 0 |
| | | 496 | | 543,200 |
| TOTAL | | 753 | | 1,342,130 |

### Other Equipment Accounts

| Description | Total |
|---|---|
| Roadway Sm. Tools | 14,000 |
| Roadway Machinery | 400,000 |
| Shop Machinery | 379,000 |
| Power Plant Machinery | 4,000 |
| Passenger Cars | 6,000 |
| Work Equipment | 290,000 |
| Misc. Equipment | 53,000 |
| | 1,146,000 |

### Summary

| | |
|---|---|
| Locomotives | 4,735,400 |
| Freight Cars and Cabooses | 1,342,130 |
| Other Equipment Accounts | 1,146,000 |
| | 7,223,530 |
| Equipment Obligations | −1,356,000 |
| | 5,867,530 |

## II. *Ties*

CNJ and L & NE attack our reliance (pp. 1304–1305 and 1313) on the valuation made in 1978 by Rodola, Wyer Dick's project manager for the study of the CNJ's liquidation value, as supported by the testimony of GP witness Mewhinney. As it has done throughout this proceeding, CNJ does not adequately recognize that the issue with respect to ties is not simply reusability but also marketability, and it has failed to supply any estimate that we could reasonably accept. With the CNJ's figure clearly too high and the GPs' too low, we continue to believe that the amounts fixed in our opinion represent the best solution available on the record.

## III. *Real Estate*

### A. *Testimony of Hannoch and Heaney*

██ CNJ criticizes the portion of our opinion (pp. 1285–1287) which concluded that its appraisers, Hannoch and Heaney, "employed two assumptions that detract significantly from the reliability of their estimates." One was "that all CNJ real estate would continue to be served by a rail line if the purchaser so desired." CNJ argues that Hannoch and Heaney assumed continued rail service only "in those areas where rail was a factor to the users of land." Hannoch/Heaney Deposition, March 24, 1982 at 750, 5 CNJ App. at 0084. Our criticism, still unanswered by CNJ, was that this assumption was unjustified and that the record supplied no way to adjust for the error. The other assumption was that, with respect to embankments, the land would be returned to its original contours prior to sale, this being based on the premise that fill materials could be sold on site for a price greater than the cost of removal. CNJ now argues that any error on this score had only minor effect and has presented tables, purportedly constructed from the record, showing that 94.2% of the values in Essex County, 95.4% of the values in Hudson County, and 79.17% of the values in Union County were in level parcels; it suggests that we adopt the Hannoch-Heaney valuations for the level parcels and the Van Horn valuations for the balance. The

GPs object that the proposal comes too late since it would deny them opportunity for cross-examination and rebuttal of the classifications now made by CNJ counsel. We agree. CNJ knew all along that the topography issue was very much in the case. At this late stage it will not be allowed to reverse its tactical decision to go all-out for the Hannoch-Heaney approach to that issue.

### B. *Adjustments to Van Horn valuations*

On the other hand, we agree with some but not all of CNJ's arguments that Van Horn's valuations require upward adjustment.

#### 1. *Bridge dismantlement and removal costs*

■ The parties had entered into a stipulation on February 5, 1982, that the NLV of CNJ's bridges should be taken as zero. Sp.Ct.Rptr. NO39193. However, Van Horn had deducted $559,000 for bridge removal costs and CNJ asks that this be added. The CPs concede that an adjustment should be made. However, they disagree with the amount since they had already made a partial adjustment by valuing at zero parcels where Van Horn's appraisal showed a negative value after removal. We find that an upward adjustment of $349,800 is required.

#### 2. *Omitted parcel*

Both sides agree that an upward adjustment of $75,000 should be made because of Van Horn's omission of a parcel in Union County designated as Ig/2/3.

#### 3. *Title Defects*

CNJ argues that we have double-counted in making an adjusted deduction of 7.162% from base value for title defects on the basis of the testimony of Lacouture (pp. 1290–1292) and that Van Horn made an adequate deduction for this factor.

■ The workpapers supplied in the appendix to CNJ's petition for rehearing (5 CNJ App. at 0002) show that it has considerably exaggerated the impact of what Van Horn did on this score and that it is feasible to make an adequate adjustment for double counting without rejecting Lacouture's careful study. The workpapers relate to only 21 parcels with a total area of 116.3 acres. Of these Van Horn considered title to 28.9 acres to be impaired and to 87.4 to be unimpaired. However, of the 28.9 acres with impaired title he valued 20.9 at $118,500. With but one exception (parcel Ib/9/2) Van Horn valued impaired and unimpaired portions of the same parcel at the same per acre price and applied the same liquidation factor. In other words, when Van Horn did assign value to land with impaired title, he made no deduction for the impairment. Accordingly, there is no double counting in applying Lacouture's discount to the valued acreage. This leaves only 8 acres to which Van Horn ascribed no value because of the impairment. In all but a few instances it is possible to value these impaired acres at the same price per acre as unimpaired portions of the same parcel and then apply Lacouture's discount. Where this is not possible because the entire parcel suffered an impairment, an imputed value (i.e., what the land would be worth but for the impairment) can be reached, perhaps a bit too favorably to CNJ, on the basis of the average per-acre price of all valued parcels, to wit, $12,400 per acre, or a total of $163,700. Van Horn's base value should be increased by that amount, less the generally applicable 7.162% deduction for title defects, or a net increase of $151,976.

#### 4. *"Free standing" parcels*

CNJ objects that Van Horn appraised certain parcels without regard to the higher price they would have commanded if sold along with retained parcels. The latter method of valuation would have been permissible, see *Olsen v. United States,* 292 U.S. 246, 256, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934), and apparently was adopted by the appraisers for both CNJ and the GPs. However, it is impossible to determine how much Van Horn would have increased his valuations if he had adopted the approach now urged.

### 5. Appreciation from 1974 to April 1, 1976

█ CNJ urges that since Van Horn used 1974 market values, these should be adjusted upward by 8% to reflect appreciation to April 1, 1976. The issue is problematic. Van Horn used some comparable sales that were later than 1974 and some that were even later than April 1, 1976 (Opinion p. 1288), although he used earlier ones as well. Although he was of the opinion that there had been appreciation between 1974 and April 1, 1976, of "less than 10 percent", he refused to set a percentage or to say that an adjustment was required. Wyer Dick's former president, Shannon, a witness for CNJ, testified that real estate values in Northern New Jersey had declined, as did the GPs' witness Eastdil. Although we could well stand on our opinion, we have determined that in the interest of entire fairness to CNJ, Van Horn's base value should be increased by 3% to reflect appreciation to April 1, 1976.

### 6. "Rapid Sale" Valuation

█ CNJ contends that we should not have discounted Van Horn's base values because Van Horn included among "liquidation factors" a component calculated to bring about "rapid sale" of the real estate. Van Horn's testimony as to what he meant by "rapid sale" is vague.[3] It is clear that his "rapid sale" assumption was not the same as a "forced sale" or "distress" price valuation, see GPs' Opening Brief at G–19 to G–23. There is nothing to indicate that he assumed a particularized pace of sale and applied discounts to reflect this. To the contrary he testified that a particularly ill-situated parcel would be disposed of under his "rapid sale" approach in "something less than eight years". We have determined that 55% of the conveyed real estate would be sold in the first two years and that only 5% would remain to be sold in the 8th year, and there is no way to tell how much more rapid pace Van Horn assumed.

However, again in the interest of complete fairness to CNJ, we will increase his base values by another 3% in order to protect against possible double discounting.

### IV. Liquidation Organization and Disposition Costs

The GPs contend that we erred in rearranging the order of the steps by which the GPs' witness Murphy updated Wyer Dick's 1968 study of these costs. According to the GPs, the subtraction of certain double-counted costs (Opinion, p. 1330) should have preceded our adjustment for the decrease in the size of CNJ's operations from 1968 to 1976 and the division between CNJ's conveyed and retained assets on pp. 1328–1329 of the opinion.

█ Our original reading of Murphy's testimony was that he meant the double-counted costs for trackwork and real estate disposition to reflect solely those expenses attributable to the conveyed assets, as measured by the GPs' witness Tesh and as reflected in the dismantlement stipulation. However, we conclude that the GPs are correct in stating that the numbers Murphy used are those of the 1968 Wyer Dick study updated to 1976 and reflect a larger "whole" CNJ. We therefore sustain the GPs' contention that the double-counted costs should be subtracted before applying our succeessive 40% and 37.6% reductions, in the general manner set forth on p. 14 of their petition for reconsideration.

### V. Method of Discounting

█ Although neither petition for reconsideration raises a question as to the method for discounting payments to be received and made after April 1, 1976, comparison of the method of discounting used on the last page of the GPs' recalculation of liquidation organization and disposition costs (GPs' Petition, Exhibit 3) and that used by CNJ in connection with its pace of sale argument (CNJ's Petition, p. 17), makes it evident that the parties differ in

---

**3.** He defined the term to mean an attempt to reach a value "at which sale could be made without any undue delay and, in fact, without

what might be considered a normal waiting time for the sale of the property." Van Horn Deposition, June 29, 1982, at 151–52.

·their application of the stipulated 9.13% discount factor. Although we could leave this for the parties to work out in their discussions on an agreed judgment (Opinion, p. 1335), we think it preferable to instruct that all proceeds and expenses for a given year should be treated as being received or paid at the mid-point of the year.

We have carefully reviewed such other points as are raised in CNJ's petition for reconsideration. Almost all of these constitute reargument of issues already considered and decided and do not merit further discussion.

The parties shall now proceed as directed by the final paragraph of our opinion filed July 12, 1983.